Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, California 94612-1810
Telephone: (415) 436-9682
Facsimile: (510) 844-7150
lbelenky@biologicaldiversity.org

Deborah A. Sivas (CA Bar No. 135446)
Alicia E. Thesing (CA Bar No. 211751)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone:  (650) 723-0325
Facsimile:  (650) 723.4426
dsivas@stanford.edu
athesing@stanford.edu

Attorneys for Desert Survivors, Center for
Biological Diversity, WildEarth Guardians, and
Western Watersheds Project

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (San Francisco Division)

| | |
|---|---|
| DESERT SURVIVORS; CENTER FOR BIOLOGICAL DIVERSITY; WILDEARTH GUARDIANS; and WESTERN WATERSHEDS PROJECT,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>          Defendants. | Case No.  3:16-cv-1165<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      The Bi-State Sage-Grouse is a small, genetically unique population of the greater sage-grouse that straddles the border of eastern California and western Nevada. These iconic birds, known for their elaborate mating dance, have lost half of their habitat and experienced even greater population losses.

2.      In 2013, after years of research and consideration, the U.S. Fish and Wildlife Service ("Service"), the federal agency charged with listing determinations under the Endangered Species Act, proposed listing the Bi-State Sage-Grouse as a threatened species and proposed to designate over 1.8 million acres of habitat as critical habitat for the Bi-State Sage-Grouse population.  Then, in 2015, the Service reversed its position and withdrew its science-based listing proposal.  Although the Service found that some of the isolated populations of Bi-State Sage-Grouse may be completely wiped out in the foreseeable future, it irrationally concluded that the Bi-State Sage-Grouse was not endangered or threatened throughout a significant portion of its range.  It also relied on the same uncertain conservation measures that, just two years earlier, the Service correctly deemed insufficient to protect the bird when it proposed listing the Bi-State Sage-Grouse.

3.      Plaintiff environmental groups challenge the withdrawal of the proposed rule to list the species because it was arbitrary and capricious and not in accordance with the law.  Plaintiffs seek, *inter alia,* an order directing the agency to vacate that decision and remand the proposed listing rule to the Service to reconsider listing the Bi-State Sage-Grouse as required by the Endangered Species Act.

**JURISDICTION**

4.      This action arises under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44, and the Administrative Procedure Act, 5 U.S.C. §§ 551, 701-06 ("APA"). The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as defendant), 1361 (action to compel agency performance of duty), and/or 2201-2202 (declaratory and injunctive relief).  Plaintiffs have properly given notice to Defendants of their

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1   claims under the ESA in accordance with 16 U.S.C. § 1540(g)(2).

**VENUE**

3   5.     Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because Desert

4   Survivors resides in this district, and Center for Biological Diversity is incorporated in and

5   maintains an office in this district.

**INTRADISTRICT ASSIGNMENT**

7   6.     Pursuant to Civil Local Rules 3-2(c) and 3-2(d), this action is properly assigned to

8   either the San Francisco or Oakland Division of this Court because Plaintiff Desert Survivors

9   resides in Alameda County, and Plaintiff Center for Biological Diversity maintains offices in

10  Alameda County.

**PARTIES**

12  7.     Plaintiff DESERT SURVIVORS is a non-profit corporation based in Oakland,

13  California.  Desert Survivors is a conservation organization with more than 700 members

14  primarily in California and Nevada, focused on the protection of desert plants, wildlife, and

15  ecosystems.  Desert Survivors also engages in a vigorous program of public education about desert

16  lands and their unique character.  Desert Survivors' primary goals are to protect fragile desert

17  lands and to teach visitors to those lands about their value.  Desert Survivors leads educational

18  trips to desert lands.  Desert Survivors has led more than 400 such trips to the desert including

19  many trips to areas inhabited by the Bi-State Sage-Grouse including in and near Mono Lake, the

20  Bodie Hills, and the White Mountains.

21  8.     Desert Survivors brings this action on its own institutional behalf and on behalf of

22  its members, many of whom regularly enjoy and will continue to enjoy educational, recreational,

23  and scientific activities regarding the Bi-State Sage-Grouse.  The interests of Desert Survivors and

24  its members in observing, studying, and otherwise enjoying the Bi-State Sage-Grouse have been

25  harmed by defendants' actions.

26  9.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit

27  501(c)(3) corporation headquartered in Tucson, Arizona, with offices throughout the country,

28

1   including in California and Nevada.  The Center is dedicated to the preservation, protection, and

2   restoration of biodiversity, native species, and ecosystems.  The Center works through science,

3   law, and policy to secure a future for all species, great or small, hovering on the brink of

4   extinction.  The Center has more than 50,000 members, including many who reside in, explore,

5   and enjoy the native species and ecosystems of California and Nevada where the Bi-State Sage-

6   Grouse Distinct Population Segment is located.

7         10.    The Center brings this action on its own institutional behalf and on behalf of its

8   members, many of whom regularly enjoy and will continue to enjoy educational, recreational, and

9   scientific activities regarding the Bi-State Sage-Grouse.  The interests of the Center and its

10   members in observing, studying, and otherwise enjoying the Bi-State Sage-Grouse have been

11   harmed by defendants' actions.

12         11.    Plaintiff WILDEARTH GUARDIANS ("Guardians") is a west-wide non-profit

13   conservation organization with over 130,000 members and activists dedicated to protecting the

14   wildlife, wild places, wild rivers, and the health of the American West.  Guardians has a

15   longstanding interest in protecting and restoring the Bi-State Sage-Grouse and its habitat in

16   California and Nevada.

17         12.    Guardians brings this action on its own institutional behalf and on behalf of its

18   members, many of whom regularly enjoy and will continue to enjoy educational, recreational, and

19   scientific activities regarding the Bi-State Sage-Grouse.  The interests of Guardians and its

20   members in observing, studying, and otherwise enjoying the Bi-State Sage-Grouse have been

21   harmed by defendants' actions.

22         13.    Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a conservation

23   organization that was founded in 1993 with the mission of protecting and restoring western

24   watersheds and wildlife on public lands through education, research, public policy initiatives, and

25   litigation.  Headquartered in Hailey, Idaho, WWP has 1,400 members and field offices in Idaho,

26   California, Montana, Oregon, Wyoming, and Arizona.  WWP has actively advocated for statutory

27   and regulatory protection of sagebrush-obligate species, including the Bi-State Sage-Grouse, since

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1  its formation.

2      14.     WWP brings this action on its own institutional behalf and on behalf of its

3  members, many of whom regularly enjoy and will continue to enjoy educational, recreational, and

4  scientific activities regarding the Bi-State Sage-Grouse.  The interests of WWP and its members in

5  observing, studying, and otherwise enjoying the Bi-State Sage-Grouse have been harmed by

6  defendants' actions.

7      15.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR ("Interior") is

8  ultimately responsible for the administration and implementation of the ESA with regard to

9  terrestrial endangered and threatened species, and for compliance with all other federal laws

10 applicable to the Interior.

11     16.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("Service") is an

12 agency within the Interior authorized and required by law to protect and manage the fish, wildlife,

13 and native plant resources of the United States, including enforcing and implementing the ESA.

14 The Service has been delegated primary authority for the day-to-day administration of the ESA

15 with respect to terrestrial species.

16                          **LEGAL BACKGROUND**

17 **A.     Listing a Distinct Population Segment Under the Endangered Species Act**

18     17.     The ESA was enacted, in part, to provide a "means by whereby the ecosystems

19 upon which endangered species and threatened species depend may be conserved [and] a program

20 for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).

21     18.     The Service decides to list a species as endangered or threatened under the ESA

22 based upon a consideration of five factors: "A) the present or threatened destruction, modification,

23 or curtailment of [the species'] habitat or range; B) overutilization for commercial, recreational,

24 scientific, or educational purposes; C) disease or predation; D) the inadequacy of existing

25 regulatory mechanisms; or E) other natural or manmade factors affecting [the species'] continued

26 existence."  16 U.S.C. § 1533(a)(1).  The Service must make listing decisions "solely on the basis

27 of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  Listing of a

28

species may be done in response to a petition.  16 U.S.C. § 1533(b)(3)(A).

19.     The ESA defines a "species" as including "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).  The Service weighs three factors in determining whether a segment of a species is a Distinct Population Segment ("DPS") and should be listed: 1) the discreteness of the population segment in relation to the remainder of the species to which it belongs; 2) the significance of the population segment to the species to which it belongs; and 3) the population segment's conservation status – whether it would treated as endangered or threatened if it were a species – in relation to the ESA. 61 Fed. Reg. 4725 (Feb. 7, 1996).

**B.      Significant Portion of Its Range Policy**

20.     Under the ESA, the Interior and the Service must list a species if it is endangered or threatened throughout "all or a significant portion of its range."  16 U.S.C. §§ 1532(6) (defining "endangered species"), 1532(20) (defining "threatened species"), 1533(a)-(b) (describing the listing process).

21.     On July 1, 2014, the Interior and the Service published the Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species" ("SPOR Policy"), a final rule interpreting the statutory language "significant portion of its range."  79 Fed. Reg. 37578-612 (July 1, 2014).

22.     The SPOR Policy concludes, "if a species is found to be endangered or threatened throughout a significant portion of its range, the entire species is listed as endangered or threatened, respectively, and the [ESA's] protections apply to all individuals of the species wherever found."  79 Fed. Reg. at 37578.  Additionally, "if a vertebrate species is endangered or threatened throughout [a significant portion of its range], and the population in that significant portion is a valid [DPS, the agency] will list the DPS rather than the entire taxonomic species or subspecies."  *Id.*

23.     A portion of the species' range is significant under the SPOR Policy "if the species

is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range." *Id*.

24.     In the SPOR Policy, the Service defined a species' range as "the general geographical area within which that species can be found at the time [the agency] makes any particular status determination." *Id*.  Historical range is not considered as part of the "significant portion of its range" analysis.  The Service chose not to include historical range because the text of the ESA, specifically, the phrase "is in danger of extinction" is in the present tense.  79 Fed. Reg. at 37583.

25.     The Service will only analyze whether a portion of the species' range is significant if the species is not already listed on "all" of its range.  79 Fed. Reg. at 37579.  In making a listing determination, the agency will first look at whether a species classifies for rangewide listing.  *Id*. Under the SPOR Policy, the agency then looks to portions and asks "whether the species would be in danger of extinction or likely to become so in the foreseeable future without that portion, i.e., if the members of that portion were not just currently imperiled, but already completely extirpated." 79 Fed. Reg. at 37581.

26.     The determination of a portion's significance depends on whether the species on that portion of the range is biologically important to the conservation of the species as a whole using the concepts of redundancy, resiliency, and representation ("the three Rs").  79 Fed. Reg. at 37581.  Resiliency "refers to the capacity of an ecosystem, population, or organism to recover quickly from disturbance by tolerating or adapting to changes or effects caused by a disturbance or combination of disturbances." *Id*. at 22839.  Redundancy "refers to the ability of a species to compensate for fluctuations in or loss of populations across the species' range such that the loss of a single population has little or no lasting effect on the structure and functioning of the species as a whole." *Id*.  Representation "refers to the conservation of the diversity of a species, including genetic makeup." *Id*.  The analysis of the three Rs "evaluates current and anticipated threats."

1  79 Fed. Reg. at 37582.

2       27.    In the SPOR Policy, the Service provides examples of when a portion of the range

3  of a species might be significant: if the remainder of the population "might not be large enough to

4  be resilient to environmental catastrophes or random variations in environmental conditions," if

5  the viability of the species depends on the portion to maintain a high-enough growth rate, if the

6  spatial structure of the remainder would be too disrupted and fragmented to persist, or if the

7  portion of the range population "contains important elements of genetic diversity" that make the

8  entire species diverse enough to allow for adaptation to changing environmental conditions.  79

9  Fed. Reg. 37583.

10       28.    The Service relied on the SPOR Policy in making its determination to withdraw the

11  proposed listing for the Bi-State Sage-Grouse.

12  **C.     Policy for the Evaluation of Conservation Efforts**

13       29.    Under the ESA, the Service shall make listing decisions "after taking into account

14  those efforts, if any, being made by any State or foreign nation, or any political subdivision of a

15  State or foreign nation, to protect such species."  16 U.S.C. § 1533(b)(1)(A).

16       30.    On March 28, 2003, Interior and the Service published the Policy for Evaluation of

17  Conservation Efforts When Making Listing Decisions ("Conservation Policy").  68 Fed. Reg.

18  15100 (March 28, 2003).  The Conservation Policy establishes criteria to be applied by the Service

19  in evaluating whether identified, but not yet implemented, conservation efforts can be considered

20  as part of a listing decision.  *Id.*  Such efforts can be federal, state, tribal, or private.  *Id.*

21       31.    The Service evaluates conservation efforts according to two criteria: (1) certainty of

22  implementation and (2) certainty of effectiveness.  *Id.* at 15101.  To warrant consideration in a

23  listing decision, the Service must find that a conservation effort is "sufficiently certain to be

24  implemented and effective so as to have contributed to the elimination or adequate reduction of

25  one or more threats to the species identified through the section 4(a)(1) analysis."  *Id.* at 15115.

26  The Conservation Policy identifies nine criteria for evaluating certainty of implementation, and six

27  criteria for evaluating certainty of effectiveness.  *Id.* at 15114-15.

28

32.     Regardless of the adoption of a conservation effort, the Service must proceed with appropriate rule-making activity if the best available scientific and commercial data indicates that the species is endangered or threatened.  *Id.* at 15115.

33.     In issuing its 2013 Proposed Listing, the Service did not evaluate the 2012 Bi-State Action Plan under its Conservation Policy framework.  *See* 78 Fed. Reg. at 64358-64384.

34.     In issuing its 2015 Listing Withdrawal, the Service applied the Conservation Policy to the 2012 Bi-State Action Plan.  80 Fed. Reg. at 22828, 22847.  The agency concluded that the conservation efforts described in the Bi-State Action Plan met the criteria for certainty of implementation and certainty of effectiveness.  *Id.*  Based on this determination, the Service concluded that the Bi-State Sage-Grouse DPS was not threatened and withdrew the proposed rule.  *Id.* at 22849.

**D.      The Administrative Procedure Act**

35.     The Administrative Procedure Act provides for judicial review of "final agency action," 5 U.S.C. § 704, by "adversely affected or aggrieved" persons, 5 U.S.C. § 702.

36.     A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

37.     The Service's 2015 Listing Withdrawal is reviewable as a final agency action.

**FACTUAL BACKGROUND**

**A.      Bi-State Sage-Grouse Distinct Population Segment**

38.     Sage-grouse are large, striking birds known for their elaborate mating ritual.  Males puff their chests, flutter their wings, and emit a unique sound during their mating dance performed on mating grounds called leks.  These ground-dwelling birds depend on large, interconnected expanses of sagebrush interspersed with native grasses and flowering plants for food and habitat.

39.     Sage-grouse are considered an umbrella species, or a species whose conservation would confer benefits on a host of other birds and mammals in the ecosystem.

40.     The Service recognizes the sage-grouse found in the far southwestern reach of the

greater sage-grouse's range, the Mono Basin area, as a Distinct Population Segment called the Bi-State Sage-Grouse, a genetically unique and markedly separate population from the rest of the sage-grouse's range. 80 Fed. Reg. at 22829. The Bi-State Sage-Grouse live along the western border of Nevada and the eastern border of California.

41.    The Service has classified the Bi-State Sage-Grouse into six different population management units including Pine Nut, Desert Creek-Fales, Bodie, Mount Grant, South Mono, and White Mountains. 80 Fed. Reg. at 22830. This is a way of considering separate geographic groupings of Bi-State Sage-Grouse.

42.    The Service estimates that across these six population management units there are three to six unique genetic strains of Bi-State Sage-Grouse. 80 Fed. Reg. at 22831. This is a way of considering separate, genetically diverse groupings of Bi-State Sage-Grouse.

43.    Sage-grouse generally have low reproductive rates and are particularly sensitive to habitat fragmentation. U.S. Fish and Wildlife Service, Species Status Assessment: Bi-State Distinct Population Segment of Greater Sage-Grouse at 6 (Mar. 1, 2015) ("2015 Species Report"). The Bi-State Sage-Grouse's small population size and isolation, coupled with stressors caused by human activities, threaten the population's long-term survival. *Id.* at 153.

44.    Approximately 54 percent of the Bi-State Sage-Grouse's remaining habitat is managed by the Bureau of Land Management, and 35 percent is managed by the U.S. Forest Service. 2015 Species Report at 133, 138.

**B.    Shrinking Habitat and Population Size of Bi-State Sage-Grouse**

45.    The range of the Bi-State Sage-Grouse has been curtailed by nearly 50 percent over the past 150 years. 80 Fed. Reg. at 22831. The remaining habitat is reduced in quality and fragmented. *Id.*

46.    Bi-State Sage-Grouse population loss outpaces habitat loss. The estimated population of Bi-State Sage-Grouse has declined by over 50 percent from historic levels. 80 Fed. Reg. at 22831; 2015 Species Report at 17. A 1995 study estimated a 71 percent decline in sage-grouse populations in the California portion of the Bi-State area. 2015 Species Report at 16. In

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

total, the Bi-State Sage-Grouse DPS is estimated to number between 2,497 to 9,828 birds, although the Service acknowledges that the higher end of this estimate is overstated.  80 Fed. Reg. at 22831.  The low reproductive rate of the Bi-State Sage-Grouse indicates that the population would be slow-growing even in an ideal habitat.  80 Fed. Reg. at 22830.

47.     There are now approximately 43 active leks, with an estimated total of 427 to 1,404 males, across the Bi-State Sage-Grouse range.  80 Fed. Reg. at 22830.

48.     An estimated 5,000 individual birds may be necessary to maintain the evolutionary potential of the Bi-State Sage-Grouse and avoid long-term extinction risk.  *See* 2015 Species Report at 123.  According to the Service, population size estimates for all six population management units of Bi-State Sage-Grouse fall below this threshold.  80 Fed. Reg. at 22830. The Service has noted that there must be a minimum of 500 breeding birds – male and female birds that are reproducing in a given year – to maintain evolutionary potential of the Bi-State Sage-Grouse.  2015 Species Report at 123. The estimated number of breeding birds is as low as 230.  *Id.* at 124.

**C.     Proposed Listing Rule for Bi-State DPS**

49.     In 2002 and 2005, two separate sets of environmental groups petitioned the Service to emergency list Bi-State Sage-Grouse (then denoted as the Mono Basin Population of the Greater Sage Grouse) as a Distinct Population Segment under the ESA.  The Service initially rejected both petitions.  In 2007, several Plaintiffs in this action challenged the Service's 90-day finding, 71 Fed. Reg. 76058 (December 19, 2006), that the 2005 Petition did not provide sufficient information to show that the population may warrant listing.  *Center for Biological Diversity et al. v. U.S. Fish & Wildlife Service*, Case 3:07-cv-04347-JCS (N.D. Cal.).  Pursuant to a settlement agreement in that matter (*Id.,* Dkt. # 25, Stipulated Settlement, Feb. 21, 2008), the Service agreed to again review the petition, found that the Bi-State Sage-Grouse could warrant listing, and issued multiple findings on species' status.  *See* Proposed Listing Rule, 78 Fed. Reg. 64358, 64360 (Oct. 28, 2013).

50.     On May 23, 2010, the Service concluded that the Bi-State Sage-Grouse population

1    is a "listable entity" as a DPS, but that immediate action was precluded by higher listing priorities.

2    *Id.*  In other words, the DPS warranted listing as a threatened or endangered species, but was not

3    an agency priority.

4         51.    Separate from the Service's evaluation, on March 15, 2012, various signatory

5    parties finalized and approved the Bi-State Action Plan, an update to the 2004 Greater Sage-

6    Grouse Conservation Plan for the Bi-State Plan Area of Nevada and Eastern California.  PECE

7    Evaluation for the Bi-State Distinct Population Segment of Greater Sage-Grouse 2012 Bi-State

8    Action Plan (BSAP) at 2-4 ("PECE Evaluation").  The 2012 Bi-State Action Plan identifies

9    strategies, objectives and actions to achieve long-term conservation of the Bi-State Sage-Grouse

10   and its habitat.  *Id.* at 4.  The signatory agencies are the Service, Bureau of Land Management,

11   U.S. Forest Service, Natural Resources Conservation Service, U.S. Geological Service, Nevada

12   Department of Wildlife, and California Department of Fish and Wildlife.  *Id.*

13        52.    On October 28, 2013, the Service issued a Proposed Rule to list the Bi-State Sage-

14   Grouse DPS as a threatened species, along with an ESA section 4(d) rule for the threatened listing.

15   78 Fed. Reg. at 64358.  Simultaneously, the Service also proposed designating over 1.8 million

16   acres habitat as critical habitat for the species.  Proposed Designation of Critical Habitat, 78 Fed.

17   Reg. 64328 (October 28, 2013).

18        53.    Relying on scientific analysis in the 2013 Species Report, the Service identified

19   multiple impacts of "high current or future scope and severity within the DPS" that result in "the

20   present or threatened destruction, modification, or curtailment of its habitat or range, and other

21   natural or manmade threats affecting the DPS's continued existence."  78 Fed. Reg. at 64364.

22        54.    The primary threats identified by the Service include: urbanization and habitat

23   conversion; infrastructure (i.e. fences, power lines, and roads); mining; renewable energy

24   development; grazing and rangeland management; nonnative and native, invasive plants (e.g.,

25   pinyon-juniper encroachment, cheatgrass); wildfires and altered fire regime; and small population

26   size and structure.  78 Fed. Reg. at 64373.  Other threats impacting the DPS throughout its range

27   are climate change (including drought); recreation; and disease and predation.  78 Fed. Reg. at

28

64373.

55.     The Service concluded that the identified threats were "likely acting cumulatively to further contribute to the challenges faced by several Bi-State DPS populations now and into the future."  78 Fed. Reg. at 64373.

56.     The Service concluded that existing regulatory mechanisms were inadequate to protect the Bi-State Sage-Grouse DPS against the identified threats.  78 Fed. Reg. at 64373.  The Service was aware of and considered the 2012 Bi-State Action Plan when it made this determination.  *See* 78 Fed. Reg. at 64377, 64373.

57.     In concluding that existing regulatory mechanisms were inadequate, the Service explained that Bi-State Sage-Grouse habitat is largely comprised of federally managed lands, for which existing land use plans "afford relatively broad latitude to managers."  *Id.* at 64372.  Because implementation is prone to change based on managerial discretion, and such discretion can result in land use decisions that adversely affect sage-grouse habitat, the Service concluded that "most existing Federal mechanisms offer limited certainty as to managerial direction pertaining to sage-grouse conservation, particularly as the Federal mechanisms relate to addressing the threats that are significantly impacting the Bi-State DPS."  *Id.* at 64372.

58.     The Service asserted that the Bi-State Sage-Grouse DPS was a threatened species "likely to become endangered within the foreseeable future throughout all or a portion of its range."  78 Fed. Reg. at 64373-74.

**D.     The 2015 Withdrawal of Proposed Listing for Bi-State DPS**

59.     On April 23, 2015, the Service withdrew the proposed listing rule, finding that the threats to the Bi-State Sage-Grouse DPS identified in the proposed listing had been – or would be, after further conservation – reduced such that listing was no longer necessary.  80 Fed. Reg. 22828 (Apr. 23, 2015) ("Listing Withdrawal").

60.     In withdrawing the listing, the Service relied on some new information, including a population trend analysis ("Coates Analysis") and two genetic evaluations, as well as conservation efforts and plans that existed at the time the Service proposed listing the species.  80 Fed. Reg. at

1   22830, 22849-50.

2       61.     The Coates Analysis modeled the population trends of four of the six population

3   management units over ten years, from 2003 to 2012.  *Id*. at 22830.  According to the Service, the

4   Coates Analysis found that four of the six populations had variable population growth over a ten-

5   year period.  *Id*.  The model's results, however, are not reliable.  The model in the Coates Analysis

6   predicted a positive growth rate for the Pine Nut population, *id*. at 22831, but in reality, the single

7   active Pine Nut lek had zero males in 2013 and only a single male in 2014.  *Id*.  Two other

8   populations could not be evaluated due to data limitations.  80 Fed. Reg. at 22831.  Yet the

9   Service used information from the Coates Analysis to conclude that "evaluated populations are, in

10  their entirety, stable."  *Id*.

11      62.     The Service misinterpreted and misapplied the Coates Analysis in the Withdrawal

12  Listing.  The model used in the Coates Analysis demonstrated poor support for populations being

13  stable, and instead predicted that the population was unstable with an equal probability of an

14  increasing or decreasing trend.  The probability that the population is stable was only 15.8 percent

15  in the model.

16      63.     In the Listing Withdrawal, the Service found that the sage-grouse population

17  clusters in multiple population management units are diminishing or may be extirpated.  For

18  example, the Mount Grant Unit is experiencing negative growth, and the birds in the Pine Nut

19  Unit could be extirpated and thereby reduce population redundancy within the DPS.  *Id*. at 22832-

20  33.  The Service could not estimate the population size or status for the largely isolated White

21  Mountain Unit.  *Id*. at 22834.  Without future conservation efforts, the Service would anticipate a

22  loss of some populations in the Pine Nut, Desert-Fales, and Mount Grant Units, with a contraction

23  of the remaining range, leaving them more susceptible to extirpation.  *Id*.  Yet the Service did not

24  find the Bi-State Sage-Grouse is endangered or threatened throughout a significant portion of its

25  range.

26      64.     The Service analyzed whether three of the at-risk population management units –

27  Pine Nut, Mount Grant, and White Mountain – might be significant portions of the range.  80 Fed.

28

Reg. at 22852-53.  While acknowledging "there is information available that may lead some to believe that the populations in these three [units] are at risk of becoming endangered in the foreseeable future," the Service concluded that the current and future conservation efforts contradicts that information and extirpation of these smaller populations would not endanger the Bi-State Sage-Grouse on the whole in the foreseeable future.  *Id*.

65.     After the Service issued the proposed rule, signatory agencies to the Bi-State Action Plan had "provided a package of information examining their commitments, including staffing and funding," to implementing the actions outlined in the Bi-State Action Plan.  80 Fed. Reg. at 22828, 22846.

66.     Citing the conservation efforts in the 2012 Bi-State Action Plan and the agencies' June 2014 commitment letters, the Service concluded that the Bi-State Sage-Grouse no longer met the definition of a threatened or endangered species under the ESA.  *Id.* at 22849-50.

67.     The Service published its new evaluation of the Bi-State Action Plan under the Conservation Policy in a separate document attached to the Withdrawal Listing ("PECE Evaluation").  *See* 80 Fed. Reg. at 22847 (summarizing the full PECE Evaluation).  In the PECE Evaluation, the Service concluded that the Bi-State Action Plan met the criteria of certainty of implementation and effectiveness and could be considered as part of the basis for the Service's listing determination.  PECE Evaluation at 57.

68.     The Bi-State Action Plan does not specifically address mining, renewable energy development, or recreation.  PECE Evaluation at 45-46.  The Service states that "minimal efforts are expected to be applied in the near future" to the threats of infrastructure, mining, renewable energy development, recreation, disease, predation, and contaminants, in order to focus the "majority of conservation efforts" on significant impacts.  PECE Evaluation at 44.

69.     The Bi-State Action Plan focuses on strategies to address wild horse grazing issues, PECE Evaluation at 38-39, but does not adequately identify concrete efforts to address livestock grazing.

70.     The Bi-State Action Plan describes strategies to address pinyon-juniper

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1  encroachment, PECE Evaluation at 39-40, but does not adequately identify concrete efforts to

2  address cheatgrass.

3      71.    The Bi-State Action Plan does not adequately address threats to the population

4  from small population size and structure.

5      72.    The Service recognized that the 11 percent of suitable sage-grouse habitat under

6  private ownership may be impacted by current grazing or ranching activities, and may be "targeted

7  for development because of their proximity to recreation sites, aesthetics, or water rights."  PECE

8  Evaluation at 37.  That land harbors the majority of the Bi-State's critical brood rearing habitat.

9  *Id.*  The Service nonetheless concluded that the Bi-State Action is certain to be effective in

10 conserving the species.

11     73.    Despite finding that federal mechanisms offer limited certainty as to managerial

12 discretion in 2013, the Service relied on land use plans, Forest Plans, and Resource Management

13 Plans across the 89 percent of habitat occurring on federal lands in concluding that the Bi-State

14 Action Plan is sufficiently certain to be implemented.  *See* PECE Evaluation at 11-13.

15     74.    The Bi-State Action Plan contains no commitment, or even plan, to implement

16 many of the measures the Service emphasized in its determination that threats to the Bi-State

17 Sage-Grouse DPS are adequately addressed.

18     75.    The Service failed to adhere to the best available scientific information concerning

19 direct, indirect, and cumulative threats to the Bi-State Sage-Grouse populations and habitat,

20 including but not limited to threats from invasive native and non-native plants, wildfire,

21 infrastructure, urbanization, habitat conversion, livestock grazing, and climate change.

22     76.    The Service improperly defined the foreseeable future as 30 years, *see* 80 Fed. Reg.

23 at 22849, although researchers were able to project probability of persistence up to 100 years.  *See*

24 Garton, et al, "Greater sage-grouse population dynamics and probability of persistence," 38

25 Studies in Avian Biology 293, 303-04, 325 (2011) ("2011 Garton Report").  The 2011 Garton

26 Report is the same study that the Service relied on to consider the foreseeable future over 30 years

27 and also projects probability 100 years into the future.  Garton Report at 303-04.  In 2015, Garton

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

et al. updated their 2011 information and issued a report that was provided to the Service before the Withdrawal Decision was made.  Garton et al. divide the Bi-State population into northern and southern sub-areas rather than following the PMU framing.  They found a greater risk of both the South Mono population and the North Mono population declining below the quasi-extinction threshold at 100 years than at 30 years in both areas.  2015 Garton Report at 13-14, 41 (Table 6).

77.     In the Listing Withdrawal, the Service considered and inappropriately disregarded the three Rs – resiliency, redundancy, and representation – as they relate to the Bi-State Sage-Grouse.  80 Fed. Reg. at 22839-40.  The Service found that Bi-State Sage-Grouse resiliency might be reduced, but that genetic diversity and conservation measures mitigated that reduction.  *Id*.  The Service acknowledge that Bi-State Sage-Grouse redundancy "could be a concern into the future" and that if one of the three to six genetically unique populations was "permanently lost, the DPS' population redundancy would be lowered, thereby decreasing the DPS' chances of survival in the face of [potential catastrophic events such as drought]," but that conservation measures sufficiently reduced these threats.  *Id*.

78.     On December 22, 2015, Plaintiffs submitted to the Service and Interior a 60-day notice of intent to sue over the Listing Withdrawal for violations of the ESA and the APA.

## CLAIMS FOR RELIEF

### First Cause of Action

**(Violation of the ESA – Defendants' Listing Withdrawal Decision Is Arbitrary, Capricious, and Contrary to the ESA)**

79.     Plaintiffs hereby re-allege and incorporate by reference the allegations of paragraphs 1 through 78 herein as if set forth in full.

80.     The Service's decision in the Listing Withdrawal that the Bi-State Sage-Grouse does not warrant ESA protection violated the ESA because the Service failed to properly apply the ESA's listing factors, failed to adhere to the best available science, and failed to adequately explain why it reversed course and denied protection to the Bi-State Sage-Grouse and its habitat.

16 U.S.C. 1533(a)(1).  In particular, the Service erred in concluding that the Bi-State Sage-Grouse is not endangered or threatened by:

      (a) Failing to adhere to the best available science, which shows that an estimated 5,000 individual birds may be necessary to maintain the evolutionary potential of the Bi-State Sage-Grouse and avoid long-term extinction risk, *see* 2015 Species Report at 123, and the population size for all six population management units of Bi-State Sage-Grouse now fall below this threshold, 80 Fed. Reg. at 22830;

      (b) Improperly defining the foreseeable future as 30 years, when researchers the Service relied on were able to project probability of persistence up to 100 years;

      (c) Improperly interpreting the model results from Coates et al. to find that populations were stable;

      (d) Concluding that existing regulatory mechanisms including measures in current land use plans, Forest Plans, and Resource Management Plans adequately protect Bi-State Sage-Grouse across the 89 percent of habitat occurring on federal lands;

      (e) Concluding that existing regulatory mechanisms including measures in the Bi-State Action Plan adequately conserve the Bi-State Sage-Grouse;

      (f) Failing to adhere to the best available science concerning the direct, indirect and cumulative threats to Bi-State Sage-Grouse populations and habitat in its "threats analysis," including by dismissing the significant threats posed by mining and energy development and the significance of widespread and ongoing impacts from grazing on habitat even if all proposed mitigation measures were put in place.

81.    As a result of all of these errors, the Service's Listing Withdrawal was and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA and is actionable under the APA.  5 U.S.C. § 706(2).

1

**Second Cause of Action**

2

**(Violations of the ESA – Defendants' Adoption of the Policy Interpreting "Significant**

3

**Portion of Its Range" is Arbitrary, Capricious, and Contrary to the Statutory Language;**

4

**and In Relying on that Policy Defendants Failed to Analyze Threats to the Bi-State Sage-**

5

**Grouse Throughout a Significant Portion of its Range)**

6

7     82.     Plaintiffs hereby reallege and incorporate by reference the allegations of paragraphs

8     1 through 81 herein as if set forth in full.

9     83.     The Service violated the ESA in adopting the Significant Portion of its Range

10    ("SPOR") Policy.  It unlawfully defines "range" as the species geographic area at the time of

11    listing rather than the area the species historically inhabited, renders the terms "significant portion

12    of its range" in the definitions of "endangered species" and "threatened species" superfluous, and

13    sets such a high threshold for "significant portion of its range" that the SPOR Policy can never be

14    invoked to protect a species that would not otherwise be eligible for listing under the ESA.  The

15    Service's adoption of the SPOR Policy was arbitrary, capricious, an abuse of discretion and

16    otherwise not in accordance with the ESA and is actionable under the APA.  5 U.S.C. § 706(2).

17    84.     The Service violated the ESA by misapplying the SPOR Policy in the Listing

18    Withdrawal when it concluded that a bird species living on a highly fragmented area consisting of

19    less than 50 percent of its original habitat could lose three of its six remaining populations and still

20    not be at any foreseeable risk of extinction, and in concluding that there were no portions of the

21    Bi-State Sage-Grouse DPS that may be significant.  80 Fed. Reg. at 22853.  The Service erred in

22    determining that the Bi-State Sage-Grouse DPS is not endangered or threatened in a significant

23    portion of its range because the best available data and information shows that the population size

24    for all six population management units of Bi-State Sage-Grouse already fall below this threshold

25    necessary to maintain the evolutionary potential of the Bi-State Sage-Grouse and avoid long-term

26    extinction risk, *see* 2015 Species Report at 123, 80 Fed. Reg. at 22838-39, and significant risk of

27    extirpation for at least three of the population management units, the Pine Nut, Mount Grant, and

28

White Mountains PMUs, 80 Fed. Reg.22853.  Should any of these populations be lost, the entire DPS will be at risk of extinction, and therefore, the species is at risk of extinction across a significant portion of its range.

85.     As a result of all of these errors, the Service's Listing Withdrawal and its conclusion that the species was not at risk throughout a significant portion of its range was and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA and is actionable under the APA.  5 U.S.C. § 706(2).

**Third Cause of Action**

**(Violations of the ESA – Defendants' Application of its Own "Policy on the Evaluation of Conservation Efforts" to the Bi-State Sage-Grouse Withdrawal Decision Is Arbitrary, Capricious, and Contrary to the ESA)**

86.     Plaintiffs hereby reallege and incorporate by reference the allegations of paragraphs 1 through 85 herein as if set forth in full.

87.     In addition to violating the ESA statutory requirements in finding that existing regulatory mechanisms were adequate to protect the species, 16 U.S.C. § 1533(a)(1)(D), the Service also violated the ESA by misapplying the nine criteria in the Service's Conservation Policy for evaluating certainty of implementation of conservation efforts for the 2012 Bi-State Action Plan.  Although the Bi-State Action Plan discusses funding commitments, it is a voluntary agreement that contains no commitment to implement many of the measures the Service emphasized in its determination that threats to the Bi-State Sage-Grouse DPS are adequately addressed.  It also does not fully identify the specific conservation measures proposed.

88.     The Service also violated the ESA by misapplying the six criteria in its Conservation Policy for evaluating certainty of effectiveness for conservation efforts included in the 2012 Bi-State Action Plan.  The Bi-State Action Plan does little to address risks from livestock grazing, small population size and structure, cheatgrass, mining, renewable energy development, and recreation, each of which the Service previously identified as threats to the Bi-State Sage-

1  Grouse DPS.

2       89.     Defendants' conclusion that the Bi-State Action Plan is certain to be effective and

3  implemented and its reliance on that conclusion to withdraw the proposed listing for the Bi-State

4  Sage-Grouse is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with

5  the ESA and is actionable under the APA.  5 U.S.C. § 706.

6                                **PRAYER FOR RELIEF**

7          WHEREFORE, Plaintiffs respectfully request that the Court:

8       1.      Declare that Defendants' actions in the Listing Withdrawal were arbitrary,

9  capricious and in violation of the ESA and its implementing regulations;

10      2.      Set aside and vacate the Service's Withdrawal Listing and remand the matter to the

11 Service for a new final listing decision on the Proposed Rule to list the Bi-State Sage-Grouse in

12 accordance with the deadlines set forth in 16 U.S.C. § 1533(b);

13      3.      Enjoin Defendants from relying on or applying the Significant Portion of its Range

14 Policy in considering the proposed listing for the Bi-State Sage-Grouse or any other species

15 proposed to be listed under section 4 of the ESA;

16      4.      Award Plaintiffs their reasonable attorneys' fees and costs associated with this

17 action; and

18      5.      Grant Plaintiffs such additional relief as the Court may deem just and proper.

19
20 DATED:  March 9, 2016            Respectfully submitted,

21                                 ENVIRONMENTAL LAW CLINIC
                                   Mills Legal Clinic at Stanford Law School
22

23                            By: _____
24                                     Deborah A. Sivas
                                   Attorneys for Plaintiffs
25

26

27

28

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF