UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DESERT SURVIVORS, et al.,

        Plaintiffs,

    v.

US DEPARTMENT OF THE INTERIOR, et al.,

        Defendants.

Case No.  16-cv-01165-JCS

**ORDER RE SUMMARY JUDGMENT MOTIONS**

Re: Dkt. Nos. 130, 133, 135

## I.    INTRODUCTION

In this case, Plaintiffs Desert Survivors, Center for Biological Diversity, WildEarth Guardians, and Western Watersheds Project challenge: 1) the decision of the U.S. Fish and Wildlife Service ("Service" or "FWS") to withdraw the proposed listing of the Bi-State Sage-Grouse as "threatened" under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544; and 2) the Service's "Final Policy on Interpretation of the Phrase 'Significant Portion of its Range' in the Endangered Species Act" (the "SPR Policy").  Presently before the Court are motions for summary judgment by Plaintiffs, Defendant United States Department of the Interior ("DOI") and Defendant-Intervenors Nevada, Nevada Association of Counties and County of Mono, California (collectively, "Intervenors").  A hearing on the motions was held on April 6, 2018.  For the reasons stated below, Plaintiffs' summary judgment motion is GRANTED.   The motions of DOI and the Intervenors are DENIED.[1]

---

[1] All parties, including the Intervenors, have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.    BACKGROUND

### A.    Legal Framework

#### 1.  The Endangered Species Act

The ESA was enacted for the purpose of "provid[ing] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "provid[ing] a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).  It affords a range of protections for species that are listed as endangered or threatened.  *See* 16 U.S.C. § 1533.  "The term 'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6).  "The term 'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).  "The term 'species' includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. §1532(16).

"The ESA requires the Service to identify and list species that are 'endangered' or 'threatened.'" *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv*., 475 F.3d 1136, 1137–38 (9th Cir. 2007)(citing 16 U.S.C. § 1533).  The Service may list a species on its own initiative through "notice-and-comment rule-making." *Id*. (citing 16 U.S.C. § 1533(b)(5)).  In the alternative, any interested person may petition the Service to list a species under the Administrative Procedure Act ("APA"). *Id.* (citing 5 U.S.C. § 553(e); 16 U.S.C. § 1533(b)(3)(A)).  The Service then must determine within 90 days, "[t]o the maximum extent practicable," whether the petition is supported by "substantial scientific or commercial information." 16 U.S.C. § 1533(b)(3)(A).  If the Service finds that it is, it must "commence a review of the status of the species concerned." *Id*. The Service must make a finding on the status of the species within twelve months and publish its finding ("the 12-month finding") in the Federal Register. 16 U.S.C. § 1533(b)(3)(B).  The Service is required to make its decision "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).  In the 12-month finding, the Service must determine whether listing is: 1) "warranted"; 2) "not warranted"; or 3) "warranted but precluded by pending

proposals to determine whether any species is an endangered species or a threatened species." 16 U.S.C. § 1533(b)(3)(A)-(B). If the Service finds that a petitioned action is warranted, it must promptly publish a proposed regulation to implement its finding. 16 U.S.C. § 1533(b)(3)(B)(ii).

The Service considers five factors in determining whether a species or distinct population segment should be listed: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1). The ESA requires that the Service "shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas." 16 U.S.C.A. § 1533(b)(1)(A). Where a species is found to be threatened or endangered, it is included in a list published in the Federal Register that specifies "over what portion of its range it is endangered or threatened, and . . . any critical habitat within such range." 16 U.S.C. § 1533(c)(1).

## 2. The SPR Policy

As noted above, the ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6). Likewise, a "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The ESA does not define the phrase "significant portion of its range"; nor does it define the words "significant" or "range" as they are used in that phrase. In July 2014, the Service adopted a final policy on the interpretation of this phrase ("SPR Policy"). 79 Fed. Reg. 37,578. Its interpretation is as follows:

> (1) if a species is found to be endangered or threatened throughout a significant portion of its range, the entire species is listed as endangered or threatened, respectively, and the Act's protections

apply to all individuals of the species wherever found; (2) a portion of the range of a species is "significant" if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range; (3) the range of a species is considered to be the general geographical area within which that species can be found at the time FWS or NMFS makes any particular status determination; and (4) if a vertebrate species is endangered or threatened throughout an SPR, and the population in that significant portion is a valid [Distinct Population Segment ("DPS")], we will list the DPS rather than the entire taxonomic species or subspecies.

"Final Policy on Interpretation of the Phrase 'Significant Portion of Its Range' in the Endangered

Species Act's Definitions of 'Endangered Species' and 'Threatened Species,'" 79 Fed. Reg.

37,579. The Service explained that this interpretation is intended to adhere to the Ninth Circuit's

ruling in *Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001), which "indicates that,

with respect to the statutory language 'throughout all or a significant portion of its range,' we

should give the words on either side of the 'or' operational meaning." 79 Fed. Reg. 37,579-

37,580.   In other words, "under the SPR Policy, a species will be able to qualify as an

'endangered species' in two different situations: (1) If it is in danger of extinction throughout all

of its range, or (2) if it is in danger of extinction throughout a significant portion of its range." *Id*.

The SPR Policy further provides that "[t]he same is true for 'threatened species.'" *Id*.

With respect to its interpretation of the word "range" in the phrase "significant portion of

its range," the Service acknowledged that the ESA is ambiguous as to whether this word refers to

a species' current range or its historical range. *Id*. at 37583.  Reviewing the handful of uses of the

word "range" in the ESA, the Service concluded that it is "used primarily in determining *whether*

a species qualifies as an endangered . . . or threatened species" and not to determine *where* the

species is protected. *Id*. (emphasis added). The Service went on to find, based on the text of the

ESA, that "range" refers to current range because the ESA defines a species as endangered if it "*is*

in danger of extinction." *Id*. (emphasis added).  Use of the present tense, the Service found,

"denotes a present-tense condition of being at risk of a current or future undesired event." *Id*.  The

Service continues, "[t]o say a species 'is in danger' in an area where it no longer exists – *i.e.*, in its

historical range where it has been extirpated – is inconsistent with common usage." *Id*.

4

Addressing those who "have questioned whether lost historical range may constitute a significant portion of the range of a species, such that the Service must list the species rangewide because of the extirpation in that portion of the historical range," the Service explains, "[w]e already take into account in our determinations the effects that loss of historical range may have on the current and future viability of the species." *Id*.

### 3. PECE

In 2003, the Service announced a "final policy for the evaluation of conservation efforts when making listing decisions" under the ESA. "Policy for Evaluation of Conservation Efforts When Making Listing Decisions" ("PECE"), 68 Fed. Reg. 15,100. The Summary of PECE explains that while the ESA requires the Service "to take into account all conservation efforts being made to protect a species, the policy identifies criteria [it] will use in determining whether formalized conservation efforts that have yet to be implemented or to show effectiveness contribute to making listing a species as threatened or endangered unnecessary." *Id*. The underlying premise of PECE is that the ESA requires the Service to "consider both current actions that affect a species' status and sufficiently certain future actions – either positive or negative – that affect a species' status." 68 Fed. Reg. 15,114; *see also* 68 Fed. Reg. 15,106 (recognizing that the Service "may not rely on speculative promises of future action when making listing decisions"); 68 Fed. Reg. 15,107 ("determining whether a species meets the definition of threatened or endangered . . . requires us to make a prediction about the future persistence of a species.").

The Service explains, "[a]s part of our assessment of future conditions, we will determine whether a formalized conservation effort that has yet to be implemented or has recently been implemented but has yet to show effectiveness provides a high level of certainty that the effort will be implemented and/or effective and results in the elimination or adequate reduction of the threats." *Id*. As part of this analysis, the Service considers "the estimated length of time that it will take for a formalized conservation effort to produce a positive effect on the species." 68 Fed. Reg. 15,114. The Service explains, "[i]n some cases, the nature, severity, and/or imminence of threats to a species may be such that a formalized conservation effort cannot be expected to

5

1    produce results quickly enough to make listing unnecessary since we must determine at the time of

2    the listing decision that the conservation effort has improved the status of the species." *Id*.

3        In the PECE, the Service sets forth criteria that it will consider in evaluating: 1) the

4    certainty that a conservation effort will be implemented (for those efforts that have not yet been

5    implemented); and 2) certainty that conservation efforts will be effective (for those efforts that

6    have not yet demonstrated effectiveness). *Id*.  With respect to certainty that conservation efforts

7    will be implemented, the Service asks whether the following criteria are met:

8        1. The conservation effort, the party(ies) to the agreement or plan
9        that will implement the effort, and the staffing, funding level,
         funding source, and other resources necessary to implement the
10       effort are identified. 2. The legal authority of the party(ies) to the
         agreement or plan to implement the formalized conservation effort,
11       and the commitment to proceed with the conservation effort are
         described.  3. The legal procedural requirements (e.g. environmental
12       review) necessary to implement the effort are described, and
         information is provided indicating that fulfillment of these
13       requirements does not preclude commitment to the effort. 4.
         Authorizations (e.g., permits, landowner permission) necessary to
14       implement the conservation effort are identified, and a high level of
         certainty is provided that the party(ies) to the agreement or plan that
15       will implement the effort will obtain these authorizations. 5. The
         type and level of voluntary participation (e.g., number of
16       landowners allowing entry to their land, or number of participants
         agreeing to change timber management practices and acreage
17       involved) necessary to implement the conservation effort is
         identified, and a high level of certainty is provided that the party(ies)
18       to the agreement or plan that will implement the conservation effort
         will obtain that level of voluntary participation (e.g., an explanation
19       of how incentives to be provided will result in the necessary level of
         voluntary participation). 6. Regulatory mechanisms (e.g., laws,
20       regulations, ordinances) necessary to implement the conservation
         effort are in place. 7. A high level of certainty is provided that the
21       party(ies) to the agreement or plan that will implement the
         conservation effort will obtain the necessary funding. 8. An
22       implementation schedule (including incremental completion dates)
         for the conservation effort is provided. 9. The conservation
23       agreement or plan that includes the conservation effort is approved
         by all parties to the agreement or plan.

24   68 Fed. Reg. 15,114-15,115.

25       With respect to certainty that conservation efforts will be effective, the Service considers

26   whether:

27       1. The nature and extent of threats being addressed by the
         conservation effort are described, and how the conservation effort
28       reduces the threats is described. 2. Explicit incremental objectives

6

for the conservation effort and dates for achieving them are stated. 3. The steps necessary to implement the conservation effort are identified in detail. 4. Quantifiable, scientifically valid parameters that will demonstrate achievement of objectives, and standards for these parameters by which progress will be measured, are identified. 5. Provisions for monitoring and reporting progress on implementation (based on compliance with the implementation schedule) and effectiveness (based on evaluation of quantifiable parameters) of the conservation effort are provided. 6. Principles of adaptive management are incorporated.

*Id*. at 15,115. The Service explains that these criteria are "not comprehensive because the conservation needs of species will vary greatly and depend on species-specific, habitat-specific, location-specific, and action-specific factors." 68 Fed. Reg. 15,104.

If the Service finds that a conservation effort is "sufficiently certain to be implemented and effective so as to have contributed to the elimination or adequate reduction of one or more threats to the species," it may find that a species need not be listed or that a species is threatened rather than endangered. 68 Fed. Reg. 15,115. Where a conservation plan includes "numerous conservation efforts, not all of which are sufficiently certain to be implemented and effective," those efforts that are "not sufficiently certain to be implemented and effective cannot contribute to a determination that listing is unnecessary or a determination to list as threatened rather than endangered." *Id*. "Regardless of the adoption of a conservation agreement or plan, . . . if the best available scientific and commercial data indicate that the species meets the definition of 'endangered species' or 'threatened species' on the day of the listing decision, then [the Service] must proceed with appropriate rule-making activity" under the ESA. *Id.*

Even where a listing is avoided based on formal conservation efforts, PECE provides that the Service will "track the status of the effort including the progress of implementation and effectiveness of the conservation effort." *Id.* The Service "will reevaluate the status of the species and consider whether initiating the listing process is necessary" where: 1) planned conservation measures are not implemented on schedule; 2) objectives are not achieved; 3) the plan is not modified to adequately address increased threats or new information about threats; or 4) the Service receives "any other new information indicating a possible change in the status of the species." *Id.*

## B. Factual Background

### 1. The Bi-State Sage Grouse

The Bi-State Sage Grouse is a distinct population segment ("DPS") of the greater sage-grouse species that live in the "far southwestern reach of the greater sage-grouse's range" in the central border region of eastern California and western Nevada. 80 Fed. Reg. 22,828, 22,829 (AR Doc. 6771, BSSG 87985-87986). The Bi-State Sage Grouse DPS (hereinafter, "the Bi-State DPS") "is genetically unique and markedly separate from the rest of the species' range." 80 Fed. Reg. 22,830 (AR Doc. 6771, BSSG 87987). The greater sage grouse species as a whole is "long-lived, reliant on sagebrush, highly traditional in areas of seasonal habitat use, and particularly susceptible to habitat fragmentation and alterations in its environment." *Id.* According to the Service, there has been a reduction in the historical range and habitat of the Bi-State DPS "on the order of 50 percent over the last 150 years," with reduction in abundance that "proportionally exceeds habitat loss," *ie*., is greater than 50% over the same period. 80 Fed. Reg. 22,831 (AR Doc. 6771, BSSG 87988). The population of the entire Bi-State DPS is estimated to be between 2,497 and 9,828 individuals. *Id.*

In 2001, the Service designated six population management units ("PMUs") "as management tools for defining and monitoring sage-grouse distribution in the [B]i-State area," drawing boundaries based on aggregations of leks,[2] known seasonal habitats, and telemetry data." 80 Fed. Reg. 22,830 (AR Doc. 6771, BSSG 87987). The six PMUs are Pine Nut, Desert Creek-Fales, Bodie, Mount Grant, South Mono, and White Mountains. *Id.* Based on the maximum number of males counted on leks, the two largest populations exist in the Bodie and South Mono PMUs. 80 Fed. Reg. 22,831 (AR Doc. 6771, BSSG 87988). The remaining PMUs contain smaller populations. *Id.* The population of each of the PMUs is "relatively small," leading "species experts" to conclude that the populations of the PMUs, and the Bi-State DPS as whole, are "below the theoretical minimum threshold for long-term persistence," though the Service notes that these opinions are not "statistically proven." March 1, 2015 Species Status Assessment of Bi-State DPS

---

[2] A "lek" is a "sage-grouse breeding complex." 80 Fed. Reg. 22,829 (AR Doc. 6771, BSSG 87986).

1  ("2015 Species Report")(AR Doc. 5508, BSSG 550).

2      The Service estimates that all of the PMUs combined have a total of 43 active leks, as

3  compared to as many as 122 leks[3] reported in the Bi-State DPS in the past.  80 Fed. Reg. 22,830

4  (AR Doc. 6771, BSSG 87987); 2015 Species Report (AR Doc. 5508, BSSG 445);  *see also* Delta

5  Table (AR Doc. 4835, BSSG 57940) (reflecting that in 2010 there were 89 leks throughout the Bi-

6  State DPS). There is "limited connectivity of populations and habitats within and among the

7  PMUs" and that connectivity "continues to slowly erode."  80 Fed. Reg. 22,831 (AR Doc. 6771,

8  BSSG 87988);  *see also*  2015 Species Report (AR Doc. 5508, BSSG 546) ("Based on radio-

9  telemetry and genetic data, sage-grouse populations in the Bi-State area appear to be isolated to

10  varying degrees from one another"). "Isolated populations are typically at greater risk of extinction

11  due to genetic and demographic concerns such as inbreeding depression, loss of genetic diversity,

12  and Allee effect (the difficulty of individuals finding one another), particularly where populations

13  are small." 2015 Species Report (AR Doc. 5508, BSSG 548).  "In addition to the potential

14  negative effects to small populations due to genetic considerations, small, isolated populations

15  such as those found in the Bi-State area are more challenged by stochastic events such as disease

16  epidemics, prey population crashes, or environmental catastrophes."  2015 Species Report (AR

17  Doc. 5508, BSSG 549).

18          **2.  Conservation Efforts by Governmental and Non-Governmental Actors**

19      In August 2000, the Nevada Governor's Sage Grouse Conservation Team ("Governor's

20  Team") was created "to provide the primary forum for coordinating sage-grouse conservation

21  efforts for the State of Nevada, including the Bi-State area."  Final PECE Analysis (AR Doc.

22  5716, BSSG 79486).  The Governor's Team completed the Nevada Sage-Grouse Conservation

23  Strategy ("Strategy") in October of 2001. *Id.*  Subsequently, the Strategy was expanded to include

24  Eastern California, and Local Area Working Groups ("LAWGs") were "tasked with designing

25  projects to address on-the-ground challenges in their areas."  *Id.*  The LAWGs include

26  "representatives of local government (county planners), wildlife agency representatives

27

28  [3] The Service notes this number may be "an overestimate as locations were poorly documented."
2015 Species Report (AR Doc. 5508, BSSG 445).

(Nevada Department of Wildlife (NDOW) and California Department of Fish and Wildlife

(CDFW; formerly California Department of Fish and Game (CDFG)), land management

agencies (Bureau of Land Management (BLM) and the U.S. Forest Service (USFS)),

nongovernmental organization (NGO) representatives, agribusiness representatives (landowners,

grazing permittees, irrigation districts, etc.), mining industry representatives, sportsmen, and

tribal representatives." *Id.* In the Bi-State DPS there is one LAWG ("the Bi-State LAWG"),

which includes representatives of Lyon, Douglas, Mineral, Esmeralda, Carson City, and Storey

Counties in Nevada and Inyo and Mono Counties in California. *Id.* In June 2004, the Governor's

Team and the Bi-State LAWG developed the "first version" of the Bi-State Action Plan

("BSAP"). Final PECE Analysis (AR Doc. 5716, BSSG 79487).

In 2011, the Governor's Team created the Bi-State Executive Oversight Committee

("EOC"), which includes federal and state agency directors from FWS, Bureau of Land

Management, U.S. Forest Service, the Natural Resources Conservation Service ("NRCS"), U.S.

Geological Survey, Nevada Department of Wildlife, and California Department of Fish and Game.

2012 BSAP (AR Doc. 5870, BSSG 90789). The EOC, in turn, assigned biologists from each of

the participating agencies to form the Technical Advisory Committee ("TAC"), which is

"responsible for providing technical expertise and guidance, and identifying and prioritizing

actions necessary for conservation of the Bi-State DPS." 2012 BSAP (AR Doc. 5870, BSSG

90800). On March 15, 2015, the conservation recommendations of the TAC were issued as the

updated Bi-State Action Plan ("2012 BSAP"). *Id.*

The goals of the 2012 BSAP were: 1) to summarize "conservation actions that have been

completed to mitigate threats to the Bi-State DPS since 2004;" and 2) "to develop a

comprehensive set of strategies, objectives, and actions to accomplish specific goals and

objectives for effective long-term conservation of the Bi-State sage-grouse and their habitats."

2012 BSAP (AR Doc. 5870, BSSG 90791-90792). The 2012 BSAP was described as a "living

document" that would be "updated at a minimum of every three years with monitoring, inventory,

and research results" and that would "incorporate[] a strategic, science-based adaptive

management approach for future project planning based on development of a Conservation

Planning Tool ['CPT'] for evaluation of the effectiveness of completed actions and updated analyses of specific risks to each life stage of the population." *Id*. The CPT was to "consist[ ] of linked data-driven predictive models and interactive maps to identify and rank areas for management actions and provide a basis to evaluate those actions." *Id*. at BSSG 90874. The 2012 BSAP describes the CPT as "critical because it provides a mechanism to modify future actions for efficiency." *Id*.

In the meantime, in the spring of 2010, NRCS, which is an agency within the U.S. Department of Agriculture, launched its Sage Grouse Initiative ("SGI"). March 25, 2011 letter by NRCS re Annual Status Review for Greater Sage Grouse (Doc. No. 6904, BSSG 109128). "NRCS is the principal federal agency for providing conservation technical assistance to private landowners, conservation districts, tribes, and other organizations." 2012 BSAP (AR Doc. 5870, BSSG 90900). "SGI was structured to be a collaborative effort with its conservation partners across the West for conservation of greater sage-grouse." *Id*. The Service describes SGI as "a new paradigm for conserving wildlife (including the [B]i-State DPS) through voluntary cooperation, incentives, and community support" in which NRCS "applies the power of the Farm Bill to target lands where habitats are intact and sage-grouse numbers are highest, covering 78 million acres across 11 western states." Final PECE Analysis (AR Doc. 5716, BSSG 79488). According to the Service, "NRCS considers the [B]i-State DPS a key component in SGI's national conservation strategy and [has] committed resources to help landowners on both private lands and public allotments remove encroaching conifers, restore meadows, develop grazing management plans, and to secure conservation easements." *Id*.

Another conservation group, the Conservation Objectives Team ("COT") was formed in 2013, at the direction of the Service. March 22, 2013 Cover Letter, Greater Sage Grouse Conservation Objectives: Final Report ("COT Report") (AR Doc. 5829, BSSG 103823). COT included members of the Service and representatives of state wildlife agencies. *Id*. In February 2013, COT provided a report to the Service that "delineate[d] reasonable objectives, based upon the best scientific and commercial data available at the time of its release, for the conservation and survival of greater sage-grouse." COT Report (AR Doc. 5829, BSSG 103827). The report was

offered for "guidance only" and did not make any funding commitments. *Id.*

### 3. Efforts by Environmental Groups to Obtain Protection of the Bi-State Sage Grouse under the Endangered Species Act

Environmental groups have been petitioning the Service for the protection of the Bi-State Sage Grouse for more than a decade. In December 2001, the Institute for Wildlife Protection brought a petition ("the 2001 Petition") to emergency list sage grouse found in Mono County, California and Lyon County, Nevada as an endangered distinct population segment of the greater sage-grouse. 71 Fed. Reg. 76,058 (AR Doc. 6760, BSSG 87615). In 2002, the Service rejected the 2001 Petition, finding that it lacked "substantial scientific or commercial information" that the listing was warranted. 71 Fed. Reg. 76,058-76,059 (AR Doc. 6760, BSSG 87615-87616). In November 2005, the petitioners filed suit in the Western District of Washington challenging the Service's finding that listing was not warranted. *Id.*

Also in November 2005, a new petition ("the 2005 Petition") to list the Mono Basin area greater sage grouse as threatened or endangered was brought by the Center for Biological Diversity, the Western Watersheds Project, the Sagebrush Sea Campaign, and Christians Caring for Conservation.[4] 71 Fed. Reg. 76,059 (AR Doc. 6760, BSSG 87616). In March 2006, the Service responded to the 2005 Petition with a letter stating that it had reviewed the petition and found that the listing was not necessary. *Id.* The Service further informed the petitioners that because of "court orders and settlement agreements for other listing and critical habitat actions" the Service was unable to further address the 2005 Petition. *Id.* In April 2006, the petitioners sent the Service a notice of their "intent to sue the Service for violating the Act's requirement to make a petition finding within 12 months after receiving a petition." *Id.*

The Service settled both of these lawsuits in an April 2006 settlement agreement in which it agreed to evaluate the 2005 Petition, re-evaluate the 2001 Petition, and publish a 90-day finding on the petitions in December 2006. *Id.* If the Service found that there was "substantial information" indicating that the petitioned action was warranted, it agreed to complete "12-month

---

[4] The Sagebrush Sea Campaign was later absorbed into WildEarth Guardians, a plaintiff in the instant action. Cotton Decl. at 2–3.

United States District Court
Northern District of California

findings" by December 2007.  *Id.*  However, the Service concluded in its 90-day findings that the "substantial information" threshold was not met.  71 Fed. Reg. 76,058 (AR Doc. 6760, BSSG 87615).

In 2007, the Center for Biological Diversity, the Sagebrush Sea Campaign, Western Watersheds Project, and Desert Survivors brought an action in this Court challenging the 2006 90-day finding.  *See Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, Case 3:07-cv-04347(JCS) (N.D. Cal.). The parties reached a settlement in 2008, when the Service agreed to review the petitions again and issue a new 90-day finding. 71 Fed. Reg. 76,060 (AR Doc. 6760, BSSG 87617).  That finding was issued on April 29, 2008, when the Service found that the 2001 and 2005 Petitions "presented substantial scientific or commercial information indicating that listing the Mono Basin area population may be warranted." 78 Fed. Reg. 64,358, 64,360 (AR Doc. 6764, BSSG 87898, 87900).   Based on that finding, the Service went on to complete 12-month findings, which were issued in March 2010.  71 Fed. Reg. 76,060 (AR Doc. 6760, BSSG 87617). In the 12-month findings, the Service found that the Mono Basin area sage grouse population was a "listable entity under Service policy as a DPS and that the DPS warranted recognition under the Act but that immediate action was precluded by higher listing priorities."  78 Fed. Reg. 64,360 (AR Doc. 6764, BSSG 87900).  The Service assigned the Bi-State DPS a Listing Priority Number of 3 on a scale of 1 to 12 (which 1 being the highest priority).  March 23, 2010 12-month Petition Findings, 75 Fed. Reg. 14,009 (AR Doc. 6762, BSSG 87740).  The warranted-but-precluded finding placed the species (for which the Service adopted the nomenclature used in the conservation context, Bi-State DPS) on the Service's "candidate list" for protection under the Endangered Species Act. 78 Fed. Reg. 64,360 (AR Doc. 6764, BSSG 87900).

In 2011, the Service entered into a settlement agreement with WildEarth Guardians and other groups in a consolidated case in the District of Columbia, whereby the Service agreed to publish proposed rules for protection or findings that protection was not warranted for the 251 species that were candidates for protection under the ESA in 2010, which included the Bi-State DPS.  78 Fed. Reg. at 64,361.

1     **4.  2013 Species Report**

2          On July 26, 2013, the Service issued a species status assessment for the Bi-State DPS.

3    2013 Species Report (AR Doc. 1671, BSSG 23827-24028).  In it, the Service summarized the

4    status of the Bi-State DPS as follows:

5      • There has been a reduction from historical range and habitat of greater than 50 percent; the

6         current trend is a slow, continued reduction in range and habitat.

7      • There has been a reduction from historical abundance of greater than 50 percent. The

8         current trend in abundance is unknown, but it is expected to gradually decrease for at least

9         five of the six Population Management Units (PMUs). This is of critical concern to the

10        species because fluctuations in the four small, less secure PMUs are likely to result in

11        extirpations and loss of population redundancy within the Bi-State DPS.

12     • All six PMUs of the Bi-State DPS include poor connectivity within and among PMUs; the

13        current trend in connectivity is slowly deteriorating, and this is of critical concern to the

14        species because it increases the risk of loss of individual PMUs via stochastic events.

15     • Remaining habitat is increasingly fragmented within all six PMUs; the current trend in

16        habitat fragmentation is a slow increase.

17     • Well known leks in the center of the species' range that have remained protected over time

18        have long-term monitoring data suggesting stable population trends.

19     • Trends for most leks are unknown, especially on periphery of the species' range. This is of

20        critical concern to the species because there is a pattern of historical extirpations of

21        peripheral leks and populations for the Bi-State DPS.

22     • Recent extensive and intensive surveys for the Bi-State DPS rangewide did not

23        significantly increase the known number of leks or individuals.

24     • The size of the Bi-State population is generally below theoretical minimums for long-term

25        persistence reported in scientific literature; populations are especially small and

26        increasingly isolated outside the two largest (core) PMUs of South Mono and Bodie.

27    2013 Species Report (AR Doc. 1671, BSSG 23831).

28          The Service went on to summarize its findings as to "impacts" to the Bi-State DPS as

14

follows:

- There are multiple impacts to habitat interacting in the Bi-State DPS, and no one impact stands out.

- Sage-grouse are long-lived, habitat specialists with low reproductive rates and particularly sensitive to habitat fragmentation caused by multiple, interacting impacts.

- Pinus edulis (pinyon pine) and various Juniperus (juniper) species encroachment has caused significant habitat reduction; the current trend in woodland encroachment is increasing, but mitigated partially by ongoing woodland removal projects.

- Urbanization has caused significant habitat reduction; the current trend in urbanization is increasing, but slowly.

- Infrastructure development (e.g., roads) has caused significant habitat fragmentation; the current trend in this impact is increasing, but slowly.

- The fire-invasive species cycle destroys native plant communities and sage-grouse habitat; the current trend in habitat loss from fire and invasive species is increasing.

- Small population size and meta-population isolation increases risk to sage-grouse; the current trend in small, isolated populations is gradually increasing. This is of critical concern to the species because fluctuations in the four small, less secure PMUs are likely to result in extirpations and loss of population redundancy within the Bi-State DPS.

- Predation is locally impacting sage-grouse, such as that occurring in the South Mono PMU near a landfill; the current trend in predation for the Bi-State DPS rangewide is unknown.

- There is uncertainty over long-term impacts from climate change and its effects on other factors like invasive species; however, change is anticipated.

2013 Species Report (AR Doc. 1671, BSSG 23832).

The Service recognized that "[h]abitat restoration and protection efforts are actively occurring" and that "[p]artnerships are strong and conservation interest currently high." 2013 Species Report (AR Doc. 1671, BSSG 23832). It noted that the area "has maintained an active Bi-State Local Planning Group since the early 2000s, and the Group is active in Nevada and California." *Id*. It also pointed to the BLM Bishop Field Office's "demonstrated track record of

15

avoiding substantial development impacts in the Bodie and South Mono PMUs, which is in part why those two PMUs have the largest remaining populations." *Id.* Finally, it acknowledged that the BSAP was updated in 2012 and that the updated BSAP provided "a general roadmap toward species conservation." The Service found, however, that the 2012 BSAP "lack[ed] specificity in key areas" and "lack[ed] assurances of funding or implementation." *Id.* As an example of the lack of specificity of the 2012 BSAP, the Service pointed out that it "identifies the importance of pinyon-juniper removal, but does not specify how much and where removal is necessary." *Id.* With respect to the lack of assurances of funding, the Service noted that the 2012 BSAP "includes many measures similar to those in the 2004 Bi-State Plan that were never funded or implemented." *Id.*

### 5. Issuance of Proposed Rule to List Bi-State Sage Grouse as Threatened Under the ESA

Three months later, on October 28, 2013, the Service issued a proposed rule to list the Bi-State DPS as threatened under the ESA and a proposed special rule under section 4(d) of the ESA to provide for the conservation of the Bi-State DPS. 78 Fed. Reg. at 64,358 (AR Doc. 6764, BSSG 87898). In conjunction with the proposed rules ("Proposed Listing"), the Service proposed designating critical habitat for the Bi-State DPS. *Id.* In the Proposed Listing, the Service echoed the concerns set forth in the 2013 Species Report with respect to the status of the Bi-State DPS and threatened impacts to it. *Id.* The Service concluded that the severity of these impacts was "high." 78 Fed. Reg. at 64,364 (AR Doc. 6764, BSSG 87904).

In determining whether the Bi-State DPS was threatened or endangered, the Service considered the following five factors that may give rise to a finding that a species is threatened or endangered: "(A) The present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) Disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 78 Fed. Reg. at 64,358 (AR Doc. 6764, BSSG 87898).

With respect to Factor D, the inadequacy of the existing regulatory mechanisms, the

Service found that some local, state and federal regulatory mechanisms exist "that either provide

or have the potential to provide a conservation benefit to the Bi-State DPS," but that "supporting

documents for some of these are many years old and have not been updated, calling into question

their consistency with our current understanding of the DPS's life history requirements, reaction to

disturbances, and the DPS's conservation needs." 78 Fed. Reg. at 64,372 (AR Doc. 6764, BSSG

87912). The Service further noted that implementation of conservation actions pursuant to these

existing regulatory mechanisms varies depending on the availability of staff and funding. *Id.*

With respect to land planning mechanisms for federally managed lands (of which the Bi-State area

is "largely comprised"), the Service noted that "[e]xisting land use plans, as they pertain to sage

grouse, are typically general in nature and afford relatively broad latitude to land managers,"

which "can result in land use decisions that negatively affect the Bi-State DPS." *Id*. The Service

found regulations in some counties "identify the need for natural resource conservation and

attempt to minimize impacts of development through zoning restrictions" but that they "neither

preclude development nor do they provide for monitoring of the loss of sage-grouse habitats." *Id*.

Likewise, the Service concluded that "State laws and regulations are general in nature and provide

flexibility in implementation, and do not provide specific direction to State wildlife agencies." *Id*.

With respect to the proposed special rule under Section 4(d) of the ESA to provide for the

conservation of the Bi-State DPS, the Service recognized the ongoing voluntary conservation

efforts discussed above, stating as follows:

> The Service proposes this 4(d) special rule in recognition of the
> significant conservation planning efforts occurring throughout the
> range of the Bi-State DPS for the purpose of reducing or eliminating
> threats affecting the DPS. Multiple partners (including private
> citizens, nongovernmental organizations, and Federal and State
> agencies) are engaged in conservation efforts across the entire range
> of the DPS on public and private lands, and these efforts have
> provided and will continue to provide a conservation benefit to the
> DPS. Two recent examples of conservation programs in the Bi-State
> area are the Bi-State Action Plan, which was finalized on March 15,
> 2012, and addresses the entire range of the DPS on public and
> private lands; and the NRCS's Sage-Grouse Initiative (SGI). Efforts
> associated with both programs will facilitate conservation benefits in
> the Bi-State area, and these programs will continue to provide
> conservation benefits to the DPS into the future. Currently, existing
> programs do not yet fully address the suite of factors contributing to
> cumulative habitat loss and fragmentation, which is our primary

17

concern across the Bi-State DPS's range. However, the Bi-State Action Plan, if completely refined and fully implemented, may result in the removal of threats to the Bi-State DPS so that the protections of the Act may no longer be warranted, especially in combination with other actions, including Federal land management agencies' ongoing efforts to ensure regulatory mechanisms are adequate for the DPS.

October 28, 2013 Proposed Listing, 78 Fed. Reg. 64,377 (AR Doc. 6764, BSSG 87917).

### 6. Public Comment in Response to Proposed Listing

The Service received extensive public comments in response to the proposed listing of the Bi-State DPS as threatened. *See* Index of Public Comments (AR Doc. 3042); 80 Fed. Reg. 22,854 (AR Doc. 6771, BSSG 88011) (stating that the Service received "more than 6,400 comment letters directly addressing the proposed listing of the [B]i-State DPS."). The public comment period was scheduled to end on December 27, 2013 but was extended several times, finally closing on September 4, 2014. 80 Fed. Reg. 22,828-22,829 (AR Doc. 6771, BSSG 87985-87986). The Service agreed to delay the determination of whether to list the Bi-State DPS as threatened until April 28, 2015 "based on substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the proposed listing, making it necessary to solicit additional information." 80 Fed. Reg. 22,829 (AR Doc. 6771, BSSG 87985).

On June 8, 2014, the EOC (which had drafted the 2012 BSAP) submitted a packet of comments and documents in opposition to listing the Bi-State DPS as threatened. EOC Comment Package re Listing of Bi-State DPS (AR Doc. 4099, BSSG 80368-80422). This package included a memorandum of understanding to facilitate interagency cooperation and six letters of commitment ("Commitment Letters") with regard to conservation efforts aimed at the Bi-State DPS. *Id.* According to the EOC cover letter, the total amount committed by EOC partner agencies to implement the BSAP was over $45 million, exceeding the $38 million required for full implementation of the projects "currently identified." EOC Comment Package re Listing of Bi-State DPS (AR Doc. 4099, BSSG 79987-79989). The EOC cover letter also pointed to "new science" that post-dated the Proposed Listing indicating that the population of the Bi-State DPS is stable. *Id.* Finally, it asserted that "[t]he threat of pinyon-juniper pointed out in the proposed rule is ameliorated through the implementation of the [2012 BSAP], and the additional threats in the

18

proposed rule are addressed in the land use plan amendments." *Id*. In particular, the EOC states that "[t]he lead regulatory agencies (BLM and USFS) have provided detailed responses outlining their proposed regulatory changes that will amend existing land use plans and be incorporated in future land use plan revisions for the benefit of sage-grouse and their habitats in the [Bi-State DPS.]" *Id*. EOC opined that "these efforts [would] ensure that appropriate regulatory mechanisms will be in place to provide adequate conservation measures." *Id*.

### 7. 2015 Species Report

On March 1, 2015, the Service issued an updated species report. 2015 Species Report (AR Doc. 5508, BSSG 425-636). While the Status and Impacts set forth in the Executive Summary were described in largely the same terms as in the 2013 Species Report, the emphasis on voluntary conservation efforts was greater. 2015 Species Report (AR Doc. 5508, BSSG 429-430). With respect to the 2012 BSAP, the Service recognized that it "initially lacked specificity in key areas" but stated that "[s]ince our proposed listing in 2013, participating agencies have made significant progress to further refine the conservation actions identified in the 2012 Bi-State Action Plan." 2015 Species Report (AR Doc. 5508, BSSG 430). The Service went on to note that "through the leadership of the Bi-State Executive Oversight Committee (EOC), commitments to implement . . . the BSAP have been provided, including funding totaling more than 45,000,000 dollars (EOC 2014, p. 2)." 2015 Species Report (AR Doc. 5508, BSSG 431).

The first section of the 2015 Species Report, entitled "Biological Information," describes the geographical range of the Bi-State DPS as a whole and the six PMUs, and addresses populations trends. 2015 Species Report (AR Doc. 5508, BSSG 431-458). It summarizes the results of a 2014 analysis of population trends in the Bi-State area spanning the years 2003 to 2012, by Coates *et al*. ("Coates Study"). *See A Hierarchical Integrated Population Model for Greater Sage-Grouse (Centrocercus urophasianus) in the Bi-State Distinct Population Segment, California and Nevada,* Peter S. Coates, *et al.*, published by United States Department of the Interior and United States Geological Survey, 2014 (AR Doc. 4480, BSSG 84307-84348). The Service recognized that the Coates Study "did not evaluate the populations in the Mount Grant or White Mountains PMUs due to data limitations" but found that the Coates Study "suggest[ed] a

stable trend in population growth across the entire Bi-State area between 2003 and 2012." 2015 Species Report (AR Doc. 5508, BSSG 445).

The "Biological Information" section of the species report also described "[t]wo recent and independent genetic evaluations . . . conducted in the Bi-State area," by Oyler-McCance *et al.* and Tebbenkamp. 2015 Species Report (AR Doc. 5508, BSSG 445). According to the Service:

> Oyler-McCance *et al.* (2014, p. 8) concluded there are between three and four unique genetic clusters within the Bi-State area, while Teb[b]enkamp (2014, p. 18) concluded there were five unique genetic clusters. In addition, Teb[b]enkamp (2014, p. 12) did not evaluate the Pine Nut population, which Oyler-McCance *et al.* (2014, p. 8) found to be unique. Thus, presumably Teb[b]enkamp (2014, entire) would have differentiated six populations had these data been available. Based on this information, we presume that there are likely three to six populations or groups of birds in the Bi-State area that largely operate demographically independent of one another.

*Id.*

The 2015 Species Report also includes an updated description of past and ongoing conservation efforts, describing the efforts made to address the specific threats posed by urbanization, infrastructure (including fences and roads), grazing (by livestock and wild horses), invasive species, pinyon and juniper encroachment, wildfire fuel reduction and rehabilitation, meadow and sagebrush habitat condition, and disease or predation. 2015 Species Report (AR Doc. 5508, BSSG 460-466). The report goes on to conduct an Impact Analysis of these threats, providing a detailed evaluation of the nature and severity of the threats and the efforts to address them. 2015 Species Report (AR Doc. 5508, BSSG 469-567).

### 8. The October 31, 2014 Decision of the Regional Director of the Service's Pacific Southwest Region and the Conclusions of the Recommendation Team

On October 29, 2014, the Service convened a meeting of the Bi-State DPS Recommendation Team ("Recommendation Team"). October 31, 2014 Memorandum of Regional Director, Pacific Southwest Region (AR Doc. 4932, BSSG 58596). Thirteen agency biologists "familiar with greater sage grouse issues" participated in the meeting, along with three regional directors ("the Regional Directors"). *Id.* According to the Regional Director of the Pacific Southwest Region, who participated in the meeting, this meeting involved "extensive briefing on

the status of the Bi-State DPS" and was "the culmination of the Region's standard operating procedure on listing decisions." *Id*. Prior to the meeting, participants were sent: 1) a revised draft Species Report, along with a briefing paper summarizing it; 2) a "Delta Table" that summarized species information and threats over time, *see* AR Doc. 4835; and 3) a copy of the Coates Study. October 16, 2014 email to Recommendation Team meeting participants with attached materials (AR Doc. 4932, BSSG 57671).

Detailed meeting notes reflect that the Recommendation Team began by reviewing the status of and threats to the Bi-State DPS at the time of the Proposed Listing, in 2013. October 29, 2014 Recommendation Team Meeting Notes (AR Doc. 4907, BSSG 58533-58535). The team then went on to address the following "2014 issues," which were "informed from peer review:" 1) "our perception of historic baseline did not change from 2013; 2) new information on habitat, population trends and threats; and 3) some threats were reduced in 2014 due to conservation actions." October 29, 2014 Recommendation Team Meeting Notes (AR Doc. 4907, BSSG 58535). Finally, the team addressed conservation efforts that had occurred since 2013 and future conservation efforts to be conducted under the 2012 BSAP. October 29, 2014 Recommendation Team Meeting Notes (AR Doc. 4907, BSSG 58536-58537).

In the "Pulse Check" discussion that followed, the biologists were asked to make recommendations as to two issues: 1) "the proposed status that should be applied today (threatened/endangered/not warranted);" and 2) ""Given the information provided since 2013 and the anticipated future conservation efforts, what is the proposed status for the future (threatened/endangered/not warranted)?" October 29, 2014 Recommendation Team Meeting Notes (AR Doc. 4907, BSSG 58538). In response to the first question, twelve of the thirteen biologists found that the Bi-State DPS was threatened. October 29, 2014 Recommendation Team Meeting Notes (AR Doc. 4907, BSSG 58538-58539). In response to the second question, eight of the biologists found that the listing was "not warranted," with virtually all of them pointing to the commitment to future conservation efforts under the BSAP as the basis of their opinion. *Id*. Some of these biologists acknowledged that there was uncertainty as to future funding, especially over the long term, but gave the "benefit of [the] doubt" or reasoned that if funding commitments did

not come through it would be possible to revisit the question in the future and reevaluate. *Id*.

Of the remaining biologists, three found that the future status of the Bi-State DPS was threatened. *Id*. The first opined that while future conservation commitments were "heartening and welcome," the conservation strategy "doesn't really address wildfire, infrastructure and small pop[ulation] sizes," and the "lack of regulatory hammer will let conservation[] efforts not persist." The second found that "[a]ll threats cannot be addressed by the future conservation efforts," highlighting the threats posed by fire and climate change, the small population size and the "[l]ikely" loss of non-core PMUs. *Id*. The third commented that "[c]onservation commitments are good but legal liability of those commitments under the PECE policy is not convincing." *Id*.

Finally, two biologists were "uncertain" as to the future status of the Bi-State DPS. One expressed concern that "fire will continue to persist and amelioration cannot really effectively address the future threat." *Id*. That biologist noted, "[c]onservation efforts are hopeful but don't see a real change." *Id*. The second biologist was uncertain but "lean[ed] to threatened," opining that "wildfire and invasives are not going to be addressed to hit the bar for not threatened in the present or the future." *Id*.

In a formal memorandum ("Memorandum") issued on October 31, 2014, signed by all three regional directors who participated in the Recommendation Team meeting, the Regional Directors summarized the conclusions of the Recommendation Team on a number of subjects relevant to the listing status of the Bi-State DPS. First, on the subject of "Abundance, Trends and Persistence," they stated, "[n]ot surprisingly, little has changed since the 2013 finding," but noted that "[t]here are new findings that suggest we may have slightly underestimated the Bi-State trend and persistence in our 2013 finding." October 31, 2014 Memorandum of Regional Director, Pacific Southwest Region (AR Doc. 4932, BSSG 58596). Next, they addressed "Threats." October 31, 2014 Memorandum of Regional Director, Pacific Southwest Region (AR Doc. 4932, BSSG 58597). Here too, the Memorandum does not suggest that the Recommendation Team found significant reduction in threats since 2013, stating that "threats to the Bi-State [DPS] have declined since 2013, but not in a major way." *Id*. at BSSG 58598.

Next, the Memorandum addressed "Future Conservation Benefits," stating that "[t]his is

22

the area where greatest change has occurred since 2013 and greatest potential for beneficial change exists." *Id*.  In this section, the Regional Directors described the 2012 BSAP, stating that it "recognized 79 projects and the need for $38 million over a 10-year period to address immediate conservation needs" and that "[a]t this time, all 79 projects are either being addressed or are slated to be addressed and $45 million has been pledged with good certainty of implementation." *Id*. The Memorandum also describes anticipated BLM land management plan amendments to benefit the Bi-State DPS, which the authors of the Memorandum "believe will be completed in a timely manner." *Id*. at BSSG 58599.   Based on the commitments made to carry out these conservation efforts, the Regional Directors recommended a finding that listing of the Bi-State DPS was not warranted. *Id*.  The Regional Directors also suggested that the majority of the biologists on the Recommendation Team agreed with this conclusion, stating that "of the [twelve biologists] that responded, four believed ESA listing as threatened was warranted, 8 believed ESA protection was not needed at this time." *Id*. at BSSG 58596.   The Memorandum does not mention that twelve of the thirteen biologist found that the *current* status of the Bi-State DPS is "threatened."

### 9.  Withdrawal of Proposed Listing of Bi-State DPS

On April 23, 2015, the Service withdrew the proposed rule to list the Bi-State DPS as threatened, as well as the proposed special rule under section 4(d) and the proposed designation of critical habitat.  80 Fed. Reg. 22,828 ("Withdrawal Decision") (AR Doc. 6771, BSSG 87985).  In the Withdrawal Decision, the Service addressed "16 potential threats to the [B]i-State DPS." 80 Fed. Reg. 22,835 (AR Doc. 6771, BSSG 87992).  Of these threats, the ones the Service found "more significant" were "infrastructure (i.e., fences, power lines, and roads)," "urbanization and human disturbance," "the spread of nonnative, invasive and native plants (e.g., pinyon-juniper encroachment, cheatgrass)," "wildfires and altered fire regime," and "the small size of the DPS (both the number of individual populations and their size), which generally makes such species more susceptible to extirpation." 80 Fed. Reg. 22,834 (AR Doc. 6771, BSSG 87991).  The Service found that "[t]hese impacts, along with those that are currently considered minor, have the potential to act together to negatively affect the [B]i-State DPS." *Id*. The Service further found, however, that "completed, ongoing and planned conservation actions have reduced the scope and

severity of these impacts." *Id.*

The Service explained that it was withdrawing the Proposed Listing because it had "determine[d] that threats have been reduced such that listing is not necessary for this DPS." *Id.* It summarized its conclusion as follows:

> Based on our analyses of the potential threats to the species, and our consideration of partially completed, ongoing and future conservation efforts (as outlined in the Policy for Evaluation of Conservation Efforts When Making Listing Decisions (PECE) section of this document), we have determined that the [B]i-State DPS should not be listed as a threatened species. Specifically, we have determined that conservation efforts (as outlined in the [Bi-State Action Plan ("BSAP")], Agency commitment letters, and our detailed PECE analysis . . as well as the [Bi-State Technical Advisory Committee ("TAC")] comprehensive project database] will continue to be implemented because (to date) we have a documented track record of active participation and implementation by the signatory agencies, and commitments to continue implementation into the future.

80 Fed. Reg. 22,829 (AR Doc. 6771, BSSG 87986).  A detailed PECE analysis (which had not been conducted in connection with the earlier issuance of the Proposed Listing of the Bi-State DPS), was set forth in a separate document and was summarized in the Withdrawal Decision.  80 Fed. Reg. 22,846-22,849 (AR Doc. 6771, BSSG 88003-88006);  Final PECE Analysis (AR Doc. 5716, BSSG 79486-79550).

In the Withdrawal Decision, the Service also relied on the Coates Study in support of the conclusion that the population of the Bi-State DPS is stable.  80 Fed. Reg. 22,865 (AR Doc. 6771, BSSG 88022) (stating based on Coates Study that "these new data estimate that population growth has been stable across the [B]i-State area between 2003 and 2012);  80 Fed. Reg. 22,829 (AR Doc. 6771, BSSG 87988) ("At the time of the proposed listing rule, we stated that declining [B]i-State DPS population trends were continuing for the Pine Nut, Desert Creek-Fales, and Mount Grant PMUs, with an unknown trend for the White Mountains PMU" but a "more recent trend analysis conducted by Coates *et al*. (2014, p. 19) examining six populations . . . over a 10-year period between 2003 to 2012 estimated these populations to be stable (not growing or declining.").

In its discussion of "Resiliency, Redundancy, and Representation," the Service relied on the 2014 Oyler-McCance genetic study in support of the conclusion that "while resiliency of the

1   [B]i-State DPS may be reduced to some degree as a result of relatively small total population size,

2   the genetic diversity in the [B]i-State area improves the capacity of the DPS to recover from

3   disturbance, or adapt to changes or effects caused by a disturbance or a combination of

4   disturbances." 80 Fed. Reg. 22,829 (AR Doc. 6771, BSSG 87996). It also described the results of

5   another recent genetic study, Tebbenkamp 2014, which the Service found supported the

6   conclusion that there are "between three and six populations (or groups of birds) in the Bi-State

7   area that largely operate demographically independent of each other." *Id*.

8         The Service also conducted an "SPR" analysis in its Withdrawal Decision. 80 Fed. Reg.

9   22,852-22,853 (AR Doc. 6771, BSSG 88009-88010). Applying the SPR Policy adopted by the

10   Service in 2014, the Service addressed whether three PMUs – Pine Nut, White Mountains and

11   Mount Grant – "rise to the level such that the sage grouse is likely to become an endangered

12   species in the foreseeable future (threatened) in these three PMUs combined." *Id*. at BSSG 88010.

13   The Service found that "the combination of the [B]i-State DPS small population size, isolation due

14   to fragmented habitat, peripheral locations, and the presence of several stresors [sic] to the sage-

15   grouse in the Pine Nut, Mount Grant, and White Mountains PMUs makes these PMUs more

16   vulnerable than the Bodie, Desert Creek-Fales, and South Mono PMUs, but not to the degree that

17   sage-grouse are in danger of extinction or likely to become so in the foreseeable future in these

18   PMUs." *Id*. The Service relied, in part, upon the Coates Study in support of this conclusion,

19   finding that it showed that "several of the populations in the [B]i-State area (including but not

20   limited to the core populations) are stable (as opposed to declining)." *Id*. It also relied on findings

21   that "1) Multiple sage-grouse are still observed through monitoring activities, (2) one to eight

22   active leks are present within each PMU, [and] (3) stresors [sic] acting upon these small

23   populations are not geographically concentrated and exist in all six PMUs throughout the range of

24   the [B]i-State DPS." *Id*.

25         Ultimately, the Service acknowledged that there is "information available that may lead

26   some to believe that the populations in these three PMUs are at risk of becoming endangered in

27   the foreseeable future" but concluded, based on its PECE analysis, that ongoing conservation

28   efforts would "change[ ] the trajectory from a point where the DPS was previously considered to

be a threatened species, to a point where the best available information related to current and future conservation efforts indicates the entire range of the DPS, including the specific portion of the DPS's range in the Pine Nut, Mount Grant, and White Mountains PMUs, does not meet the definition of a threatened species or an endangered species." *Id.* On that basis, the Service concluded that listing of the Bi-State DPS was not warranted under the SPR Policy, finding that "substantial information indicates that: (1) There are no portions of the [B]i-State DPS that may be significant, and (2) the DPS is not likely to become an endangered species in the foreseeable future in the portion of its range that harbors the least number of birds (i.e., the Pine Nut, Mount Grant, and White Mountains PMUs)." 80 Fed. Reg. 22,853 (AR Doc. 6771, BSSG 88010).

### C. The Complaint

Plaintiffs bring this action under the ESA, 16 U.S.C. §§ 1521-1544, and the APA, 5 U.S.C. §§ 551, 701-706. They assert three claims. First, they claim that the Service's withdrawal of the proposed rule to list the Bi-State DPS as threatened violated the ESA and was arbitrary, capricious and an abuse of discretion under the APA, 5 U.S.C. § 706(2), because the Service "failed to properly apply the ESA's listing factors, failed to adhere to the best available science, and failed to adequately explain why it reversed course and denied protection to the Bi-State Sage Grouse and its habitat." Complaint ¶¶ 79-81.

Second, Plaintiffs bring both a facial and an as-applied challenge to the SPR Policy, asserting that the Service's adoption of the SPR Policy and its application of that policy in connection with its decision to withdraw the Proposed Listing of the Bi-State DPS were arbitrary and capricious and an abuse of discretion under the APA, 5 U.S.C. § 706(2). *Id.* ¶¶ 82-85. Plaintiffs' facial challenge is based on the assertion that the Service "unlawfully defines 'range' as the species['] geographic area at the time of listing rather than the area the species historically inhabited, renders the terms 'significant portion of its range' in the definitions of 'endangered species' and 'threatened species' superfluous, and sets such a high threshold for 'significant portion of its range' that the [SPR Policy] can never be invoked to protect a species that would not otherwise be eligible for listing under the ESA." *Id.* ¶ 83.

Plaintiffs' as-applied challenge is based on the allegation that the Service violated the ESA

26

"by misapplying the [SPR] Policy in the [Withdrawal Decision] when it concluded that a bird species living on a highly fragmented area consisting of less than 50 percent of its original habitat could lose three of its six remaining populations and still not be at any foreseeable risk of extinction, and in concluding that there were no portions of the Bi-State Sage-Grouse DPS that may be significant." *Id.* ¶ 84. Plaintiffs further allege that the Service erred "in determining that the Bi-State Sage-Grouse DPS is not endangered or threatened in a significant portion of its range because the best available data and information shows that the population size for all six population management units of Bi-State Sage-Grouse already [falls below the] threshold necessary to maintain the evolutionary potential of the Bi-State Sage-Grouse and avoid long-term extinction risk . . . and significant risk of extirpation for at least three of the population management units, the Pine Nut, Mount Grant, and White Mountains PMUs." *Id.* According to Plaintiffs, "[s]hould any of these populations be lost, the entire DPS will be at risk of extinction, and therefore, the species is at risk of extinction across a significant portion of its range." *Id.*

Third, Plaintiffs claim the Service violated the ESA and the APA by misapplying the PECE with respect to the evaluation of certainty of implementation and effectiveness of the conservation efforts described in the 2012 BSAP. *Id.* ¶¶ 86-89. In particular, Plaintiffs point to the fact that while the 2012 BSAP "discusses funding commitments, it is a voluntary agreement that contains no commitment to implement many of the measures the Service emphasized in its determination that threats to the Bi-State Sage-Grouse DPS are adequately addressed." *Id.* ¶ 87. Further, Plaintiffs assert, the 2012 BSAP "does not fully identify the specific conservation measures proposed." *Id.* With respect to the evaluation of effectiveness, Plaintiffs contend the 2012 BSAP "does little to address risks from livestock grazing, small population size and structure, cheatgrass, mining, renewable energy development, and recreation, each of which the Service previously identified as threats to the Bi-State Sage-Grouse DPS." *Id.* ¶ 88.

**D.    Contentions of the Parties**

**1.  Plaintiffs' Contentions**

Plaintiffs ask the Court to enter summary judgment in their favor on all three of their claims and to enter an order vacating and remanding the Withdrawal Decision and SPR Policy and

enjoining Defendants from relying on or applying that policy.  Plaintiffs argue that the Withdrawal

Decision is unlawful on numerous grounds.  First, they contend it is not based on the best

available science, focusing in particular on: 1) the Service's reliance on the 2014 Coates Study to

show that the population of the Bi-State DPS is stable; and 2) the Service's reliance on recent

genetic studies to support their revised analysis of species resiliency, redundancy and

representation.   They also contend the Service addressed threats to the Bi-State DPS only in

isolation and failed to consider the cumulative impacts of these threats.

Second, they argue that the Service improperly relied on updates to various land use plans

that had not yet been adopted whereas the Service may consider only *existing* regulatory

mechanisms in making listing determinations.

Third, Plaintiffs challenge the Service's PECE analysis, which concluded that the future

conservation efforts described in the 2012 BSAP justified withdrawing the listing of the Bi-State

DPS.  In particular, Plaintiffs argue that PECE does not allow the Service to rely on "speculative

promises" of future action but instead requires that it rely on "formalized conservation efforts"

where there is a "high level of certainty" that the measures will be implemented and effective.

According to Plaintiffs, the Service did not adhere to this requirement in conducting its PECE

analysis.  With respect to the level of certainty that the conservation measures in the 2012 BSAP

will be implemented, Plaintiffs argue that the letters of commitment by federal agencies to funding

and staffing, upon which the Service relied in its Withdrawal Decision, cannot provide the

requisite certainty where they purport to commit to efforts that will occur over the next ten years.

Such commitments, no matter how well-intentioned, cannot be "highly certain" when agency

budgets are subject to annual Congressional budget appropriations and executive branch

prerogatives, Plaintiffs assert. Plaintiffs also contend there is not a high level of certainty that the

conservation efforts envisioned in the 2012 BSAP will be effective.  Rather, they argue, the

Service provides a "laundry list" of proposed future actions without explaining why they would be

sufficiently effective to withdraw the Proposed Listing of the Bi-State DPS.

Plaintiffs also argue the PECE analysis is flawed because the ESA permits the Service to

consider conservation efforts by "any State or foreign nation, or any political subdivision of a

28

State or foreign nation" in determining whether listing is warranted.  *See* 16 U.S.C. § 1533(b)(1)(A).  When it comes to conservation efforts by federal agencies, on the other hand, the ESA takes into account only *existing* regulatory mechanisms, Plaintiffs assert.  *See* 16 U.S.C. § 1533(a)(1)(D).  According to Plaintiffs, the Service violates the ESA by relying on non-regulatory promises by a few federal agencies to deprive the Bi-State DPS of the mandatory protection that would be required of all federal agencies if it were listed as threatened.

Finally, Plaintiffs challenge the 2014 SPR Policy on its face and as applied.  Plaintiffs' facial challenge is based on the definitions of "significant" and "range" in the SPR Policy.  As to the former, Plaintiffs contend the SPR Policy gives the "significant portion of its range" language of the ESA no independent meaning because a portion of a species' range is "significant" under the SPR Policy only if its contribution to the viability of the species is so important that without the members of that portion the species would be threatened or endangered throughout all of its range.  Plaintiffs argue that that approach is inconsistent with the Ninth Circuit's holding in *Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001). They also contend it is inconsistent with Congressional intent and the purpose of the ESA.  With respect to the definition of "range" in the SPR Policy as meaning "current range," Plaintiffs argue that this definition violates principles of statutory construction because "range" is used throughout the ESA to refer to the historical range of a species.

Plaintiffs also contend the Service misapplied the SPR Policy when it considered whether the listing of the Bi-State DPS should be withdrawn.  In particular, they argue that the Service failed to explain why the acknowledged challenges to the smaller PMUs, which are at significant risk of extirpation, are not sufficient to show that the entire species is threatened under the SPR Policy.

### 2.  Defendants' Contentions

Defendants contend they have violated neither the ESA nor the APA and ask the Court to enter summary judgment in their favor on all of Plaintiffs' claims.   First, they reject Plaintiffs' assertion that the Service's PECE analysis was flawed, arguing that it was based on an extensive analysis of the 2012 BSAP, including the new information that was submitted during the public

comment period for the proposed listing by the local, state and federal agencies involved in the implementation of the plan. According to Defendants, this included consideration of refined conservation priorities and specific and concrete conservation measures, as well as letters of commitment totaling $45 million in funding for these measures. Because this new information addressed the shortcomings identified in the Proposed Listing, Defendants assert, the Service's conclusion that the PECE criteria were satisfied was reasonable.

Defendants reject Plaintiffs' argument that the conservation plans outlined in the 2012 BSAP are too speculative to satisfy PECE, arguing that PECE is a predictive tool that allows the Service to consider even incomplete and unproven actions, so long as they are "sufficiently certain" to be implemented and effective. Likewise, Defendants accuse Plaintiffs of adopting a "cramped" reading of language in the PECE policy that states that the Service "must determine at the time of the listing decision that the conservation effort has improved the status of the species."

Defendants argue that Plaintiffs' reliance on the vagaries of Congressional funding and changing executive priorities to show that implementation of the BSAP conservation measures is not "sufficiently certain" is a "novel argument" that is unsupported by case law. Further, they assert, the possibility of budget cuts is speculative and should not be considered. And even if appropriations were reduced in future budgets, they contend, this does not automatically result in cuts to particular programs given that agencies retain the discretion to set priorities.

Defendants also argue that the Service reasonably concluded that the actions in the 2012 BSAP are "sufficiently certain" to be effective, rejecting Plaintiffs' contention that the Service did not provide specific reasons in support of that conclusion. To the contrary, Defendants assert, the Service provided an extensive evaluation of the threats to the Bi-State DPS, the efficacy of past and ongoing conservation efforts and the likely efficacy of future conservation measures in addressing these threats. The Service also compared planned conservation measures in the 2012 BSAP to the guidance provided in the COT report, which provided peer-reviewed conservation objectives and recommended measures to achieve them. According to Defendants, the main example cited by Plaintiffs – conservation efforts to remove pinyon and juniper trees from sagebrush habitat – actually shows that the Service conducted a thorough analysis of how the

conservation efforts described in the 2012 BSAP were likely to reduce this threat.

Defendants also reject Plaintiffs' argument that the Service should not have considered the future voluntary conservation efforts of federal agencies, arguing that under PECE and the ESA, the Service may consider "the pertinent laws, regulations, programs, and other specific actions of *any* entity that either positively or negatively affects the species." To the extent that Plaintiffs rely on 16 U.S.C. §1533(b)(1)(A), which calls for consideration of conservation efforts of "any State or foreign nation," Defendants contend this provision is not exclusionary and does not preclude the Service from considering the non-regulatory efforts of federal agencies.

With respect to Plaintiffs' assertion that the Service did not rely on the best available science, Defendants argue that the Service's reliance on the Coates Study and the Oyler-McCance and Tebbenkamp genetic studies in support of the Withdrawal Decision was not arbitrary and capricious. With respect to the Coates Study, Defendants reject Plaintiffs' assertion that the study: 1) did not support the conclusion that the population of the Bi-State DPS is stable; and 2) did not provide a sufficient basis for analyzing the general direction of the population trend for the Bi-State DPS because it did not study the Mount Grant or White Mountains PMUs. As to the genetic studies, Defendants argue that the Service's reliance on them in support of its findings as to species resiliency, representation and redundancy was only one piece of its analysis and that it actually addressed Plaintiffs' concerns about connectivity and minimum sustainable population size, noting that the 5,000 individual minimum population was theoretical and not statistically proven, and that observations showed that the populations "have continued to persist despite relatively small numbers of birds and annual fluctuations." Defendants also reject Plaintiffs' assertion that the Service did not consider threats to the Bi-State DPS cumulatively, asserting that the Service did, in fact, consider specific threats both individually and cumulatively.

Addressing Plaintiffs' challenges to the SPR Policy and its application to the Bi-State DPS, Defendants argue that the policy is a permissible construction of the ESA and is entitled to deference. They further contend the policy reasonably defines the words "significant" and "range." As to the term "significant" Defendants contend Plaintiffs' challenge is not ripe for judicial review because the Service's conclusion that the Bi-State DPS was not threatened under

the SPR Policy was based on its finding that *no* portion of the Bi-State DPS was threatened and therefore, it did not address whether any portion was "significant." Defendants also argue that the Service's application of the SPR Policy in the Withdrawal Decision was reasonable.[5]

## III. ANALYSIS

### A. General Legal Standards Governing Judicial Review Under the APA's "Arbitrary and Capricious" Standard

Judicial review of agency action under the ESA is governed by the "arbitrary or capricious" standard set forth in the APA, which provides that "a reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under this standard is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id*. (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, (1962)). Typically, this requires courts to "'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id*. (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System*, supra, 419 U.S. 281, 285 (1974); and citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

The Supreme Court has explained that "[n]ormally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. at 43. "In recognition of the agency's

---

[5] The Intervenors' arguments are limited to the question of whether the Service's PECE analysis was arbitrary and capricious. Their arguments on that subject largely mirror those of Defendants and therefore the Court does not summarize them here. The Court has considered their arguments, however, and addresses them as appropriate in its discussion of the PECE analysis.

technical expertise the court usually defers to the agency's analysis, particularly within its area of competence." *Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010). Agency action is not entitled to such deference, however, "when the agency's decision is without substantial basis in fact" or there is no "rational connection between the facts found and the determinations made." *Id*. (citing *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 766 (9th Cir. 2007)).

Where an agency takes action under the ESA, it is required to "use the best scientific and commercial data available." 16 U.S.C.A. § 1536(a)(2). Courts have held that "[a] failure by the agency to utilize the best available science is arbitrary and capricious." *Consol. Delta Smelt Cases*, 717 F. Supp. 2d 1021, 1060 (E.D. Cal. 2010). The Ninth Circuit has explained, however, that "'[t]he best available data requirement merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (quoting *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006)) (internal quotation and citation omitted). On the other hand, where superior information is not readily available, the "best available science" requirement of the ESA does not "insist on perfection" and does not require the "'the best scientific data *possible*.'" *Id*. (quoting *Building Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246 (D.C.Cir. 2001) (emphasis added); *see also Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992) (holding that "[w]hen an agency relies on the analysis and opinion of experts and employs the best evidence available, the fact that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination 'arbitrary and capricious.'")(citing *Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984)).

"The [APA] makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action." *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). Thus, "agency action representing a policy change" need not be "justified by reasons more substantial than those required to adopt a policy in the first instance." *Id*. at 514. Nonetheless, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Id*. (emphasis in

original). Further, when a "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency may need to "provide a more detailed justification than what would suffice for a new policy created on a blank slate" as it "would be arbitrary or capricious to ignore such matters." *Id*.

Finally, when a court reviews an agency's construction of a statute that is "silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 842-843 (1984); *see also Pac. Nw. Generating Co-op. v. Dep't of Energy*, 580 F.3d 792, 806, 812 (9th Cir. 2009)("When relevant statutes are silent on the salient question, we assume that Congress has implicitly left a void for [the] agency to fill, and, therefore, we defer to the agency's construction of its governing statutes, unless that construction is unreasonable.").

### B. Whether the Decision to Withdraw the Proposed Listing was Arbitrary and Capricious

#### 1. The Service's Reliance on the Coates Study

##### a. Background

The Coates Study was completed during the comment period following the Proposed Listing of the Bi-State DPS and was aimed at providing "a thorough examination of population dynamics and persistence that includes multiple subpopulations and represents the majority of the DPS," which was "largely lacking" at that time. Coates Study (AR Doc. 4480, BSSG 84313). In particular, the authors noted that previous "[r]ange-wide population analyses for sage-grouse" had relied on "underlying data [that] only represent[ed] a portion of the DPS and [were] comprised of lek count observations only." *Id*. (citing studies by the Sage and Columbian Sharp-tailed Grouse Technical Committee 2008 and Garton *et al.*, 2011). In the Coates Study, the authors used data regarding lek attendance, movement, and survival of sage-grouse across multiple life stages, collected between 2003 and 2012 using radio-telemetry techniques, to develop an integrated population model ("IPM") that would "allow[] integration of multiple data sources to inform population growth rates and population vital rates for the Bi-State DPS overall, as well as for

individual subpopulations." *Id*. at BSSG 84314.

The data used to develop the IPM was drawn from six sage-grouse subpopulations (Pine Nut, Desert Creek, Fales, Bodie Hills, Parker Meadows and Long Valley) located in four PMUs (Pine Nut PMU, Desert Creek–Fales PMU, Bodie PMU and South Mono PMU). *Id*. at BSSG 84314-84315. The study did not include data from the Mount Grant or White Mountains PMUs, where no subpopulations were monitored. *Id* at BSSG 84314. The authors concluded, however, that "[t]he number of subpopulations and their spatial distribution provided a reliable representation of demography for the Bi-State DPS." *Id*. at BSSG 84314-84315.

The conclusion of the Coates Study was that "[t]he preponderance of evidence suggests that sage-grouse populations are stable . . . within Bi-State DPS in its entirety over the period of 2003–2012." *Id*. at BSSG 84331. In particular, the authors state that "the following probabilities were calculated for the period 2003–2012: (1) increased population, 42.5 percent; (2) stable population, 15.8 percent; and (3) decreased population, 41.6 percent." *Id*. In other words, "[t]he odds of increase to decrease is 1.03, meaning that the odds that the trend in the population is increasing was 3 percent greater than odds of it decreasing." *Id*. The authors noted that these odds substantially varied across years and sites, however. *Id*. For example, they found that the "data suggest that the odds that the Parker Meadows subpopulation is decreasing was 17.4 times greater than the odds that this subpopulation is increasing," providing "compelling evidence" that this subpopulation is "currently at risk of extinction." *Id*. For the Pine Nut subpopulation, the IPM found a positive growth rate of 1.04. *Id*. at BSSG 84326.

The authors of the Coates Study studied only a ten-year period because: 1) "the lek data across the Bi-State DPS did not meet high enough quality standards to allow for reliable inferences for this specific analysis prior to this 10-year period"; and 2) "demographic data was not available for any subpopulation during years prior to 2003, which [were] fundamental modeling components of [the] study." *Id*. at BSSG 84336. They recognized that sage grouse populations are cyclical but concluded that their study of a ten-year period adequately addressed that "cyclicity," explaining that "sage-grouse generally exhibit a degree of short-term oscillation in population that has a regular period of 6–9 years (Fedy and others, 2013)." *Id*. Therefore, they

found, ten years "will fully encompass the cyclicity, whereas estimates from a shorter term period might be misleading in only capturing a portion of the cycle." *Id.* They noted, however, that "although the 10-year period we evaluated represented climatic variation that might influence population dynamics, a period of severe and prolonged drought did not occur in this time. Thus, the effects of drought on sage-grouse population trends are uncertain for the Bi-State [DPS] and studies that investigate these effects would be beneficial." *Id.*

Plaintiffs challenge the Service's reliance on the Coates Study to support its conclusion that the overall population trend of the Bi-State DPS is stable, asserting that this conclusion is problematic on several grounds. First, they point to the estimated probabilities that the population would increase, decline or stay the same (described above), arguing that a 15.8 percent chance that the population will remain unchanged indicates the population is *not* stable. Plaintiff's Motion at 23. Rather, Plaintiffs assert, the high probability that the population will either increase (42.5%) or decrease (41.6%) supports the conclusion that populations are fluctuating widely from year to year – "a concerning trait for subpopulations below their minimum threshold for viability" – and therefore are *unstable.* Plaintiffs' Reply at 7.

Next, Plaintiffs point out that the Coates Study predicted positive growth for the Pine Nut PMU but that actual observation revealed only one lek in this PMU in 2013 and 2014, with zero males strutting in 2013 and only one strutting in 2014. *See* Plaintiff's Motion at 23-24; Delta Table (AR Doc. 4835, BSSG 5790); 80 Fed. Reg. 22,831 (AR Doc. 6771, BSSG 87988). By contrast, 10 leks were counted in the Pine Nut PMU in 2010. Delta Table (AR Doc. 4835, BSSG 5790). Indeed, the Service itself noted in the Withdrawal Decision that because of this discrepancy, it was treating the results of the IPM, particularly for the Pine Nut PMU, "with caution." 80 Fed. Reg. 22,831 (AR Doc. 6771, BSSG 87988).

Third, Plaintiffs argue that the ten-year framework used in the Coates Study was not long enough to draw "robust, reliable conclusions given the longer cycles of population variations in sage grouse populations." Plaintiffs' Motion at 24; *see also* Plaintiffs' Reply at 6 ("The Coates Analysis ventures that its conclusions are . . . valid, but relies on one study which shows six-to-nine-year oscillations in population while disregarding three other studies that show long-term (ie.

36

decadal) declines in population sizes range-wide") (citing Coates Study (AR Doc. 4480, BSSG 84336) ("Several studies have indicated that sage-grouse populations have experienced long-term (i.e., decadal) declines in population sizes range-wide (Connelly and others, 2004; Sage and Columbian Sharp-tailed Grouse Technical Committee 2008; Garton and others, 2011).").

Finally, Plaintiffs argue the Service cannot draw reliable conclusions from the Coates Study about the Bi-State DPS as a whole because the authors did not have any data from the Mount Grant or White Mountains PMUs, which are two of the largest PMUs by geographical size. *Id.*

Plaintiffs contend these concerns also were articulated by the biologists who attended the Recommendation Team meeting on October 29, 2014. Plaintiff's Motion at 24 (citing October 29, 2014 Recommendation Team Meeting Notes (AR Doc. 4907, BSSG 58535)).

Defendants argue that the Service's reliance on the Coates Study in its Withdrawal Decision was reasonable and that Plaintiffs' arguments regarding the shortcomings of the study do not withstand scrutiny. Defendants' Cross-Motion for Summary Judgment and Memorandum in Support Thereof and in Opposition to Plaintiffs' Motion for Summary Judgment ("Defendants' Opposition/Cross-Motion") at 25. With respect to the probabilities that populations would increase, decrease, or stay the same, Defendants argue that Plaintiffs overstate their case in pointing to the low probability that the population will stay the same, ignoring the fact that over time, the probabilities of increase and decrease will balance each other out. *Id.*

Defendants also challenge Plaintiffs' argument that the scope of the Coates Study was inadequate because it did not rely on any data from the Mount Grant or White Mountains PMUs. *Id.* at 25-26. They point out that there was no data for these PMUs, and in any event, the authors concluded that the populations they did analyze "provided a reliable representation of demography" for the entire Bi-State DPS. *Id.* (quoting Coates Study (AR Doc. 4480, BSSG 84314-84315)). According to Defendants, while the agency must consider the best available science, it need not be conclusive in every respect. *Id.* (citing *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 680 (9th Cir. 2016*), cert. denied sub nom. Alaska v. Ross*, No. 17-118, 2018 WL 491541 (U.S. Jan. 22, 2018), and *cert. denied sub nom. Alaska Oil & Gas Ass'n v. Ross*, No. 17-

133, 2018 WL 491542 (U.S. Jan. 22, 2018); *Cent. Ariz. Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1539-40 (9th Cir. 1993)). They further point out that the Service relied on the Coates Study "only for the limited purpose of assessing the general direction of the population trend for the Bi-State DPS." *Id*. at 26.

Likewise, Defendants assert, Plaintiffs' criticism of the ten-year interval in the Coates Study confuses the best *available* science with the best *possible* science. *Id*. They note that the authors of the Coates Study chose this interval based, in part, on a lack of high quality data that would allow them to use a longer interval. *Id*. They also point out that the authors explained why the interval they used was reasonable. *Id*.

Finally, as to Plaintiffs' criticism of the IPM's predictions for the Pine Nut PMU, which did not match actual observations, Defendants contend this does not establish that the Service acted unreasonably because it expressly recognized this shortcoming in the Withdrawal Decision and did not rely on the model for that PMU. *Id*. at 27.

With respect to comments made by the Recommendation Team regarding the Coates Study, Defendants contend Plaintiffs' reliance on these comments is misplaced because they represent only preliminary statements whereas the Court's task is to evaluate the agency's final decision. *Id*. at 9 n. 3 (citing *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007); *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 33 (D.C. Cir. 1986)). They further assert that Plaintiffs ignore the Service's responses to these concerns, which are also documented in the meeting notes and show that the Service did not "blindly accept the Coates Study in every respect." *Id*. at 7 n. 21.

      b. Discussion

As a preliminary matter, the Court finds that it may consider the comments made by agency biologists who were involved in the internal process of evaluating the available science and conservation efforts in order to make recommendations as to the proposed listing of the Bi-State DPS. In *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, cited by Defendants, the Supreme Court held that "federal courts ordinarily are empowered to review only an agency's final action, *see 5* U.S.C. § 704, and the fact that a preliminary determination by a local agency

38

representative is later overruled at a higher level within the agency does not render the decision making process arbitrary and capricious." 551 U.S. 644, 659–60 (2007). However, as the Ninth Circuit explained in *Barnes v. U.S. Department of Transportation*, the Supreme Court in *National Association of Home Builders* "did not hold . . . that such preliminary determinations are irrelevant in any context . . . or that they may not be considered when reviewing an agency action." 655 F.3d 1124, 1134 (9th Cir. 2011). Here, the comments of the agency biologists who were expressly requested to provide recommendations as to whether the Bi-State DPS should be listed (and whose opinions were cited in the formal recommendation letter by the Director of the Pacific Southwest Region) are relevant to whether the Service's decision to withdraw the proposed listing was arbitrary and capricious even if these preliminary recommendations are not themselves final agency action.[6]

Turning to Plaintiffs' specific challenges, the Court finds that the Service did not violate the requirement that it use the "best available science" by relying on the Coates Study to gain an understanding of overall population trends for the Bi-State DPS. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014). While Plaintiffs have raised some serious questions about the conclusions of the Coates Study, they have not pointed to *superior* scientific evidence addressing current population trends of the Bi-State DPS that the Service ignored when it relied upon the Coates Study. Rather, it appears that prior studies of sage grouse population trends were less comprehensive than the Coates Study, which attempted to fill this gap in the science.

It is a separate question, however, whether there was a "rational connection between the facts found and the determinations made." *See Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010). Even where there is no better science available, failure to meet this requirement may render an agency action arbitrary and capricious. Thus, for example, in *Tucson Herpetological Soc. v. Salazar*, the Ninth Circuit found that the Service's withdrawal of a

---

[6] The Court notes, however, that evidence reflecting the comments of the agency biologists, while shedding some light on the question of whether the Service acted in a manner that was arbitrary and capricious, was not dispositive of the Court's result. Even in the absence of such evidence, the Court would have reached the same result.

proposed listing of the flat-tailed horned lizard was "without substantial basis in fact," and therefore arbitrary and capricious, where the Service concluded that the lizard at issue persisted in a substantial portion of its range; that conclusion, in turn, was based on population studies that were "limited and inconclusive." 566 F.3d 870, 878-879 (9th Cir. 2009). According to the court, the Service erred when it "[a]pparently . . . infer[red] from the uncertainty in the population studies that lizard populations remained viable throughout most of the lizard's current extant range." *Id*. at 878 (internal quotations and citation omitted). Here, the Court must decide whether the Coates Study provides a rational basis for the Service to conclude that the overall population trend of the Bi-State DPS is stable – a conclusion upon which it relied heavily in the Withdrawal Decision.

The Court rejects Plaintiffs' challenge based on the ten-year period that was used in the Coates Study to evaluate population trends. In order to assess the appropriateness of that period, the Court would be required to weigh competing scientific analyses, which exceeds the scope of its review under the arbitrary and capricious standard. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 659 (9th Cir. 2009) ("Though a party may cite studies that support a conclusion different from the one the Forest Service reached, it is not our role to weigh competing scientific analyses"). In particular, the authors of the Coates Study cite one study to justify their conclusion that the ten-year period is reasonable; Plaintiffs point to three other studies cited in the Coates Study that they contend support the opposite conclusion. The Court does not have the expertise to resolve this dispute, nor would it be appropriate for it to do so. At most, this appears to be a challenge based on "weak" science.

Similarly, the Court concludes that it is beyond the scope of its arbitrary and capricious review to determine whether the authors of the Coates Study could properly use the IPM to make predictions about the overall population of the Bi-State DPS without data from the Mount Grant and White Mountains PMUs. The authors of the study opined that the subpopulations that they did study provided a "reliable representation of demography" for the entire DPS and the Service found that conclusion to be reasonable. The Court defers to the expertise of the Service on this issue as well.

On the other hand, the Service's adoption of the main conclusion of the Coates Study – that the overall population of the Bi-State DPS is stable – is inconsistent with its own finding, set forth in the Withdrawal Decision, that the results of the Integrated Population Model (IPM) that was developed by Coates must be interpreted "with caution" because the IPM incorrectly predicted the population trend in the Pine Nut PMU. 80 Fed. Reg. 22,831 (AR Doc. 6771, BSSG 87988) ("[t]herefore, we interpret these model results, particularly for the [Pine Nut] population, with caution."). In other words, the Service itself recognized that the failure to accurately predict the population in the Pine Nut PMU cast significant doubt on the validity of the IPM as a whole. This scenario is similar to the one in *Tucson Herpetological Society*, where the Service drew inferences as to persistence even though it had recognized that the studies on which it relied were "limited and inconclusive."

Defendants contend the Service "acknowledged and accounted for the limitations of the Coates [S]tudy with respect to the Pine Nut subpopulation, but there was no reason to discount the Coates [S]tudy in its entirety," citing cases that hold that even if plaintiffs can "poke some holes" in a model, that does not mean reliance upon that model is arbitrary and capricious. Defendants' Opposition/Cross-Motion at 27 (citing *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 620-621 (9th Cir. 2014); *Alaska v. Lubchenco*, 825 F. Supp. 2d 209, 223 (D.D.C. 2011)). The problem with that argument, however, is that it mischaracterizes the Withdrawal Decision on this question. The Service did not discount the IPM as to only the Pine Nut PMU. Rather, as discussed above, the Service found that the predictions of the population model *as a whole* should be treated with caution. Indeed, this conclusion is entirely consistent with the opinions of virtually all of the agency biologists who participated in the Recommendation Team meeting, who concluded in October 2014 that the current status of the Bi-State DPS – considering new information (including the Coates Study) received after the 2013 listing proposal but not the likely impact of future conservation efforts – was threatened. In light of the Service's own recognition of the questionable validity of the model developed in the Coates Study, the Service erred in relying on that study in support of its finding in the Withdrawal Decision that the overall population of the Bi-State DPS was stable.

### 2. The Service's Reliance on New Genetic Studies

#### a. Background

In the Withdrawal Decision, the service addresses "Resiliency, Redundancy, and Representation." It describes "resiliency" as follows:

> *Resiliency* refers to the capacity of an ecosystem, population, or organism to recover quickly from disturbance by tolerating or adapting to changes or effects caused by a disturbance or a combination of disturbances.

> The degree of resiliency of a species is influenced by both the degree of genetic diversity across the species, and the number of individuals. Resiliency increases with increasing genetic diversity and/or a higher number of individuals; it decreases when the species has less genetic diversity and/or fewer individuals.

80 Fed. Reg. 22,839 (AR Doc. 6771, BSSG 87996) (emphasis in original). Turning to the resiliency of the Bi-State DPS, the Withdrawal Decision goes on to state that "resiliency may be lower to some degree because the total population size is relatively small (e.g., compared to the population size of many upland game birds), with some populations having low numbers or negative population trends." *Id*. On the other hand, the Service points to a 2014 study by Oyler-McCance *et al*. ("Oyler-McCance Study"), along with a number of older studies, that indicate that the genetic diversity of the Bi-State DPS "does not appear to be low." *Id*. On the basis of these studies, the Service concludes:

> This information suggests that while resiliency of the [B]i-State DPS may be reduced to some degree as a result of relatively small total population size, the genetic diversity in the [B]i-State area improves the capacity of the DPS to recover from disturbance, or adapt to changes or effects caused by a disturbance or a combination of disturbances.

*Id*. The Service also notes that "[m]ultiple, interacting populations across a broad geographic area provide insurance against the risk of extinction caused by catastrophic events (redundancy)." *Id*.

Next, the Service states that the Oyler-McCance Study and Tebbenkamp 2014 ("the Tebbenkamp Study") support its conclusion that there are "between three and six populations . . . in the [B]i-State area that largely operate demographically independent of each other." *Id*. Also citing the Oyler-McCance and Tebbenkamp Studies, the Service states that "[r]epresentation across the [B]i-State DPS is moderate to high, with three to six genetically different groups across

the [B]i-State DPS." *Id.* (The Service defines "representation" as "conservation of the diversity

of a species, including genetic make-up." *Id.*) The Service notes that the viability of some of the

smaller populations is "less certain" and acknowledges that "[i]f a population is permanently lost,

the DPS' population redundancy would be lowered, thereby decreasing the DPS' chance of

survival in the face of potential environmental, demographic, and genetic stochastic factors and

catastrophic events (extreme drought, wildfire, disease, etc.)." *Id.* It finds that the "level of threats

faced by the population[s] that make up the [B]i-State DPS" is reduced due to "ongoing and

planned" conservation measures under the 2012 BSAP. *Id.*

Plaintiffs challenge the Service's characterization of the "resiliency, redundancy and

representation" of the Bi-State DPS, arguing that the "Service erroneously suggested that two

recent genetic reports may lessen concerns about persistence over time because they indicate that

[there is] moderate to high genetic diversity across the DPS range." Plaintiffs' Motion at 26.

Plaintiffs point to the Service's own recognition that "[m]ultiple, interacting populations across a

broad geographic area provide insurance against the risk of extinction caused by catastrophic

events (redundancy)," arguing that here, the evidence shows that the populations that make up the

Bi-State DPS are isolated and do *not* interact. *Id.* In other words, Plaintiffs argue that the Service

has overstated the degree of resiliency, redundancy and representation based on the genetic

diversity found in the Oyler-McCance and Tebbenkamp Studies.

Plaintiffs also point to a draft version of the Withdrawal Decision in which the Service

used much more dire language in its discussion of this issue, stating as follows:

> [W]e find that resiliency, redundancy, and representation in the Bi-State DPS are a concern for the DPS's long-term persistence given current and future conditions. The best available information indicates resiliency overall is low, with four of six populations being small. Trends for some of the smaller populations (e.g., Pine Nut, Fales, and Parker Meadows) remain of concern at the DPS level because fluctuations in these small, less secure populations are likely to result in extirpations and loss of population redundancy within the DPS. Representation is not of concern at this time but may be in the future if smaller populations become extirpated. When considered together, the low level of resiliency and redundancy, current and future threats to the Bi-State populations (in particular, see Drought (Factor E discussion below)), the potential loss of one or more small populations outside of the two core populations, the overall reduction of range, and future risk to representation indicate

the long-term persistence of the Bi-State DPS may be at risk.

Draft Withdrawal Decision (AR Doc. 5158, BSSG 64536). According to Plaintiffs, this grim picture is based on the fact that the populations within the Bi-State DPS are "below the theoretical minimum threshold" for persistence and are isolated from one another. Plaintiffs' Motion at 25; 80 Fed. Reg. 22,839 (AR Doc. 6771 BSSG 87996).

Defendants counter that there is nothing arbitrary and capricious about the Service's reliance on these studies, the validity of which Plaintiffs do not challenge, and that Plaintiffs are merely criticizing the Service's weighing of the evidence. Defendants' Opposition/Cross-Motion at 27. Such weighing is entitled to deference, they contend. *Id*. at 28. Further, they assert, the Service expressly noted in the Withdrawal Decision that the "theoretical minimum threshold" is not "statistically proven" and that "populations have continued to persist despite relatively small numbers of birds and annual fluctuations." *Id*. (quoting 80 Fed. Reg. 22,839 (AR Doc. 6771, BSSG 87996).

b. Discussion

While Plaintiffs challenge the Service's reliance on the Oyler-McCance and Tebbenkamp Studies in support of its conclusions related to resiliency, redundancy and representation, they do not challenge the validity of these studies, or the specific findings about the genetic diversity of the Bi-State DPS that the Service attributes to them. Rather, Plaintiffs disagree with the Service's conclusions as to the *implications* of these studies, which they contend do not justify the somewhat rosier picture in the final Withdrawal Decision than was painted in an earlier draft. Yet the Service acknowledges in the Withdrawal Decision that the individual populations are "relatively small and may be below the theoretical minimum threshold . . . for long-term persistence, as is the entire DPS, on average . . . ." 80 Fed. Reg. 22,839 (AR Doc. 6771, BSSG 87996). It also recognizes that the subpopulations are "demographically independent of each other." *Id*. Nor do Plaintiffs appear to contend that genetic diversity within the Bi-State DPS has *no* positive impact on the species' likelihood of persistence. Under these circumstances, it is appropriate to defer to the agency's expertise. *See Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992) ("[t]he court should not supplant the agency's findings merely by identifying alternative

44

1   findings that could be supported by substantial evidence.").  The Court therefore rejects Plaintiffs'

2   challenge to the Withdrawal Decision based on the Service's reliance on these genetic studies.

3           **3.  The Service's Consideration of Cumulative Threats**

4               a.  Background

5       In the Withdrawal Decision, the Service considered the following threats to the Bi-State

6   DPS: "Invasive nonnative and native plants,"  "wildfires and altered fire regime;"  "infrastructure,

7   including roads, power lines, fences, communication towers, and landfills;"  "grazing and

8   rangeland management;" "small population size and population structure;" "urbanization and

9   habitat conversion;" "mining;" "renewable energy development and associated infrastructure;"

10  "disease or predation;" "climate change, including drought;" "recreation;" "overutilization

11  (including commercial and recreational hunting);" "scientific and educational uses;" "pesticides

12  and herbicides;" and "contaminants."  80 Fed. Reg. 22,835 (AR Doc. 6771, BSSG 87992).  In

13  addition, it included a section entitled "Synergistic Impacts."   In that section, the Service states, in

14  part:

15          Many of the impacts described here and in the accompanying
            Species Report may cumulatively or synergistically affect the bi-
16          State DPS beyond the scope of each individual stressor. For
            example, the future loss of additional significant sagebrush habitat
17          due to wildfire in the [B]i-State DPS . . . could occur because of the
            synergistic interactions among fire, people and infrastructure,
18          invasive species, and climate change. Predation may also increase as
            a result of the increase in human disturbance and development.
19

20  *Id.* at BSSG 88001.  The Withdrawal Decision also refers readers to the 2015 Species Report for a

21  "full evaluation" of threats to the Bi-State DPS.  *Id*. at BSSG 87992.

22      The 2015 Species Report contains lengthier descriptions of the individual threats, as well

23  as a slightly expanded discussion of "synergistic impacts," stating as follows:

24          Many of the impacts described in this report may cumulatively or
            synergistically affect the Bi-State DPS beyond the scope of each
25          individual stressor. For example, the future loss of additional
            significant sagebrush habitat due to wildfire in the Bi-State DPS is
26          anticipated because of the intensifying synergistic interactions
            among fire, people and infrastructure, invasive species, and climate
27          change. As another example, improper livestock grazing
            management alone may only affect a small portion of the Bi-State
28          DPS, but when combined with invasive species, drought, and

                                    45

> wildfire, it could collectively result in substantial habitat loss, degradation, or fragmentation across large portions of the species' range. Predation may also increase as a result of increases in human disturbance and development. These are just a few scenarios of the numerous impacts that are likely acting cumulatively to further contribute to the challenges faced by many Bi-State DPS populations now and into the future.

2015 Species Report (AR Doc. 5508, BSSG 578-579).

Plaintiffs contend the Service failed to analyze the cumulative impact of the threats to the Bi-State DPS, asserting that while it acknowledged the "synergistic interactions among fire, people and infrastructure, invasive species, and climate change" in the Withdrawal Decision, it "did not discuss their potential impact on loss of sagebrush habitat and/or loss of sage grouse population." Plaintiffs' Motion at 26-27. They further assert that the Service did not "treat cumulative or synergistic threats in the context of the species' small population sizes" and therefore, that they violated the ESA. *Id*. at 27 (citing 50 C.F.R. § 424.11(c); *Wildearth Guardians v. Salazar*, 741 F. Supp. 2d 89 (D.D.C. 2010)).

Defendants assert that the Service "examined threats – both individually and cumulatively – at every turn." Defendants' Opposition/Cross-Motion at 29 (citing 80 Fed. Reg. 22,842 (AR Doc. 6771, BSSG 8799)). They further assert that the Service sufficiently identified and discussed cumulative impacts. *Id*. at 29-30 (citing *Rocky Mountain Wild v. U.S. Fish & Wildlife Serv*., No. 13-cv-00042-M-DWM, 2014 WL 7176384, at *8 (D. Mont. Sept. 29, 2014); *Colorado River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 206 (D.D.C. 2012); *Defs. of Wildlife v. Jewell*, 70 F. Supp. 3d 183, 193 (D.D.C. 2014) ("*Defenders II*"), aff'd sub nom. *Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*, 815 F.3d 1 (D.C. Cir. 2016); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).

b. Discussion

Under 16 U.S.C. § 1533(a) and the regulation interpreting that provision, "[a] species shall be listed or reclassified if the Secretary determines, on the basis of the best scientific and commercial data available after conducting a review of the species status, that the species is endangered or threatened because of *any one or a combination of* " the five factors listed above, in the Court's overview of the ESA. 50 C.F.R. § 424.11(c) (emphasis added). In *WildEarth*

*Guardians v. Salazar*, the court held that the Service's denial of a petition to list the Utah Prairie Dog as endangered was arbitrary and capricious because the Service did not consider the cumulative effect of the threats to the species. 741 F. Supp. 2d 89, 101 (D.D.C. 2010). In that case, the only finding that even arguably addressed the cumulative impact of the threats facing the species was the conclusory statement that "[a]lthough we agree that these factors are hindering recovery of the species, we disagree that the level of threat is significant enough to warrant endangered status." *Id.* at 101.

On the other hand, in cases were the Service has provided even a brief discussion of the cumulative threats, courts have generally found that the Service has met this requirement and deferred to the agency even if it did not consider every possible combination of threats. For example, in *Rocky Mountain Wild v. U.S. Fish & Wildlife Serv.,* the court found that the following discussion of cumulative impacts was sufficient:

> We believe that collectively, these activities have resulted in the presumed reduced abundance of white-tailed prairie dog from historical levels . . . . Many of these factors (grazing, urbanization, fire suppression, agricultural land conversion, and poisonings) were at much greater magnitude in the past and are not currently impacting the species with the same intensity. Other threats (oil and gas development, climate change, shooting, plague, and invasive plant species) can be expected to continue into the future. Of these, we consider plague and oil and gas development to have the greatest potential for cumulative impacts.

No. CV 13-42-M-DWM, 2014 WL 7176384, at *8 (D. Mont. Sept. 29, 2014) (quoting administrative record). The court noted that the Service "determined which factors it felt would cumulatively threaten the prairie dog and discussed the potential implications of those combinations in the Finding." *Id.* It further found that "even if the plaintiffs may disagree with the result or insist that the analysis could have been performed differently, . . . it is necessary to uphold the agency's decision so long as it is supported by the record, even if the record could support alternative findings." *Id.* (citing *Arkansas v. Oklahoma*, 503 U .S. 91, 112–13 (1992)); *see also Colorado River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 206 (D.D.C. 2012) (holding that although the Service's "analysis of how the listing factors interact" was "somewhat haphazard" to the extent it was scattered throughout its findings rather than set forth in a separate

section, it had adequately considered cumulative threats because its reasoning could be "reasonably discerned").

The Court finds that this case is distinguishable from *WildEarth Guardians* (and more like *Rocky Mountain Wild* and *Colorado River Cutthroat Trout* ) in that the Service offered sufficient explanation of its consideration of cumulative threats. It has identified the threats that may interact and provided some explanation of the implications of the interactions. The Court therefore rejects Plaintiffs' assertion that the Withdrawal Decision is arbitrary and capricious because the Service did not consider cumulative threats.

### 4. Whether the Service Improperly Relied Upon Proposed Amendments to Land Management Plans

#### a. Background

In the Withdrawal Decision, the Service addresses "Existing Regulatory Mechanisms," one of the five factors that must be considered under the ESA to determine whether a species is endangered or threatened. *See* 80 Fed. Reg. 22,844-22,845 (AR Doc. 6771, BSSG 88001-88002); *see also* 16 U.S.C. § 1533(a)(1) (listing five factors that must be considered). In that section of the Withdrawal Decision, the Service states that "[a]n examination of regulatory mechanisms . . . for both the [B]i-State DPS and sagebrush habitats in general reveals that some mechanisms exist that either provide or have the potential to provide a conservation benefit to the [B]i-State DPS." *Id*. It noted, however, that "supporting documents for some of these regulations are many years old and have not been updated, calling into question their consistency with our current understanding of the DPS's life-history requirements, and the DPS's conservation needs." 80 Fed. Reg. 22,845 (AR Doc. 6771, BSSG 88002). It further found that "the conservation actions that have been implemented to date according to the existing regulatory mechanisms vary across the [B]i-State area, although managing agencies are beginning to work more collaboratively across jurisdictional boundaries." *Id*. Thus, it found "[t]he degree to which these existing regulatory mechanisms conserve the DPS is largely dependent on current and future implementation, which can vary depending on factors such as the availability of staff and funding." *Id*.

With respect to federally managed lands, of which the Bi-State DPS is "largely

48

composed," the Service observes that "[h]istorically, land use plans, as they pertain to sage grouse, have been general in nature and afforded relatively broad latitude to land managers."[7]  *Id.*   The Service further explained that proposed amendments to land use plans would "include improved management direction that [will] provide a conservation benefit for the [B]i-State DPS and its habitat."  *Id.*  (explaining that "[t]he proposed amendments identify goals for desired habitat condition at both the site and landscape scale,"  "provide clear direction to managers faced with decisions on discretionary actions, such as infrastructure development projects, to consider the needs of sage-grouse in the decision making process," and "restrict the development of anthropogenic features in [B]i-State DPS habitat and thereby the potential risk these features can exert on sage-grouse in the future."). The Service stated, however, that it did not rely on the proposed amendments in its consideration of the adequacy of existing regulatory mechanisms "because they are not finalized and would require speculation on the Service's part as to the final outcomes of the plans."  *Id.*  Nonetheless, it concluded that existing regulatory mechanisms were "adequate" because, based on the Service's PECE analysis, it had "determined that the ongoing and future conservation efforts under the BSAP are removing the threats to the [B]i-State DPS."  *Id.* The Service also noted that it did not consider the proposed amendments to land management plans in its PECE analysis.  *Id.*

Plaintiffs contend the Service's consideration of existing regulatory mechanisms in the Withdrawal Decision was flawed because the Service found in the Proposed Listing that "federal land management plans, which cover the vast majority of the Bi-State Sage Grouse habitat, were inadequate regulatory mechanisms to protect the species from listing because they were dated, non-specific, and discretionary, and because funding was uncertain."  Plaintiffs' Motion at 27-28 (citing 64 Fed. Reg. 64,372 (AR Doc. 6764 BSSG 87912)).  According to Plaintiffs, the Service reached a different conclusion in its Withdrawal Decision based on its PECE analysis, which "was premised to some extent on the assumption that various land use plans *would be updated and*

---

[7] As noted above, the Service explained in the Proposed Listing that this discretion "can result in land use decisions that negatively affect the Bi-State DPS."  78 Fed. Reg. at 64,372 (AR Doc. 6764, BSSG 87912).

United States District Court
Northern District of California

*adopted* to reflect sagebrush and sage grouse protections" even though "those updates were not in place at the time of the Withdrawal Decision, and thus were not 'existing.'"  *Id*. at 28 (emphasis in original).  Plaintiffs argue the case law is clear that the Service may not rely on *future* regulations in considering this factor.  *Id*. at 27 (citing *Rocky Mtn. Wild v. Walsh*, 216 F. Supp. 3d 1234, 1248, 1152 (D. Co. 2016); *Tucson Herpetological Society v. Norton*, No. CV-04-0075-PHX-NVW, Order at 13 (D. Ariz. Aug. 30, 2005); *Fed'n of Fly Fishers v. Daley*, 131 F. Supp. 2d 1158, 1165 (N.D. Cal. 2000); *Biodiversity Legal Found. v. Babbitt*, 943 F. Supp. 23, 26 (D.D.C. 1996); *Sw. Ctr. for Biological Diversity v. Babbitt*, 939 F. Supp. 49, 52 (D.D.C. 1996)).

Defendants dismiss this argument on the basis that the Service expressly stated in the Withdrawal Decision that it was not relying on the proposed amendments to land management plans in its consideration of existing regulatory mechanisms.  Defendants' Opposition/Cross-Motion at 13 n. 7.  It does not dispute, however, that reliance on regulatory mechanisms that have not yet been adopted would violate the ESA.

b.   Discussion

As the parties are in agreement that the ESA limits the Service to consideration of "existing" regulatory mechanisms and does not extend to *planned* regulatory mechanisms that have not yet been adopted, the only remaining question is whether the Service has violated this requirement by reaching the conclusion – based in part on its PECE analysis of the conservation efforts envisioned in the 2012 BSAP – that listing of the Bi-State DPS as threatened is not warranted.   If the Service based its finding under PECE upon the proposed land management plan amendments (even if only in part), this would appear to allow through the back door consideration of regulatory measures that are not "existing" and would potentially run afoul of the case law prohibiting the consideration of regulatory mechanisms that have not yet been enacted.  The record reflects, however, that the Service did not do so.

Although the final PECE analysis does acknowledge that BLM was in the process of preparing amendments to RMPs and LMRPs for Carson City District, Tonopah and Humboldt-Toiyabe National Forest, it also describes the RMPs and Activity Plans that *already* existed and that contained "detailed, site-specific management actions outlined in livestock allotment

50

management plans, wildlife habitat management plans, wild horse herd area management plans, wilderness management plans. etc." Final PECE Analysis (AR Doc. 5716, BSSG 79507-79608). Further, the Service states in the Withdrawal Decision that it did *not* rely on the proposed amendments when "analyzing the BSAP" under PECE. Withdrawal Decision (AR Doc. 6771, BSSG 88002) (citing Final PECE Analysis). Therefore, the Court rejects Plaintiffs' assertion that the Withdrawal Decision was arbitrary and capricious because the Service impermissibly relied on amendments to land use plans that had not yet been enacted in support of its conclusion that planned conservation measures under the 2012 BSAP justified withdrawal of the proposed listing.

### 5. The Service's PECE Analysis

#### a. Background

The primary basis for the Service's Withdrawal Decision was its conclusion under PECE that the conservation efforts outlined in the 2012 BSAP were sufficiently certain to be implemented and effective to justify the withdrawal of the Proposed Listing as "not warranted." As discussed above, this conclusion was based on Commitment Letters submitted to the Service by various state and federal agencies and one California county. In particular, Commitment Letters were submitted by: 1) State of Nevada Department of Wildlife; 2) State of California Department of Fish and Wildlife; 3) U.S. Department of Agriculture: U.S. Forest Service and NRCS; 4) United States Department of the Interior Bureau of Land Management (BLM); 5) United States Geological Survey; and 6) Mono County. EOC Comment Package re Listing of Bi-State DPS (AR Doc. 4100, BSSG 80372- 80408).

As the EOC cover letter accompanying the Commitment Letters explains, total funds committed to conservation efforts under the 2012 BSAP amounted to $45,233,333, coming from the following sources: 1) Bureau of Land Management ($6,500,000); 2) Natural Resources Conservation Service ($12,000,000); 3) USDA Forest Service ($13,900,000); 4) California Department of Fish and Wildlife ($2,500,000); 5) Nevada Department of Wildlife ($3,400,000); 6) U.S. Geological Service ($400,000); 7) Mono County ($2,200,000); 8) U.S. Fish and Wildlife Service ($1,000,000); and 9) Private Contributions (e.g., landowners, NGOs) ( $3,333,333). EOC Comment Package re Listing of Bi-State DPS (AR Doc. 4100, BSSG 80368-80370).

The letters submitted by the Nevada Department of Wildlife, the California Department of Fish and Wildlife and the U.S. Geological Survey were relatively brief. The Nevada Department of Wildlife describes in its letter "unprecedented" "collaborative, multi-partnered efforts . . . to fund, implement, and monitor the effects of science-based, prioritized conservation actions outlined in the Action Plan, in an adaptive management framework." EOC Comment Package re Listing of Bi-State DPS (AR Doc. 4100, BSSG 80372). It also notes that it has "expended over $1.4 million specifically towards implementation of the revised Action Plan" and that it is committed to devoting at least $3.6 million to such efforts over the next ten years. *Id.* However, the only specific measure it references is its "vegetation monitoring program," stating that that program "in coordination with sage-grouse monitoring on the ground will provide certainty of effectiveness." *Id*.

The Commitment Letter submitted by the California Department of Fish and Wildlife is somewhat more detailed. It describes specific past conservation efforts involving the Bi-State DPS, including the acquisition of 1,235 acres in the Fales-Desert Creek PMU "to protect critical sage-grouse breeding and nesting habitat on Burcham and Wheeler Flats in northern Mono County" and the construction and/or funding of conservation easements on approximately 180 acres of private lands in southern Mono County and 1,200 acres at Sinnimon Meadow, in the Bodie PMU. *Id*. at BSSG 80375. With respect to future conservation efforts, the letter states that "the Department commits to implementation of specific projects outlined in the Bi-State Action Plan in partnership with other agencies and entities," and is "currently making plans to conduct a translocation of sage grouse to Parker Meadows in the South Mono PMU as a first priority." *Id*. It further states that the Department is working with partners to "develop a grouse monitoring program throughout the Bi-State DPS and plan[s] to monitor the effects of ravens and other predators surrounding the Mono County landfill in Long Valley as identified in the Action Plan." *Id.* Finally, it states that it is "committed to continue funding at current levels or greater for the foreseeable future regardless of the listing decision" and that "[t]his amount will total at least $3.6 million over the next ten years." *Id.*

The Commitment Letter of the U.S. Geological Survey describes the support it has

52

provided in the past, primarily with respect to the development of the Conservation Planning Tool (CPT) and the IPM, and commits to continuing to provide research and technical assistance. *Id*. at BSSG 80398-80399.

The Commitment Letters of BLM, USDA (on behalf of NRCS and USFS) and Mono County include more detailed descriptions of planned conservation efforts, with both BLM and USDA including ten-year plans. *Id*. at BSSG 80378-80397, BSSG 80400-80402. In the Commitment Letter submitted by USDA, the two top priorities of the 2012 BSAP are identified as: "(1) establishing conservation easements on private lands to ensure critical brood habitats persist and (2) removing encroaching conifers that degrade habitats and increase predation, primarily on public lands." *Id*. at BSSG 80378. The letter states that since 2010, "USDA has finalized contracts for about $27.5 million of on-the-ground projects addressing critical threats identified in the Action Plan for the two top priorities — primarily the establishment of conservation easements, removal of encroached conifer, and restoration of brood habitats" and that "[b]oth the Forest Service and NRCS stand ready and firmly committed to doing more." *Id*.

Similarly, the BLM Commitment Letter states that BLM "has been working with the U.S. Fish and Wildlife Service . . . and other Federal, State, local and private partners for several years to conserve the Bi-State [DPS] of Greater Sage-Grouse" and that it has been involved in developing the 2012 BSAP, which it describes an "unprecedented cooperative conservation effort." *Id*. at BSSG 80389. In addition to providing a ten-year strategy plan and committing to continued funding of conservation efforts, the BLM Commitment Letter commits to "finaliz[ing] and implement[ing] plan amendments for the Carson City and Tonopah Resource Management Plans (RMPs)," as noted above. *Id*. at BSSG 80390.

Plaintiffs assert in their summary judgment motion that the Service's PECE analysis was flawed, and thus arbitrary and capricious, because PECE allows the Service to consider only conservation efforts that are already "in place" at the time of the listing decision and that have improved the status of the species. Plaintiffs' Motion at 28-30 (citing *Oregon Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1153 (D. Or. 1998); *Alaska v. Lubchenco*, 825 F. Supp. 2d 209, 219 (D.D.C. 2011); *In re Polar Bear Endangered Species Act Listing*, 794 F. Supp. 2d 65, 113 n.56

(D.D.C. 2011); *Western Watersheds Project v. U.S. Forest Service*, 535 F. Supp. 2d 1173, 1187 (D. Idaho 2007); *Ctr. For Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137,1141 (D. Colo. 2004)).   On the other hand, Plaintiffs contend, the Service may not consider "speculative future conservation actions." *Id*. (citing *Fed'n of Fly Fishers v. Daley*, 131 F. Supp. 2d 1158, 1165  (N.D. Cal. 2000)).  Here, Plaintiffs assert, the Service erred by relying on a "voluntary strategy" where there was "no formalized enforceable agreement or management plan in place for Bi-State Sage Grouse recovery."  *Id*. at 30.

Plaintiffs further contend  the Commitment Letters and the 2012 BSAP do not provide sufficient certainty that the measures described in them will be either effective or implemented and therefore, that the determination on the part of the Service that these PECE requirements were met was arbitrary and capricious.  Plaintiffs' Motion at 31-33.  With respect to implementation, Plaintiffs note that the Service cited in support of its finding of sufficient certainty in the Withdrawal Decision: 1) "agency commitments to staffing and significant funding;" and 2) "continued participation" by those who created the BSAP.  *Id*. at 31 (quoting 80 Fed. Reg. 22,847).  Plaintiffs challenge this reasoning, arguing that "[t]he Withdrawal Decision failed to explain how federal public agency funding commitments for individual actions proposed to occur over the next ten years could be certain, let alone highly certain, when agency budgets are subject to annual congressional appropriations and executive branch policy prerogatives."  *Id*.  Plaintiffs contend it was arbitrary and capricious to find that the agency commitments were adequate to establish sufficient certainty as to implementation.  *Id*. at 31-32 (citing *Western Watersheds Project v. Foss*, No. CV-04-168-MHW, 2005 WL 2002473 (D. Idaho Aug. 19, 2005)).

With respect to whether there was sufficient certainty of effectiveness, Plaintiffs contend, the Service pointed to a variety of "effective methodologies" [8] for addressing threats identified as

_____

[8] According to Plaintiffs, the "methodologies" cited  by the Service in the Withdrawal Decision were: "1) targeting brood-rearing habitats for conservation easements and land exchanges, 2) six federal agency projects, 'either partially completed or planned for the future,' that 'target  invasive, nonnative plants' on 634 acres across the 1.3 million acres of documented sagebrush habitat and 'adjustments to grazing and upland habitats, when necessary' to 'reduce the risk of cheatgrass dominance,' 3) road closures and power line and fence removal within some PMUs, 4) use of a conservation planning tool to target the 'best candidates' for restoring

54

impacting the Bi-State DPS, but did not explain how any of them would be effective *enough* to change the status of the Bi-State DPS such that withdrawal of the Proposed Listing was justified. *Id*. at 32-33 (quoting 80 Fed. Reg. at 22,847). Nor did the Service offer any specific information or scientific evidence in support of such a conclusion, Plaintiffs assert. *Id*. at 33.

To illustrate this shortcoming, Plaintiffs offer the example of conservation efforts to remove pinyon-juniper woodlands, which is a significant component of the promised conservation activity on federal lands under the 2012 BSAP. *Id*. According to Plaintiffs, the "Withdrawal Decision record does not provide science to support a conclusion that such measures are or will be effective in enhancing sage grouse survival." *Id*. Moreover, they contend, "the Service did not articulate how many acres of remaining habitat would actually be addressed by these measures or whether that amount of effort would be sufficient to actually improve the status of the Bi-State sage grouse populations." *Id*. They note that although the PECE analysis "suggested that up to 203,329 acres would be examined for potential removal of encroaching pinyon-juniper," Final PECE Analysis (AR Doc. 5716, BSSG 79525), "[t]he Forest Service implementation plan identified environmental review it would undertake for eight pinyon-juniper removal projects covering roughly 95,000 acres over the next ten years . . . . BSSG080385-87 (Doc. 4100)" and the "proposed BLM's ten-year implementation plan was even less comprehensible, showing a single pinyon-juniper removal project – 301 acres in Mill Canyon for a cost of $65,000 – repeated over and over for each fiscal year from 2015 through 2022." *Id*. (citing EOC Comment Package re Listing of Bi-State DPS (AR Doc. 4100, BSSG 80392-95 (BLM 10-year plan))). Finally, Plaintiffs note, "NRCS listed $2,000,000 in EQIP funding over the next five fiscal years to finance 'PJ Removal' on private property, but did not identify any particular project(s) or provide acreage numbers and conceded that it is 'difficult to precisely predict the specific projects landowners will offer for enrollment each [fiscal year].'" *Id*. (quoting EOC Comment Package re Listing of Bi-

---

sagebrush habitat destroyed by wildfire, although such efforts 'vary in success' and recovery of functional habitat takes decades, and (5) 'Identifying potential sage-grouse populations augmentation and reintroduction sites, developing translocation guidelines, and potentially implementing augmentation and reintroduction efforts.'" *Id*. (quoting 80 Fed. Reg. at 22,847-22,848).

se

State DPS (AR Doc. 4100, BSSG 80384)).

Plaintiffs point to cheatgrass removal as another example. *Id.* at 33 n. 7. According to Plaintiffs, "the Service fails to explain why cheatgrass removal efforts at such a low rate – a bare 1,634 acres of the next ten years out of 1.3 million acres of habitat, or 0.1 percent – would be effective, given that the Service identifies the spread of cheatgrass of 'greatest concern' and has indicated that '44 percent of existing sagebrush habitat in Nevada is at moderate or high risk of displacement by cheatgrass.'" *Id.* (citing Final PECE Analysis (AR Doc. 5716, BSSG 79539) (stating that "[s]ix BLM and USFS projects are either partially completed or planned for the future that target invasive, nonnative plants on more than [634 acres] in the Desert Creek-Fales, Mount Grant, and Pine Nut PMUs" and that "[t]he USFS will also control at least [100 acres] of cheatgrass each year over the next ten years in the Pine Nut PMU") and 2015 Species Report (AR Doc. 5508, BSSG 503) (stating that "[a] variety of nonnative invasive plants are present in all PMUs within the B-State area, although cheatgrass is of greatest concern because it is dispersed across all the PMUs" and noting that a study by Wisdom *et al.* (2003) "reported that 44 percent of the existing sagebrush habitat in Nevada is at moderate or high risk of displacement by cheatgrass")).

Plaintiffs also argue that the Service's PECE analysis was flawed because it relied on voluntary conservation efforts by federal agencies. In particular, Plaintiffs contend that because PECE implements 16 U.S.C. § 1533(b)(1)(A), which allows the Service to consider conservation efforts by "any State or foreign nation," efforts by federal agencies should not be considered. *Id.* (citing *Friends of Wild Swan, Inc. v. U.S. Fish and Wildlife Serv.*, 945 F. Supp. 1388, 1399 (D. Or. 1996); 50 C.F.R. § 424.11(f)).

Defendants argue that the Service's analysis and findings under PECE were reasonable because the additional materials submitted by the EOC – and particularly the Commitment Letters – addressed the shortcomings identified by the Service in the Proposed Listing with respect to the 2012 BSAP, establishing that it was now "completely refined" and supported by specific funding commitments. Defendants' Opposition/Cross-Motion at 10-13. First, they assert, the agencies involved in carrying out conservation efforts under the 2012 BSAP further "refined priorities and

1   geographic placement of conservation actions to maximize conservation gains" to the Bi-State

2   DPS using the BSAP's "adaptive management approach and CPT." *Id*. at 11 (citing  Final PECE

3   Analysis, AR Doc. 5716, BSSG 79520-79521 and citing  80 Fed. Reg. 22,846 (AR Doc. 6771,

4   BSSG 88003)).

5   Second, Defendants point to the Service's finding that over 200 conservation projects

6   under the 2012 BSAP had been either implemented and completed or implemented and were

7   ongoing at the time of the Withdrawal Decision.  *Id*. at 12 (citing Final PECE Analysis (AR Doc.

8   5716, BSSG 79517)).  Moreover, they assert, the Commitment Letters established that $45.2

9   million in funds had been committed for future conservation efforts under the 2012 BSAP – more

10  than enough to complete the 79 projects identified in the 2012 BSAP as "necessary to address

11  immediate conservation needs for the [B]i-State DPS and its habitat," which were expected to

12  cost $38 million over ten years. *Id*. at 12 (quoting Final PECE Analysis (AR Doc. 5716, BSSG

13  79517)).

14  Defendants reject Plaintiffs' assertion that the Service impermissibly relied on

15  "speculative" promises about future conservation efforts, arguing that PECE is meant to be a

16  predictive tool and allows the Service to consider future conservation efforts so long as they are

17  "sufficiently certain." *Id*. at 13 (citing *Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*,

18  815 F.3d 1, 8 (D.C. Cir. 2016) ("*Defenders III*")).  In other words, Defendants assert, PECE (and

19  the ESA itself) allows the Service to "'consider all information that a reasonable *prognosticator*

20  would consider under the circumstances.'" *Id*. at 14 (quoting *Rocky Mountain Wild v. Walsh*, 216

21  F. Supp. 3d 1234, 1251 (D. Colo. 2016) (emphasis added)).  Indeed, Defendants assert, "'the point

22  of the PECE Policy was to establish criteria' to clarify when [the Service] would be permitted to

23  consider 'unproven' conservation efforts." *Id*. (quoting *Defenders III*, 815 F.3d at 8)).  Defendants

24  further assert that even if Plaintiffs are correct that PECE requires a "track record" of successful

25  conservation measures, the evidence shows that there is such a track record here and it was cited

26  by the Service in its PECE analysis.  *Id*. at 14-15 (citing Final PECE Analysis (AR Doc. 5716,

27  BSSG 79538)).

28  Defendants also challenge Plaintiffs' assertion that because the 2012 BSAP is a voluntary

strategy, it does not satisfy PECE. *Id*. at 16. Defendants contend PECE permits consideration of voluntary conservation efforts. *Id*. (citing *Defenders III*, 815 F.3d at 8). They also argue there is no requirement under PECE that voluntary conservation efforts must be part of an enforceable agreement. *Id*. at 17.

Defendants reject Plaintiffs' reliance on the uncertainty of budget appropriations in support of their argument that implementation of the 2012 BSAP is not "sufficiently certain." *Id*. at 7-18. They characterize Plaintiffs' argument as "novel" and "overly simplistic." *Id*. at 18. If anything, they assert, it is the possibility of budget cuts that is speculative; and even if appropriations to a particular agency are cut, Defendants argue, this does not automatically mean that the agency will chose to reduce its spending on conservation measures under the 2012 BSAP, as agencies have discretion to set their own priorities as to expenditures. *Id*. Instead, Defendants assert, the Service reasonably concluded based on the Commitment Letters that there was a high level of certainty that the 2012 BSAP conservation measures would be implemented because sufficient funds were committed. *Id*. at 19; *see also* Intervenor's Opposition/Cross-Motion at 10-15 (arguing that the conservation plans that were found to justify withdrawal of proposed listings in *Defenders III* and *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1020 (9th Cir. 2011) show that the 2012 BSAP and Commitment Letters were sufficient to meet PECE requirements).

Defendants also contend the Service reasonably concluded that there was sufficient certainty as to the effectiveness of the conservation measures envisioned in the 2012 BSAP. Defendants' Opposition/Cross-Motion at 19-23. They assert that the Service conducted an extensive review of both threats to the Bi-State DPS and the efficacy of past and ongoing efforts to address these threats. *Id*. at 20 (citing March 12, 2015 Information Memorandum (AR Doc. 6376, BSSG 86469-86579); 80 Fed. Reg. 22,847 (AR Doc. 6771, BSSG 88004)). Defendants also point to the fact that the Service compared the conservation measures in the 2012 BSAP to the objectives set forth in the COT Report, which provided "peer-reviewed guidance as to conservation objectives for the greater sage-grouse." *Id*. (citing COT Report (AR Doc. 5829, BSSG 103823-103937); Final PECE Analysis (AR Doc. 5716, BSSG 79518)). In other words,

58

Defendants argue, the Service conducted a "thorough analysis of *which* threats were addressed by the BSAP conservation efforts and *how* the efforts would reduce these threats." *Id*. at 21.

Defendants contend the example of pinyon-juniper removal efforts supports its position. *Id*. In particular, Defendants assert, the Service assessed this threat and its impact on the Bi-State DPS, evaluated a variety of removal techniques, and examined the effectiveness of the removal. *Id*. at 21-22 (citing Final PECE Report (AR Doc. 5717, BSSG 79524-79526); 2015 Species Report (AR Doc. 5508, BSSG 506-507)). It also found that pinyon-juniper removal projects were consistent with the objectives of the COT Report. *Id*. In short, Defendants contend, the analysis of threats and the efficacy of BSAP measures aimed at addressing those threats is not conclusory, contrary to Plaintiffs' assertion. *Id.* at 22.

Finally, Defendants reject Plaintiffs' argument that the ESA and PECE do not allow the Service to consider the conservation efforts of federal agencies. *Id*. at 23. They argue that Plaintiffs rely on a "strained" reading of the ESA and point out that 16 U.S.C. § 1533(b)(1)(A) does not use exclusionary language. *Id.* Rather, they assert, the ESA as interpreted under PECE applies to both the efforts of states and foreign government *and* those of federal agencies. *Id.* (citing *Rocky Mountain Wild v. Walsh*, 216 F. Supp. 3d 1234, 1249 (D. Colo. 2016)).

> b. Whether Conservation Measures Must Already Have Been "in Place" Under PECE

Plaintiffs contend that under PECE, conservation efforts must already be in place and have enjoyed some measure of success – and conversely, that future conservation efforts do not satisfy this policy. They further assert that that standard is not met here. The Court concludes that while PECE does not allow the Service to rely on *speculative* future efforts, it does not preclude the Service from considering future efforts that are sufficiently certain to be implemented and effective.

Plaintiffs rely on *Oregon Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1153 (D. Or. 1998) in support of their position. In that case, the court concluded that because 16 U.S.C. § 1533(b)(1)(B) "speaks only in the present tense in terms of 'efforts, if any, being made,' and not future efforts which have yet to be made," that section "cannot reasonably be interpreted to

include future efforts, whether regulatory or non-regulatory." 6 F. Supp. 2d at 1153.  The court in

*Daley* noted that "[t]he few courts that have addressed this issue have concluded that reliance on

future actions is not permitted by the ESA."  *Id.* (citing *Biodiversity Legal Found. v. Babbitt*, 943

F. Supp. 23 (D.D.C. 1996) and *Southwest Ctr. for Biological Diversity v. Babbitt*, 939 F. Supp. 49

(D.D.C.1996));  *see also Fed'n of Fly Fishers v. Daley*, 131 F. Supp. 2d 1158, 1169 (N.D. Cal.

2000) ("The Court finds that most of the plans were in fact proposals for future action. NMFS

could not rely on future actions in making its determination.").

These cases, however, were decided before the Service adopted the PECE, in 2003.  In that

policy, the Service interpreted the ESA differently, finding that it is appropriate to "consider both

current actions that affect a species' status and sufficiently certain *future actions* – either positive

or negative – that affect a species' status."  68 Fed. Reg. 15,114 (emphasis added).  That

interpretation of the ESA is entitled to deference under *Chevron* and moreover, Plaintiffs do not

assert in this action that PECE is unlawful on its face.  Therefore, the Court does not consider

these pre-PECE cases to be controlling.  *See Defenders II*, 70 F. Supp. 3d at 198 n. 24 ("Because

Plaintiffs do not challenge the PECE, they are mistaken in relying on pre-PECE cases that

disallowed consideration of conservation efforts not yet fully implemented or effective").

The Court also finds that Plaintiffs place too much reliance on a single sentence in *Alaska*

*v. Lubchenco*, in which the court states that "it is not enough for the State to identify conservation

efforts that may be beneficial to a species' preservation; those efforts must actually be in place and

have achieved some measure of success in order to count under the Service's policy."  825 F.

Supp. 2d 209, 219 (D.D.C. 2011).  While the undersigned agrees with this statement of the law as

a general proposition, the facts of this case are quite different from those in *Lubchenco*. In that

case, the court found that the various conservation efforts cited by the plaintiffs were not aimed at

the species at issue and that their possible impact on that species was only incidental.  *Id.*  In other

words, there was *no* conservation plan aimed at the species at issue.  *Id.*  The Court does not

interpret the statement that a plan must be "in place and have achieved some measure of success"

to preclude the application of PECE under the circumstances here, where there is a formal

conservation plan, developed over a period of years, that is aimed at addressing threats to the Bi-

State DPS and where some of the projects envisioned under the plan have already been implemented.

Other cases cited by Plaintiffs on this issue are also distinguishable. For example, in *W. Watersheds Project v. Fish & Wildlife Serv.*, 535 F. Supp. 2d 1173, 1187 (D. Idaho 2007), the Director of FWS stated that he was "encouraged that sage-grouse and sagebrush conservation efforts will moderate the rate and extent of habitat loss for the species in the future" and decided, without conducting a PECE analysis and with no data on this question, not to list the greater sage grouse as threatened or endangered. The court found that the Service had simply *assumed* that future conservation efforts would be successful. *Id.* That also is not the situation here. Therefore, the Court rejects Plaintiffs' assertion that the PECE analysis is flawed because the Service relied on future conservation efforts.

### c. Whether Voluntary Efforts of Federal Agencies May be Considered

Relying on the plain language of 16 U.S.C. § 1533(b)(1)(A), Plaintiffs contend PECE does not allow the future conservation efforts of federal agencies to be considered, citing *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 945 F. Supp. 1388, 1399 (D. Or. 1996). In that case, the court held, based in part on the language of 16 U.S.C. § 1533(b)(1)(A), that "[n]o provisions explicitly authorize FWS to consider the actions of other federal agencies" and further concluded that Congress "intentionally left out of the listing process consideration of other federal agencies' actions." *Id.* The Court reasoned that the ESA "clearly indicates that federal protection of endangered and threatened species begins with the listing process, and it would be contrary to the purposes of the Act for FWS to allow the actions of one or two federal agencies, not required by the ESA, to deprive an otherwise warranted species of the broad protections the Act would require of all federal agencies if FWS completed the listing process." *Id.*

The Service reached a different conclusion, however, when it adopted PECE, finding that "the analysis outlined in section 4 of the Act requires us to consider the conservation efforts of not only State and foreign governments but also Federal agencies, Tribal governments, businesses, organizations, or individuals that positively affect the species' status." 68 Fed. Reg. 15,113. This interpretation is entitled to deference under *Chevron*. *See Rocky Mountain Wild v. Walsh*, 216 F.

Supp. 3d 1234, 1245 (D. Colo. 2016) (finding that PECE is a "rule" for the purposes of the APA and therefore entitled to *Chevron* deference). As noted above, Plaintiffs do not bring a facial challenge to PECE and such a challenge would likely be untimely in any event under the APA's six-year limitation period given that the PECE was adopted in 2003. *See id.* at 1246 ("Normally, facial challenges to administrative action must be brought within six years of the final agency action."). In any event, the Court agrees with the court in *Rocky Mountain Wild v. Walsh* that this interpretation of the ESA is "strained" and that the Service's interpretation is permissible under *Chevron. Id.* at 1249.

The Court therefore concludes that the Service did not violate the ESA by considering planned conservation efforts by federal agencies that were described in the Commitment Letters.

### d. Certainty of Implementation

Plaintiffs contend the Service has not demonstrated sufficient certainty of implementation, notwithstanding the commitments with respect to funding and staffing contained in the Commitment Letters, because there can be no certainty as to Congressional funding and executive priorities going forward and in particular, over the ten-year period addressed in the plans submitted by USDA and BLM along with their Commitment Letters. Plaintiffs' concerns are not frivolous or speculative. Budget cuts and changes in executive priorities are a fact of life. Nonetheless, Plaintiffs have not cited any case in which a court has held that specific funding or staffing commitments by a federal agency (or any agency) should not be considered under PECE because they might later be withdrawn. The only case Plaintiffs cite in support of this argument, *Western Watersheds Project v. Foss*, No. CV 04-168-MHW, 2005 WL 2002473, at *18 (D. Idaho Aug. 19, 2005), did not reach the question of whether the Service's PECE analysis was flawed, finding that the proposed listing violated the ESA on other grounds completely unrelated to whether the voluntary conservation efforts were sufficiently certain to be implemented. Indeed, the court noted that it did "not want to discourage or undermine conservation agreements undertaken outside the auspices of the ESA," that it "commend[ed] the efforts and hard work undertaken by the many different parties involved in developing" a formal conservation plan, and that it "hope[d] the federal and state agencies and various private groups [would] continue to work

cooperatively to conserve" the species at issue "within the mandate of the ESA." *Id.*

In its PECE analysis, the Service found that the commitments of the federal (and state) agencies as to funding and staffing were sufficiently certain because these same agencies had a history of involvement in the conservations efforts under the 2012 BSAP. This is a permissible basis to find that there is a high level of certainty that they will continue to be involved in this effort and to abide by the commitments in their Commitment Letters. *See, e.g., Defenders II*, 70 F. Supp. 3d at 197 (holding that Service acted reasonably in finding sufficient certainty of implementation based on past experience). While there will always be some degree of uncertainty where budgets require approval and agency priorities are subject to change due to changes in leadership, the Court declines to adopt a rule that no other court has adopted and that would effectively make it impossible for voluntary conservation efforts by state or federal agencies to survive the PECE analysis. Therefore, the Court rejects Plaintiffs' assertion that the commitments of the federal agencies are not sufficiently certain to be implemented to satisfy PECE.[9]

e. Certainty of Effectiveness

While the Court finds that there is sufficient certainty that the conservation efforts set forth in the 2012 BSAP will be implemented, the Service's finding that these efforts are "sufficiently certain" to be effective was arbitrary, capricious and unsupported by the record.

The degree of certainty required under PECE is measured with reference to the status of the species at issue, that is, whether the conservation efforts will reduce the threats *enough* that it is no longer "threatened" under the ESA (or is threatened rather than endangered). *See* 68 Fed. Reg. 15,114-15,115 ("we must evaluate whether the conservation effort improves the status of the species under the ESA"). "Because predicting the future status of wildlife is a difficult task, . . .

---

[9] Of course, it is another matter if these agencies actually *do* withdraw their funding and staffing commitments. As the EOC Cover letter indicates, over 80% of the funding for implementation of the 2012 BSAP is to be provided by federal agencies and 92% of the Bi-State DPS is located on federal lands. Without the commitments of these agencies to fund and implement the conservation measures set forth in the 2012 BSAP, the primary basis for the Withdrawal Decision – the amelioration of threats to the Bi-State DPS likely to result from implementation of the 2012 BSAP – would no longer exist.

1    deference is appropriate to the agency's evaluation of scientific data within its expertise."

2    *Defenders III*, 815 F.3d at 14. Nonetheless, the Service must offer *some* rational basis for its

3    conclusion that future conservation efforts will be effective enough to improve the status of the Bi-

4    State DPS and therefore warrant withdrawal of the Proposed Listing. While a "track record" of

5    success is not an absolute requirement under PECE (as discussed above), evidence that past

6    conservation efforts have achieved measurable success with respect to the status of the species

7    may support a finding of "sufficient certainty of effectiveness." *See, e.g., Greater Yellowstone*

8    *Coal., Inc. v. Servheen*, 665 F.3d 1015, 1020 (9th Cir. 2011) (considering delisting of Yellowstone

9    Grizzly Bear where formal recovery plan was "widely regarded as a success" and "[s]cientists

10    estimate[d] that the [Greater Yellowstone Area's] grizzly population increased at an average rate

11    of 4.2% to 7.6% per year between 1983 and 2002 and expanded its range by 48% between the

12    1970s and 2000"); *Tucson Herpetological Soc. v. Salazar*, 566 F.3d 870, 881 (9th Cir. 2009)

13    (relying on "specific conservation benefits" that the conservation agreement had achieved since it

14    came into being in support of withdrawal decision as to the horned lizard).

15        Alternatively, where a conservation program has been shown to be effective in one portion

16    of a species' habitat, this may be sufficient to show that a similar program is likely to be effective

17    in another part of the species' habitat. *See, e.g., Defenders III*, 815 F.3d at 6 (withdrawing

18    proposed listing of dune sagebrush lizard, which has habitat in Texas and New Mexico, where the

19    Service received new information after the proposed listing that 95 percent of the lizard's habitat

20    in New Mexico had been removed from oil and gas leasing (the species' primary and "greatest"

21    threat) and covered by conservation plans and that a new Texas conservation plan very similar to

22    the plan that had already proven effective in New Mexico would cover an additional 71 percent of

23    the lizard's habitat in Texas).

24        Here, the Service pointed to "past project effectiveness within the [B]i-State Area . . . and

25    documented effective methodologies for addressing the threats identified as impacting the [B]i-

26    State DPS." 80 Fed. Reg. 22,847 (AR Doc. 6771, BSSG 88004). The Service also "considered

27    consistency with the COT Report as a measure of effectiveness." Final PECE Analysis (AR Doc.

28    5716, BSSG 79518). The PECE analysis describes conservation efforts in a variety of categories

United States District Court
Northern District of California

that had already been implemented or were in the process of being implemented at the time of the Withdrawal Decision. *Id.* at BSSG 79518-79532. It also compares the planned future conservation measures with the objectives listed in the COT Report, which identifies and prioritizes conservation objectives.

There is no doubt that a great deal of effort has been devoted to assessing threats and determining what measures are necessary to ameliorate these threats. What is missing from the PECE analysis, however, is any evidence that establishes the likely *impact* of the planned conservation measures and whether they will actually improve the status of the Bi-State DPS enough to justify withdrawal of the Proposed Listing. Below, the Court examines certainty of effectiveness with respect to the two examples addressed in-depth by the parties: 1) removal of pinyon-juniper; and 2) removal of cheatgrass.

### i. Pinyon-Juniper Removal

The 2015 Species Report states that over the last 150 years, "approximately 40 percent of the historically available sagebrush habitat [of the Bi-State DPS] has been usurped by woodland succession." 2015 Species Report (AR. Doc. 5508, BSSG 506). The Service further estimates that "the rate of woodland expansion currently outpaces treatment efforts on the order of two to seven times." *Id.* at BSSG 507. Likewise, the Final PECE Analysis states that as of the time of the Proposed Listing, in 2013, "pinyon-juniper encroachment was exceeding [the] amount of habitat that was being restored." Final PECE Analysis (AR Doc. 5716, BSSG 79525). Consequently, "significant future conservation efforts [under the 2012 BSAP] are focused on pinyon-juniper encroachment throughout the Bi-State area." *Id.* The Final PECE Analysis further states that the "TAC and PAWG intends to restore habitat and halt losses of sagebrush habitat from encroachment." *Id.*

The 2012 BASP sets forth thirteen "actions" to "Minimize and Eliminate Risks" in the area of pinyon-juniper encroachment (hereinafter, "MER 4"). 2012 BSAP (AR Doc. 4100, BSSG 80522-80523). MER 4 provides for "[e]valuat[ion] [of] pinyon-juniper encroachment and potential connectivity issues" in specific geographical locations within the Bi-State DPS and for the [d]esign and implement[ation] [of] site-specific tree removal projects based on the results." *Id.*

Thus, in the Final PECE Analysis, the Service states that "approximately 203,329 acres are identified by the TAC to be examined and treated for pinyon-juniper encroachment" but in a footnote the Service explains that this figure represents the acres and projects that will be "run through the CPT model" and that the pinyon-juniper removal projects that are identified through that process will be a "subset of this acreage." Final PECE Analysis (AR Doc. 5716, BSSG 79525). The Final PECE Analysis describes pinyon-juniper removal efforts as of June 2014, covering "over 21,000 acres," and further states that thirteen additional projects were underway at the time of the Final PECE Analysis. *Id.* at BSSG 79524. According to the Service, these conservation efforts involving pinyon-juniper removal "target appropriate phases of encroachment to provide the best return on investment for sagebrush and sage-grouse habitat restoration activities" and have been consistent with the objectives in the COT Report. *Id.*

The COT Report, in turn, lists as the "Conservation Objective" for pinyon-juniper encroachment, "[r]emove pinyon-juniper from areas of sage-brush that are most likely to support sage-grouse (post-removal) at a rate that is at least equal to the rate of pinyon-juniper incursion." COT Report (AR Doc. 5829, BSSG 103876). It further sets forth "Conservation Options"[10] related to pinyon-juniper removal, including prioritizing use of "mechanical treatments" in order to allow understory habitats to remain intact, using caution at higher elevations if removing pinyon-juniper by prescribed fire, reducing juniper cover in sage grouse habitats to less than 5%, and employing "all necessary management actions to maintain the benefit of pinyon and/or juniper removal for sage-grouse habitats, including long-term monitoring with appropriate management responses." *Id.* at BSSG 103877.

While the Court has no reason to question the soundness of the process the Service describes for evaluating the problem of pinyon-juniper encroachment and developing projects to address the problem, it also finds no evidence in the record that allows it to conclude that the efforts envisioned in the 2012 BSAP are sufficiently certain to be effective. As Plaintiffs point

---

[10] The Service's cover letter for the COT Report explains that "Conservation Options" are "examples of actions that could be used to help attain the conservation objectives" but that are not "prescriptive or mandatory." AR Doc. 5829, BSSG 103824.

66

United States District Court
Northern District of California

out, the ten-year plan offered by the Forest Service identifies eight pinyon-juniper removal projects covering roughly 95,000 acres over the next ten years, while the BLM's proposed plan identifies only one pinyon-juniper removal project aimed at removing pinyon-juniper from 301 acres in Mill Canyon over a period of many years. It is not clear how these projects were selected or what percentage of habitat threatened by woodland encroachment they will cover; nor is there evidence in the record that allows the Court to determine the likelihood that these projects will be sufficient to accomplish the goal described in the Final PECE Analysis of "halting losses of sagebrush habitat."

Even more importantly, it is not sufficiently certain that the planned pinyon-juniper removal efforts will actually have a beneficial impact on the Bi-State DPS. In the 2015 Species Report, the Service noted that "[a] variety of techniques (e.g., mechanical, herbicide, cutting, burning) are being implemented to remove conifers in sage-grouse habitat" and that "[t]reatment effectiveness varies with the technique used and proximity to invasive plant infestations, among other factors." 2015 Species Report (AR Doc. 5508, BSSG 507). It continues, "[w]e are not aware of *any study* documenting a direct correlation between these treatments and sage-grouse population response[.]" *Id.* (emphasis added). Similarly, as to the 25 woodland thinning or removal projects completed over the past decade under the 2012 BSAP, which involved removal of approximately 19,533 acres of woodland, the Service explained that it was "still too early to measure a population-level response of sage-grouse to these treatments." *Id.* The Service "infer[red] some level of positive response" based on studies showing that pinyon-juniper encroachment leads to "avoidance or reduced use" by sage grouse, but this negative inference is simply a guess; it is not based on any scientific evidence linking pinyon-juniper removal to improvement as measured by population trends. The Service also observes that there have been "anecdotal observations indicat[ing] that these actions are resulting in the addition of suitable habitat in some instances." *Id.* Such observations, however, are a far cry from the level of certainty of effectiveness required under PECE.

Finally, while the Final PECE Analysis states that the ongoing conservation efforts in the area of pinyon-juniper removal were "consistent" with the general objective of the COT Report,

that is, to "remove pinyon-juniper from areas of sagebrush that are most likely to support sage-grouse (postremoval) habitat at a rate that is at least equal to the rate of pinyon-juniper incursion," it does not state that future conservation efforts will be sufficient to achieve that goal, much less explain the basis for such a conclusion. Final PECE Analysis (AR Doc. 5508, BSSG 79524-79525) (citing COT Report).[11]

ii. Cheatgrass Removal

The 2015 Species Report explains that nonnative invasive plants are "abundant within sagebrush habitat," and that they have a negative impact on the Bi-State DPS both because they displace brush and forb species that are important for sage grouse chick survival and because they cause displacement and habitat fragmentation over the long term. 2015 Species Report (AR Doc, 5508, BSSG 503). While a variety of nonnative species are present in the Bi-State DPS, "cheatgrass is of greatest concern because it is widely dispersed across all PMUs." *Id*. The significance of the threat cheatgrass poses varies depending on the PMU; it is a low level threat in the White Mountains, South Mono, Bodie, and Desert Creek-Fales PMUs, a moderate threat in the Mount Grant PMU, and a high threat in the Pine Nut PMU. *Id*.

The 2015 Species Report states that cheatgrass removal and restoration efforts are "hindered by cost and the inability to procure the necessary equipment and seeds." *Id*. at BSSG 504. Further, the Service states, while different approaches are being "investigated," "determining the effectiveness is challenging because it will take time for sagebrush to establish and mature in areas that were dominated by annual grasses." *Id*. The Service acknowledges that "[d]espite ongoing efforts to transform lands dominated by invasive annual grasses into quality sage-grouse habitat, restoration and rehabilitation techniques are *mostly unproven and experimental*." *Id*.

---

[11] The Court also notes that the Final PECE Analysis does not state that future conservation efforts will rely on any of the "Conservation Options" described in the COT Report, such as the use of mechanical treatments when possible, or ongoing management actions to maintain the quality of the habitat. Nor do the 2012 BSAP or the Commitment Letters state that future removal efforts will employ these Conservation Options. Given that the Service acknowledged in the 2015 Species Report that the effectiveness of removal varies depending on a variety of factors, the failure of the Final PECE Analysis to address the issues raised in the Conservation Options further supports the Court's conclusion that the Service has not established sufficient certainty of effectiveness as to future pinyon-juniper removal efforts.

(emphasis added).

The Final PECE Analysis states that there are six projects underway that target nonnative invasive plants on 634 acres in the Desert Creek-Fales, Mount Grant and Pine Nut PMUs and plans for another 100 acres of cheatgrass removal annually in the Pine Nut PMU.  Final PECE Analysis (AR Doc. 5716, BSSG 79525).  It further states that two brood-rearing/meadow habitat restoration projects are underway and six more, of "undetermined acreage" are proposed for the future.  *Id.*  According to the Service, these efforts are "consistent with the COT Report's nonnative, invasive plant species conservation objective to maintain and restore healthy, native sagebrush plant communities, and the meadow restoration projects are consistent with the COT Report's general conservation objective to prevent habitat loss."  *Id.* at BSSG 79525-79526 (citing COT Report).

The COT Report objective with respect to nonnative invasive species is, as stated in the Final PECE Analysis, to "[m]aintain and restore healthy, native sagebrush plant communities." COT Report (AR Doc. 5289, BSSG 103871).  The COT Report lists five "Conservation Measures" to achieve this objective:

> 1. Retain all remaining large intact sagebrush patches, particularly at low elevations.
>
> 2. Reduce or eliminate disturbances that promote the spread of these invasive species, such as reducing fires to a "normal range" of fire activity for the local ecosystem, employing grazing management that maintains the perennial native grass and shrub community appropriate to the local site, reducing impacts from any source that allows for the invasion by these species into undisturbed sagebrush habitats, and precluding the use of treatments intended to remove sagebrush.
>
> 3. Monitor and control invasive vegetation post-wildfire for at least three years.
>
> 4. Require best management practices for construction projects in and adjacent to sagebrush habitats to prevent invasion.
>
> 5. Restore altered ecosystems such that non-native invasive plants are reduced to levels that do not put the area at risk of conversion if a catastrophic event were to occur. . . .

*Id.* at BSSG 103871-103872.

The Final PECE Analysis fails to explain why what appear to be meager efforts (based on

acreage alone) at cheatgrass removal are likely to have a meaningful impact on the status of the Bi-State DPS.  The fact that the projects that are planned for the future are "consistent" with the general objective of the COT Report to "[m]aintain and restore healthy, native sagebrush plant communities," could be said of *any* level of cheatgrass removal.  What is notably missing from the Final PECE Analysis is any discussion of whether the future conservation efforts for cheatgrass removal will be sufficient to result in a beneficial impact on the Bi-State DPS and the expected magnitude and timing of such an impact.  Nor does the Service address whether the Conservation Measures recommended in the COT Report will be employed under the 2012 BSAP.   Given that the effectiveness of cheatgrass removal is, by the Service's own admission, "mostly unproven and experimental," the efforts described in the Final PECE analysis do not support a finding that there is a sufficient certainty of effectiveness.

iii. Conclusion

PECE requires that future conservation efforts must be "sufficiently certain" to be effective.  This inquiry requires that the Service consider not only whether the planned conservation measures are the *type* of measures that are likely, in the abstract, to be beneficial to the species.  Rather, the Service must also consider the magnitude of the impact on the species that the measures can be expected to achieve, and "the estimated length of time that it will take for a formalized conservation effort to produce a positive effect on the species."  68 Fed. Reg. 15,114.  Here, the Service's PECE Analysis fails to meet these requirements.   As the examples of pinyon-juniper and cheatgrass removal illustrate, it is uncertain whether the conservation efforts outlined in the 2012 BSAP will be sufficient to produce a positive effect on the species,  the magnitude of the effect (assuming there is one), or when the effect will be achieved.  Other efforts described in the Final PECE Analysis suffer from the same flaw, though the Court does not address them here at length.[12]   In sum, the Court concludes that the Service's PECE analysis is arbitrary and

---

[12] For example, the Final PECE Analysis acknowledges that while only 11 % of "suitable sage-grouse habitat is under private ownership, these private lands harbor the majority of the [B]i-State DPS's critical brood-rearing habitat."  AR Doc. 5716, BSSG 79522.  These areas "may be impacted by existing grazing or ranching activities, or they may be targeted for development," and therefore conservation easements and land exchanges are considered "the most effective tool for protecting these critical eras."  *Id*. at BSSG 79523.  Although the Final PECE Analysis notes that

capricious because it does not offer any basis for concluding that the conservation efforts described in the 2012 BSAP are sufficiently certain to be effective.

### 6. Whether Errors Were Harmless

The APA instructs that in reviewing agency action, "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. The Ninth Circuit has held that "harmless error doctrine may be employed only when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *Tucson Herpetological Soc. v. Salazar*, 566 F.3d 870, 880 (9th Cir. 2009) (internal quotations and citations omitted). That standard is not met here.

As discussed above, the Service erred in concluding on the basis of the Coates Study that the population of the Bi-State DPS is stable. It also erred in concluding under PECE that there was sufficient certainty of effectiveness of planned conservation measures to support the conclusion that listing the Bi-State DPS as threatened is no longer warranted. There is no real dispute that the Service's PECE analysis was critical to its Withdrawal Decision. The Service acknowledges in the Withdrawal Decision that "[w]ithout the conservation measures being implemented now and planned for the future as described in the BSAP, the stressors that rise to the level of being a threat as identified in the proposed rule to the [B]i-State DPS would remain at a level that would warrant listing of the DPS as a threatened species." Withdrawal Decision (AR Doc. 6771, BSSG 88007). Likewise, the erroneous reliance on the Coates Study to conclude that the population of the Bi-State DPS was stable also likely played an important role in the Service's decision to withdraw the Proposed Listing. This finding clearly informed the Service's understanding of the urgency of the situation, which must be taken into account when deciding under PECE whether future conservation efforts are likely to produce positive results quickly

---

15,000 acres of conservation easements had been purchased by 2013 and that the Service expected further such easements to be purchased in the future, including "high priority targets," it does not address the percentage of critical brooding habitat that is likely to be obtained under the 2012 BSAP or whether it will be sufficient to have a positive impact on the Bi-State DPS. Indeed, to the extent that such easements and land exchanges are dependent on the willingness of private landowners to sell or exchange their land, it is unlikely the Service would be able to make any such projections.

enough to change the status of a species. Consequently, the Court concludes that both errors go to the heart of the agency's action and are not harmless.

In sum, the Court concludes that the Service's Withdrawal Decision was arbitrary and capricious and unsupported by the record for the reasons discussed above.

**C.    Whether the SPR Policy is Facially Deficient or Was Misapplied in the Withdrawal Decision**

As discussed above, the Service concluded in the Withdrawal Decision that the Bi-State DPS should not be listed as threatened under the SPR Policy. Plaintiffs challenge that conclusion, asserting that the SPR Policy is invalid on its face because of its definitions of "range" and "significant" and that the Service erred in its application of the SPR Policy in the Withdrawal Decision.

**1.    Facial Challenges to the SPR Policy**

a.    "Range"

In the SPR Policy, the Service interprets the word "range" as used in 16 U.S.C. §§ 1532(6) & (20) to mean current range rather than historical range. Plaintiffs contend this is not a permissible construction of the ESA. The Court disagrees.

The term "range" as used in the phrase "significant portion of its range" is not defined in the ESA. *See Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001) ("The Secretary necessarily has a wide degree of discretion in delineating 'a significant portion of its range,' since the term is not defined in the statute"). Accordingly, the Service has a "wide degree of discretion" in interpreting this term. *Id.* Under that standard, the Court must uphold the agency's interpretation so long as it is reasonable. S*ee Pac. Nw. Generating Co-op. v. Dep't of Energy*, 580 F.3d 792, 806, 812 (9th Cir. 2009)("When relevant statutes are silent on the salient question, we assume that Congress has implicitly left a void for [the] agency to fill, and, therefore, we defer to the agency's construction of its governing statutes, unless that construction is unreasonable.").

In *Defenders of Wildlife v. Norton*, the Ninth Circuit "made clear that the Secretary must develop some rational explanation for why the lost and threatened portions of a species' range are insignificant before deciding not to designate the species for protection." *Tucson Herpetological*

*Society v. Salazar*, 566 F.3d at 877 (citing *Defenders of Wildlife v. Norton*, 258 F.3d at 1145) (holding that "a species can be extinct 'throughout . . . a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was."). In other words, the Ninth Circuit appears to have agreed with Plaintiffs that the word "range" in the ESA means historical range rather than current range. However, *Defenders of Wildlife v. Norton* and *Tucson Herpetological Society v. Salazar* were decided before the SPR Policy was adopted. Further, the Ninth Circuit's pre-SPR Policy interpretation of the ESA is not binding here because "'[a] court's prior construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.'" *Center for Biological Diversity v. Jewell*, No. 15-4-BU-SHE, 2016 WL 4592199, at * 9 (D. Montana, Sept. 2, 2016) (quoting *Chevron*, 467 U.S. 837 (1984)). As the Ninth Circuit found in *Defenders of Wildlife v. Norton* that the phrase "significant portion of its range" is ambiguous, its interpretation of the word "range" as used in that phrase is not binding and the Service "is, and continues to be, free to publish reasonable and permissible interpretations of this ambiguous statutory language." *Id*. Thus, the Court must address whether the Service's construction of the word "range" in the SPR Policy is reasonable under *Chevron*.

The D.C. Circuit addressed the same question in *Humane Society v. Zinke*, 865 F.3d 585 (2017). In that case, the court noted that the use of the present tense in Section 4 of the ESA, 16 U.S.C. §§ 1532(6) & (20), which is the reason offered in the SPR Policy for the Service's interpretation, "does not get the Service very far." 865 F.3d at 604. The Court explained:

> That is because the placement of "is" in the definitions seems most naturally to require that the species *currently* be endangered or threatened within its range, not to dictate the temporal scope of geographical evidence the Service is to consider. A species can be found to be endangered now—"*is* in danger of extinction," 16 U.S.C. § 1532(6) (emphasis added)—based just as easily on threats to the species throughout its historical range as on threats throughout its contemporary range.

*Id*. (emphasis in original). Nevertheless, the court found that the Service's interpretation of the word "range" was permissible, looking to the ESA as a whole and concluding that usages of the

73

word in other parts of the statute are not inconsistent with the Service's interpretation. *Id.* For example, in one of the three cases in which "range" was used, 16 U.S.C. § 1539(j)(2)(A), it was used in the phrase "current range," but the court found that this qualifier could "cut[] both ways." *Id.* The court explained, "[o]n the one hand, it could be argued that, if 'range' already means current range, then the adjectival addition of "current" in Section 1539(j) would be redundant. On the other hand, the use of 'current range' in Section 1539(j) could also be read to corroborate the Service's view, since 'current range' in Section 1539(j) may refer to the listed range of the endangered or threatened species." *Id.* Dictionary definitions also did not resolve the ambiguity, the court found. *Id.* The court went on to find that interpretation of the term "range" was reasonable because it was "at least consistent with the [ESA's] use of the present tense in provisions discussing the species' range. 16 U.S.C. § 1532(6), (20)." *Id.* at 605. The court also concluded that use of the phrase "current range" in Section 1539(j) could reasonably be found to support the Service's interpretation of "range." *Id.*[13]

The Court finds the reasoning in *Humane Society v. Zinke*, 865 F.3d 585 (2017) to be persuasive and for the reasons stated therein concludes that Plaintiffs' facial challenge to the definition of "range" under the SPR Policy fails.[14]

---

[13] In support of their position, Plaintiffs cite to a comment in the legislative history, 1978 U.S.C.C.A.N. 9453, 9468, stating that "the term range is used in the general sense, and refers to the historical range of the species." This comment is contained in a House Report issued in connection with 1978 amendments to the ESA. The district court in *Humane Society v. Jewell*, 76 F. Supp. 3d 69, 130 (D.D.C. 2014) cited this statement in support of its conclusion that the Service impermissibly construed "range" to mean current range in the SPR Policy. The undersigned, however, concludes that this single statement in the legislative history is not sufficient to render the Service's interpretation unreasonable. While the statement appears to refer generally to the use of the word "range" in the ESA, it is made in connection with a discussion of Section 4(c)(1), 16 U.S.C. § 1533(c)(1), which requires the Secretary to include critical habitat designations on the endangered species list. That section provides that lists of endangered and threatened species "shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range." 16 U.S.C. § 1533(c)(1). While the district court in *Humane Society v. Jewell* concluded that the statement in the legislative history applied to *all* usages of the word "range" in the ESA, another possible interpretation of the statement, which is somewhat unclear, is that it was directed only at 16 U.S.C. § 1533(c)(1) and the designation of critical habitat and not at the use of the word "range" in Section 1532. As the D.C. Circuit concluded, on appeal of the district court's decision, that the Service's construction of the word "range" in the SPR Policy was permissible, it apparently reached the same conclusion. *See Humane Society v. Zinke*, 865 F.3d at 604.

[14] Plaintiffs also argue in their reply brief that the Service's brief discussion of loss of historical

74

b.  "Significant"

i.  Whether Challenge to Definition of "Significant" Under SPR Policy is
Ripe for Review

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149(1967)).  "Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id*.

Before addressing Defendants' ripeness argument, the Court reviews the process described in the SPR Policy for determining whether a species is threatened or endangered under the ESA. *See* 79 C.F.R. 37585-37587 (Figures 1 & 2).  First, the Service determines whether the species is threatened or endangered "throughout all of its range." *Id*. at 37585.  If the answer is yes, the inquiry ends and the species is listed as threatened or endangered. *Id*.  If the answer is no, the Service proceeds to the second question, namely, whether listing is justified on the basis that the species is threatened or endangered throughout a portion of its range. *Id*. at 37586.  To answer that question, the Service begins by considering whether there is "substantial information indicating that (1) the portions may be significant and (2) the species may be in danger of extinction in those portions or likely to become so within the foreseeable future."[15]  *Id*.  If there is, the Service conducts a more "detailed analysis to determine whether these standards are indeed met." *Id*. at 37587.  In conducting the more detailed analysis, the Service explains, it may be "more efficient to address the 'significant' question first, or the status question first." *Id*.  If the

_____

range was insufficient. *See* Plaintiffs' Reply at 23-24. The Service rejected this argument in a footnote in its own reply brief. *See* Defendants' Reply at 16 n. 19.  Plaintiffs have not demonstrated that the Service's discussion of lost historical range was so insufficient as render its conclusions arbitrary and capricious.

[15] The SPR Policy refers to these two parts of the inquiry as "the 'significant' question" and the "status question." *Id*.  The Court uses the same terminology here.

75

1    Service finds in answer to the status question that the species is not threatened or endangered in

2    the portion of its range that is under consideration, the Service need not address whether the

3    portion is "significant." *Id*. Likewise, if the Service concludes that the portion is not "significant"

4    it need not address whether it is endangered or threatened there. *Id*.

5        In this case, the Service identified Pine Nut, White Mountains and Mount Grant PMUs for

6    further consideration under the SPR Policy. 80 C.F.R. 22853. It chose to address the status

7    question first, analyzing "whether stressors in these three PMUs . . . rise to the level such that the

8    sage-grouse is likely to become an endangered species in the foreseeable future (threatened) in

9    these three PMUs combined." *Id*. The Service concluded that these three PMUs were "more

10   vulnerable than the Bodie, Desert Creek-Fales, and South Mono PMUs, but not to the degree that

11   sage-grouse are in danger of extinction or likely to become so in the foreseeable future in these

12   PMUs." *Id*. The Service went on to discuss the planned conservation efforts under the 2012

13   BSAP and their likely impact on these three PMUs and on the DPS as a whole. *Id*. The Service

14   found that the "[a]pplication of these conservation efforts across the range of the DPS over the

15   next 10 years . . . changes the trajectory from a point where the DPS was previously considered to

16   be a threatened species, to a point where the . . . entire range of the DPS, including the specific

17   portion of the DPS's range in the Pine Nut, Mount Grant, and White Mountains PMUs, does not

18   meet the definition of a threatened species or an endangered species." *Id*. The Withdrawal

19   Decision then concludes:

20           [W]e find that substantial information indicates that: (1) There are
             no portions of the [B]i-State DPS that may be significant, and (2) the
21           DPS is not likely to become an endangered species in the
             foreseeable future in the portion of its range that harbors the least
22           number of birds (i.e., the Pine Nut, Mount Grant, and White
             Mountains PMUs). Therefore, we find that listing the [B]i-State
23           DPS is not warranted.

24   *Id*.

25        Defendants contend the Service addressed in the Withdrawal Decision only the status

26   question and not the "significant" question, as it was entitled to do under the SPR Policy, and

27   therefore, the "significant" question is not ripe for judicial review. There are two problems with

28   their argument. First, while the bulk of the discussion in the Service's SPR analysis was aimed at

                                                    76

answering the status question, the Service reached final conclusions as to *both* the status question and the "significant" question. Even if the Service's underlying discussion provides no analysis to support the conclusion on the "significant" question or it did not intend to reach that question, the explicit finding that "[t]here are no portions of the [B]i-State DPS that may be significant" undercuts the Service's argument that Plaintiff's challenge to the definition of "significant" under the SPR Policy is not ripe for review. Furthermore, the Service's finding that there was "substantial information indicating that . . . the portion [in the three PMUs] may be significant," *see id.* at 22852, must necessarily have been informed by the Service's understanding of the meaning of "significant" under the SPR Policy. Under these circumstances, withholding consideration of Plaintiffs' challenge to the definition of "significant" will result in hardship to Plaintiffs.

The Court further notes that Plaintiffs' challenge to this aspect of the policy is primarily legal and does not require further development of the record, supporting the conclusion that the issue is "fit" for review. *See Ctr. For Biological Diversity v. Kempthorne*, 588 F.3d 701, 708 (9th Cir. 2009) ("A claim is usually ripe if the issues raised are primarily legal, do not require further factual development, and the challenged action is final."). The Court also does not find that "the agency or court will benefit from deferring review until the agency's policies have crystallized through the application of the policy to particular facts." *See National Min. Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003) ("We next consider whether the agency or court will benefit from deferring review until the agency's policies have crystallized through the application of the policy to particular facts.").

Therefore, the Court rejects Defendants' assertion that Plaintiffs' facial challenge to the definition of "significant" under the SPR Policy is not ripe for judicial review.

ii. Whether the Definition of "Significant" under the SPR Policy is Permissible

As discussed above, the SPR Policy provides that a "portion of the range of a species is 'significant' if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members

in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range." 79 Fed. Reg. 37,580. According to the Service, this definition was intended to give independent meaning to both definitions of an endangered species in the ESA, that is, the definition based on the "throughout all" language and the definition based on the "significant portion" language after the word "or" in 16 U.S.C. §§ 1532(6) & (20). Plaintiffs contend, though, that the SPR Policy's definition of "significant" results in a threshold under the "significant portion of its range" definition that is functionally equivalent to the threshold under the "throughout all" definition, thus running afoul of *Defenders of Wildlife v. Norton*, 258 F.3d at 1141. The Court agrees.

Under the previous interpretation of the ESA that was found impermissible by the Ninth Circuit in *Defenders of Wildlife v. Norton* (commonly referred to as the "clarification interpretation"), the Service "viewed the SPR language as merely clarifying that a portion of the range of a species could be so important to its conservation that threats there could determine the status of the species overall." Draft Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Acts Definitions of "Endangered Species" and "Threatened Species," 76 Fed. Reg. 76,987. Under the clarification interpretation, "the only circumstance in which a species would be in danger of extinction in a significant portion of its range is one in which it was in fact in danger of extinction throughout all of its range." *Id*. The Service distinguishes the clarification interpretation from the definition of "significant" in the SPR Policy using two examples. *See* 79 Fed. Reg. 37,582. The first involves a situation in which a species faces severe threats "only in the portion of the range it uses in one part of its life cycle," referred to as "Portion A." *Id*. Even though the species does not face direct threats in the rest of its range, the threats in Portion A will endanger the species throughout all of its range. *Id*. According to the Service, Portion A "would be an SPR under the clarification interpretation" whereas under the SPR Policy, the Service "would still list this species, but its listing would be based on its status throughout all of its range" and the Service would go no further in the analysis. *Id*.

The second example is offered to illustrate a situation in which a species would be listed under the SPR Policy whereas it would not have been listed under the clarification interpretation.

78

1    *Id.* The example is as follows:

2          [A]nother species may have two main populations. The first of those
3          populations (found in Portion Y) currently faces only moderate
          threats, but that population occurs in an area that is so small or
4          homogeneous that a stochastic (i.e., random, unpredictable, due to
          chance) event could devastate that entire area and the population
5          inhabiting it. Therefore, if it were the only population, the species
          would be so vulnerable to stochastic events that it would be in
6          danger of extinction. (With two main populations, it is unlikely that
          both would be affected by the same stochastic event. The severity of
7          the threats posed by the stochastic event would therefore be smaller
          because there could be exchange between the populations following
8          the stochastic event—and this exchange could help to stabilize the
          population that has suffered declines.) Thus, without the portion of
9          the range currently occupied by the second population (Portion X),
          the species would be in danger of extinction. But, as long as Portion
10          X contained an extant population, the resiliency and redundancy of
          the two portions combined would be sufficient that the species
11          would not be in danger of extinction, or likely to become so in the
          foreseeable future, throughout all of its range, even in the face of
12          severe threats to Portion X. Under these facts, Portion X would not
          be an SPR according to the clarification interpretation. Under this
13          final policy, we first determine whether the species is endangered or
          threatened throughout all of its range and, if so, list the species
14          accordingly. If the species is not endangered or threatened
          throughout all of its range, then we look further to determine
15          whether it is endangered or threatened throughout a significant
          portion of its range. Under these facts, and in contrast to the
16          clarification interpretation, Portion X would be an SPR under this
          policy because the species would not currently be endangered or
17          threatened throughout all of its range, but the hypothetical loss of
          Portion X would cause the species to become endangered.
18          Therefore, we would need to consider whether the species was
          endangered or threatened in Portion X, and, if so, we would list the
          species.

19

20    79 Fed. Reg. 37,582.  The Service acknowledges that it has set a high threshold under the SPR

21    Policy and that "finding that a species is an endangered species or a threatened species based on its

22    status in an SPR will occur only under a limited set of circumstances and will be relatively

23    uncommon."  *Id.* at 37,581.  It concludes, however, that the definition of "significant" in the SPR

24    Policy strikes an appropriate balance "between being high enough to avoid" expending

25    disproportionate resources on conservation efforts due to the fact that listing applies to the entire

26    range "and low enough to give the SPR phrase independent meaning."  *Id.* at 37,582.

27          Because the word "significant" as used in the phrase "significant portion of its range" is

28    ambiguous, the Court must afford deference to the Service's interpretation under *Chevron*.  *See*

79

*Defenders of Wildlife v. Norton*, F.3d at 1141 (finding that phrase "significant portion of its range" in ESA is ambiguous). Thus, the issue before the Court is whether the Service's interpretation of the word "significant" in the SPR Policy is permissible. The Ninth Circuit has already found that the Service's interpretation of the ESA must give independent meaning to the phrase "significant portion of its range," and the Service does not dispute that an interpretation that does not meet this requirement is not permissible. The issue before the Court, then, is whether the definition of "significant" in the SPR Policy gives independent meaning to the phrase "significant portion of its range" in the ESA.

In *Center for Biological Diversity v. Jewell*, Judge Marquez addressed the same question. *See Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 958 (D. Ariz. 2017).[16] She concluded that the Service's attempt to distinguish its new policy from the one that was rejected by the Ninth Circuit failed because the difference between a species that is threatened or endangered throughout all of its range and one that is threatened or endangered in a significant portion of its range is "illusory" under the SPR Policy. *Id.* at 956. She reasoned that the three requirements that must be met in order to warrant listing under the SPR Policy simply cannot all be met at the same time, explaining:

> Under the Final SPR Policy, listing a species based on threats in a significant portion of its range will be considered warranted only if three conditions are satisfied: (1) the species is neither endangered nor threatened throughout all of its range, (2) the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be endangered or threatened throughout all of its range, and (3) the species is endangered or threatened in that portion of its range. *See* 79 Fed. Reg. at 37,582–83. All three of these conditions cannot be satisfied at once, because whenever conditions (2) and (3) are satisfied, a species should properly be determined to be endangered or threatened throughout all of its range.

*Id.* In other words, Judge Marquez explained, "[i]f a portion of a species' range is so vital that its loss would render the entire species endangered or threatened, and the species is endangered or

---

[16] Although both sides appealed this decision to the Ninth Circuit, the Ninth Circuit dismissed the appeal on February 12, 2018, after the parties filed a joint motion seeking voluntary dismissal of the appeals. *See* Docket No. 140 (Update Regarding Related Appeal).

United States District Court
Northern District of California

threatened in that portion, then the entire species is necessarily endangered or threatened. *Threats that render a species endangered or threatened in such a vital portion of its range should necessarily be imputed to the species overall.*" *Id.* (emphasis added). As a result, she concluded, "[t]he Final SPR Policy's requirement that a portion of a species' range can be considered significant only 'if the species is not currently endangered or threatened throughout all of its range,' 79 Fed. Reg. at 37,582—far from ensuring that the 'significant' and 'all' language of the ESA will retain independent meaning—actually ensures that a portion of a species' range will never be considered significant based on accurate application of the Final SPR Policy." *Id.* at 957.

Judge Marquez rejected the defendants' reliance on the proposed listing of the African coelacanth to show that the Final SPR Policy *can* support a finding that a species' range is significant. *Id.* (citing Final Rule to List the Tanzanian DPS of African Coelacanth (Latimeria chalumnae) as Threatened Under the Endangered Species Act, 81 Fed. Reg. 17,398 (March 29, 2016)). She concluded that the Service did not actually apply the test set forth in the SPR Policy to reach its conclusion:

> Whereas the Final SPR Policy provides that a portion of a species' range should be considered "significant" only if its "contribution to the viability of the species overall is so important that, without the members in that portion, the species" overall would be endangered or threatened, 79 Fed. Reg. at 37,579, the standard applied by the Service in its listing determination regarding the African coelacanth deems a portion of a species' range "significant" if its contribution to the viability of the species overall is so important that, without the members in that portion, the species overall would be at a significantly increased risk of extinction, 81 Fed. Reg. at 17,401.

*Id.* at 957.

The undersigned agrees with Judge Marquez's reasoning. Further, while the Service attempts to differentiate between the results under the clarification policy and the SPR Policy in the example quoted above, *see* 79 Fed. Reg. 37,582, involving two populations of a species where one faces more severe threats than the other, it fails to provide an adequate explanation for its conclusion that the analysis based on the hypothetical approach under the SPR Policy (which assumes the more threatened population is extirpated) would give rise to a different result than the analysis under the clarification policy (which would consider the threats to the species throughout

its range based on the existing populations).   As stated by Judge Marquez, "[i]f a portion of a species' range is so vital that its loss would render the entire species endangered or threatened, and the species is endangered or threatened in that portion, then the entire species is necessarily endangered or threatened." *Id*.

The Court also rejects the Service's reliance on the example of the proposed listing of the giant manta ray under the SPR Policy in support of its assertion that that policy gives independent meaning to the "significant portion of its range" language.  *See* 82 Fed. Reg. 3,694, 3,711 (Jan. 12, 2017).  There, the Service simply did not decide the question of whether the species was at risk of extinction throughout its entire range because of insufficient data.  *Id*. at 3710.  By all indications, however, had the Service had sufficient data to make a finding on this question, it would have found that the species was threatened or endangered throughout all of its range, thus precluding listing of the species under the SPR Policy.   In particular, the Service states in the proposed listing:

> While we assume that declining populations within the Indo-Pacific and eastern Pacific portions of its range will likely translate to overall declines in the species throughout its entire range, there is very little information on the abundance, spatial structure, or extent of fishery-related mortality of the species within the Atlantic portion of its range. As such, we cannot conclude that the species is at a moderate risk of extinction throughout its entire range.

*Id*.  Because the Service made *no* finding as to the first requirement under the SPR Policy, the example of the proposed listing of the giant manta ray does not illustrate a scenario in which the first requirement of the SPR Policy –  that the species is not threatened or endangered throughout all of its range – was *not* met but, nevertheless, based on the second and third requirements of the SPR Policy the Service decided to list the species.  This example therefore fails to support the Service's position.

For these reasons, the Court concludes the definition of "significant" in the SPR Policy is an impermissible interpretation of the "significant portion of its range" language in the ESA.

### 2. Whether Application of SPR Policy in the Withdrawal Decision was Arbitrary and Capricious

Even assuming the SPR Policy is a permissible interpretation of the ESA, the Court

1    concludes that its application by the Service here was arbitrary and capricious.

2           As discussed above, in conducting its SPR analysis, the Service addressed whether three of

3    the most vulnerable populations, the Pine Nut, White Mountains and Mount Grant PMUs, "rise to

4    the level such that the sage grouse is likely to become an endangered species in the foreseeable

5    future (threatened) in these three PMUs combined." 80 Fed. Reg. 22,852-22,853 (AR Doc. 6771,

6    BSSG 88010).  It recognized that  "the combination of the [B]i-State DPS small population size,

7    isolation due to fragmented habitat, peripheral locations, and the presence of several stresors [sic]

8    to the sage-grouse in the Pine Nut, Mount Grant, and White Mountains PMUs makes these PMUs

9    more vulnerable than the Bodie, Desert Creek-Fales, and South Mono PMUs," but concluded that

10   they were not threatened because the Coates Study showed that "several of the populations in the

11   [B]i-State area (including but not limited to the core populations) are stable (as opposed to

12   declining)."  _Id._  It also relied on findings that "1) Multiple sage-grouse are still observed through

13   monitoring activities, (2) one to eight active leks are present within each PMU, [and] (3) stresors

14   [sic] acting upon these small populations are not geographically concentrated and exist in all six

15   PMUs throughout the range of the bi-State DPS."  _Id._  Finally, while acknowledging that there

16   was "information available that may lead some to believe that the populations in these three PMUs

17   are at risk of becoming endangered in the foreseeable future" the Service concluded, based on its

18   PECE analysis, that ongoing conservation efforts would "change[ ] the trajectory from a point

19   where the DPS was previously considered to be a threatened species, to a point where the best

20   available information related to current and future conservation efforts indicates the entire range of

21   the DPS, including the specific portion of the DPS's range in the Pine Nut, Mount Grant, and

22   White Mountains PMUs, does not meet the definition of a threatened species or an endangered

23   species."  _Id._

24          There are no rational grounds for the Service's conclusion.  First, as discussed above, the

25   model developed in the Coates Study did not generate accurate predictions and was particularly

26   unreliable with respect to the Pine Nut PMU, causing the Service to note in the Withdrawal

27   Decision that the entire model should be treated with caution and _especially_ as to the Pine Nut

28   PMU.  The Coates Study also did not analyze the White Mountains and Mount Grant PMUs at

all, as the authors of that study had no data for those PMU.  Nor does the Service offer any explanation for its reliance on the conclusions of the Coates Study in its SPR analysis in light of these shortcomings.

Second, the Service relies heavily upon its conclusions as to the entire Bi-State DPS under PECE.  For the reasons discussed above, however, the Service failed to show that there was "sufficient certainty" of effectiveness of future conservation efforts under PECE.  Moreover, the PECE analysis made a finding as to the persistence of the Bi-State DPS over all of its range.  It did not address the likelihood of persistence for each individual PMU.  The Court notes that the 2015 Species Report concluded that "[w]ithin the next several decades, it is possible that sage-grouse in the Bi-State area will persist in two of the potentially six populations located in the South Mono DPU (Long Valley) and the Bodie PMU (Bodie Hills)" because these PMUs are "larger and more stable and generally have fewer habitat pressures."  2015 Species Report (AR Doc. 5508, BSSG 579).  Having failed to address the likely persistence of the species in each PMU in its PECE analysis, the Service had no basis for relying on that analysis in its SPR analysis to reach conclusions about the Pine Nut, White Mountains and Mount Grant PMUs.

Third, the Service offers no rational basis for relying on the fact that "multiple" sage grouse are still observed in these three PMU's, which each have one to eight leks.   As the Service recognizes in the Withdrawal Decision, "each population in the [B]i-State DPS is relatively small and may be below the theoretical minimum threshold . . . for long-term persistence."   While the exact population required to exceed this threshold is not statistically proven, there is nothing in the record to suggest that "multiple" sage grouse (which could mean just two) would be above that threshold.   Likewise, the Service has not explained why observation of one to eight leks in these PMUs (which the Service acknowledges are currently isolated) would be sufficient to show that these populations are not threatened and why these numbers do not, in fact, point to the likelihood of extirpation of the species in these smaller PMUs.  That is what the Delta Table listing the numbers of birds observed and leks for each PMU in 2014 seems to show as well.  Indeed, that chart indicates that the Service found the probability of persistence of the Pine Nut, Mount Grant and White Mountains PMUs to be "questionable."   *See* AR Doc. 4836, BSSG 57940-57941.

Therefore, to the extent the Service found in applying its SPR Policy that the populations of these PMUs were not threatened, that conclusion was arbitrary and capricious. Further, to the extent the Service purportedly also found that these three PMUs combined were not a "significant" portion of the species' range, that conclusion is also arbitrary and capricious because the Service offered no explanation in support of the conclusion in the Withdrawal Decision.

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs' Motion is GRANTED. The motions of Defendants and Intervenors are DENIED. At the request of the parties, the Court will conduct a further round of briefing to address the appropriate remedy in light of the Court's decision. The parties are requested to meet and confer and submit a proposed briefing schedule to the Court within ten (10) days of this Order.

**IT IS SO ORDERED.**


Dated:   May 15, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge